**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
258 Kings Highway East
Haddonfield, NJ 08033
Tel. (856) 795-9002

**HAGENS BERMAN SOBOL SHAPIRO LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel. (617) 482-3700

*Attorneys for Plumbers and Pipefitters Local 572*
*Health and Welfare Fund and the classes*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL 572 HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>    Defendant. | Civil Action No.: 3:12-cv-1379 (MAS)(DEA) |
| UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 464A HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>    Defendant. | Civil Action No.: 3:12-cv-3652 (MAS)(DEA)<br><br><br>**Return Date: December 17, 2012**<br><br>**DOCUMENT FILED ELECTRONICALLY** |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT MERCK & CO., INC.'S MOTION TO DISMISS

# TABLE OF CONTENTS

Introduction .................................................................................................1

Statement of Facts .......................................................................................2

Standard of Review .....................................................................................6

Argument......................................................................................................7

   A.   The RICO claim should not be dismissed.................................................7

     1.    Drug makers have a duty under the law to accurately report pharmacy acquisition costs.....................................................................................7

       a.    Routine and hidden waiver of personal copay obligations is fraud.....7

       b.    Failing to report accurate prices is fraud. ...........................................9

     2.    Plumbers "adequately describes the nature and subject" of the RICO fraud and satisfies Rule 9(b)..........................................................................12

     3.    Direct injury to the plaintiff and conduct by intervening or non-parties in response to the RICO scheme satisfy RICO causation.  Plumbers meets both requirements. .......................................................................................15

       a.    RICO requires direct injury but not direct factual causation.............16

       b.    The Seventh Circuit's recent RICO decision is instructive..............18

     4.    RICO enterprises require only a common purpose, relationships between members, and longevity sufficient to carry out the purpose of the enterprise.............................................................................................21

     5.    Merck's remaining RICO arguments fare no better. ...........................25

   B.   The claims under § 2(c) of the Robinson-Patman Act should not be dismissed. ....................................................................................................28

     1.    Plumbers has antitrust standing to bring § 2 (c) claims........................28

       a.    Purchasing more of an expensive product and paying fraudulently inflated prices for it constitutes antitrust injury under § 2(c)....................28

       b.    Plumbers alleges an antitrust injury under § 2(c). ............................33

       c.    Plumbers satisfies the other standing considerations. ......................37

     2.    Section 2(c) applies to classic agency or intermediary relationships like those Plumbers alleges.............................................................................39

     3.    Section 2(c) does not require secrecy. ................................................42

   C.   The tortious interference claim should not be dismissed...........................44

     1.    Workers adequately alleges a tortious interference claim. ..................44

     2.    Merck induced insureds to breach their copay obligations. .................47

3.      Merck acted with "malice." ................................................................48

Conclusion ..............................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732 (3d Cir. 2004).................................................................................*passim*

*Annulli v. Panikkar*, 200 F.3d 189 (3d Cir. 1999) ....................................15

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ...............................................6, 45

*Association of New Jersey Chiropractors v. Aetna, Inc.*, 2011 U.S. Dist. LEXIS 67718 (D.N.J. June 20, 2011) .........................................25

*Augusta News Co. v. Hudson News Co.*, 269 F.3d 41 (1st Cir. 2001).....................44

*BCS Services, Inc. v. Heartwood 88, LLC,* 637 F.3d 750 (7th Cir. 2011). .................................................................18, 19, 20

*Bell Atlantic v. Twombly,* 550 U.S. 544 (2007) .....................................6, 45

*Blue Tree Hotels Inv., Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212 (2d Cir. 2004) .........................................................31

*Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.*, 87 Fed. Appx. 227 (3d Cir. 2003).........................................................26

*Boyle v. D'Onofrio*, 99 F. Supp. 2d 541 (D.N.J. 2000)...........................25, 26

*Boyle v. United States,* 556 U.S. 938 (2009) ....................................21, 25, 26

*Bridge v. Phoenix Bond & Indemity Co.*, 553 U.S. 639 (2008). ...............16, 17, 18

*Bridges v. MacLean Stevens Studios, Inc.*, 201 F.3d 6 (1st Cir. 2000) ...................40

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)..........29, 30, 36

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ....................30

*Call, Inc. v. Advanced Health Media, LLC*, No. 11-3723, 2012 U.S. Dist. LEXIS 44890 (D.N.J. Mar. 30, 2012)........................................45

*Chassen v. Fidelity National Finance, Inc.* 2009 U.S. Dist. LEXIS 107602 (D.N.J. Nov. 16, 2009) .........................................25

*Coleman v. Commonwealth Land Title Ins. Co.*, 684 F. Supp. 2d 595(E.D. Pa. 2010) ..................................................................23, 24

*Cottman Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d 543 (E.D. Pa. 2008)...............................................................37, 39

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989) ...........................14

*Crete v. Resort Condominiums International, LLC*, CIV.A. 09-5665, 2011 U.S. Dist. LEXIS 14719 (D.N.J. Feb. 14, 2011) ......................................25

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508 (D.N.J. 2011) ..................................................................24

*Edison Elec. Inst. v. Henwood*, 832 F. Supp. 413 (D.D.C. 1993) ..........................30

*Envtl. Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052 (3d Cir. 1988), *aff'd*, 493 U.S. 400 (1990).......................................................29, 30, 31, 40

*Fitch v. Ky-Tenn. Light & Power Co.*, 136 F.2d 12 (6th Cir. 1943) ...............*passim*

*Forbes v. Eagleson*, 228 F.3d 471 (3d Cir.2000) ....................................................15

*FTC v. Henry Broch & Co.*, 363 U.S. 166 (1960)....................................................30

*FTC v. Simplicity Pattern*, 360 U.S. 55 (1959).......................................................29

*Glaberson v. Comcast Corp.*, 2006 U.S. Dist. LEXIS 62672 (E.D. Pa. Aug. 31, 2006) ...................................................................38, 39

*Grace v. E. J. Kozin Co.*, 538 F.2d 170 (7th Cir. 1976) ........................30, 32, 34, 36

*Grant v. Turner,* No. 09-2381, 2011 U.S. Dist. LEXIS 49120 (D. N.J. May 9, 2011)...................................................................14, 15

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391 (7th Cir. 1993)...................................................................29

*Hanrahan v. Britt*, No. 94-4615, 1995 U.S. Dist. LEXIS 9745 (E.D. Pa. July 11, 1995). ..................................................................24

*Harris v. Duty Free Shoppers Ltd. P'ship*, 940 F.2d 1272 (9th Cir. 1991) ...................................................................32, 42

*Hemi Group LLC v. City of New York*, 130 S. Ct. 983, 991 (2010). ...........16, 17, 18

*Holmes v. Securities Investment Protection Corp.*, 503 U.S. 258 (1992)......................................................................................................16

*In Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353 (9th Cir. 2005)....................................................................23

*In re Actiq Sales & Mktg. Practices Litig.*, No. 07-4492, 2012 U.S. Dist. LEXIS 81773 (E.D. Pa. June 13, 2012)....................................15

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61 (D. Mass. 2005)..............................................10

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, 263 F. Supp. 2d 172 (D. Mass. 2003)....................................10

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, 307 F. Supp. 2d 196 (D. Mass. 2004)....................................20

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, 460 F. Supp. 2d 277 (D. Mass. 2006)..............................10, 11

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d 20 (D. Mass. 2007), *aff'd*, 582 F.3d 156 (1st Cir. 2009)..........................................................................................11

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) .........................25

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008)....................................................................32

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2010 U.S. Dist. LEXIS 56621 (D.N.J. June 9, 2010)..........................................................................48

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235 (3d Cir. 2012)..............................................15

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ....................28

*In re: Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005)..................................................................... 11

*In re: Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148 (D. Mass. 2003)....................................................12, 20, 27

*In Town Hotels Ltd. Pshp. v. Marriott Int'l, Inc.*, 246 F. Supp. 2d 469 (S.D. W. Va. 2003) ........................................................................30, 32

*Ironworkers Local Union 68 & Participating Employers Health & Welfare Funds v. AstraZeneca Pharm., LP,* 634 F.3d 1352 (11th Cir. 2011) ......................................................................................27, 28

*Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698 (7th Cir. 1991) ...........7, 8, 9, 27

*Keystone Helicopter v. Textron, Inc.*, 1997 U.S. Dist. LEXIS 19274 (E.D. Pa. Dec. 1, 1997) .....................................................................24

*Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354 (3d Cir. 2010).............................................................................14

*Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442 (E.D. Pa. 2010) .........................................................................................24

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) ....................45, 48

*Lum v. Bank of America,* 361 F.3d 217 (3d Cir. 2004).....................................14, 26

*Lupia v. Stella D'Oro Biscuit Co. Inc.*, 586 F.2d 1163 (7th Cir. 1978) .................44

*Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.*, 870 F. Supp. 1237 (D.N.J. 1994)..........................................................................47

*McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461 (E.D. Pa. 2009) .........................................................................................32

*Momentive Performance Materials USA, Inc. v. Astrocosmos Metallurgical, Inc.*, 2009 U.S. Dist. Lexis 45941 (N.D.N.Y. 2009) .................49

*N. Am. Commc'ns, Inc. v. InfoPrint Solutions Co., LLC*, 817 F. Supp. 2d 642 (W.D. Pa. 2011) ...................................................................12

*New England Carpenters Health Benefits Fund v. First Databank, Inc. and McKesson Corp.*, 248 F.R.D. 363 (D. Mass. 2009) ............................12

*OSF Healthcare Sys. v. Banno*, 2008 U.S. Dist. LEXIS 102726 (C.D. Ill. Sept. 24, 2008) ...................................................................27

*OSF Healthcare Sys. v. Banno*, Case No. 08-1096, ECF No. 61 (C.D. Ill. Mar. 30, 2009)..........................................................................9

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ..................................6

*Rangen, Inc. v. Sterling Nelson & Sons, Inc.*, 351 F.2d 851 (9th Cir. 1965) ....................................................................................30, 34, 41

*Rea v. Federated Investors*, 627 F.3d 937 (3d Cir. 2010) ................................40, 43

*Reiter v. Sonotone Corporation*, 442 U.S. 330 (1979) ......................................31, 32

*Schuylkill Energy Res. v. Pa. Power & Light Co.*, 113 F.3d 405 (3d Cir. 1997) ......................................................................................................37

*Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367 (3d Cir. 1985) ................................................................................................32, 40

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3d Cir. 1984)...........................................................................................12

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) ................................13, 14

*Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162 (3d Cir. 1989), *overruled on other grounds*, *Beck v. Prupis*, 529 U.S. 494 (2000) ....................23

*SigmaPharm, Inc. v. Mut. Pharm. Co., Inc.*, 772 F. Supp. 2d 660 (E.D. Pa. 2011)..................................................................................38

*SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780 (9th Cir. 1996) ...........................................................................9

*Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988 (4th Cir. 1990) ..................................................................................30, 41, 42

*Strayer v. Bare*, 2008 U.S. Dist. LEXIS 34503 (M.D. Pa. Apr. 28, 2008) ................................................................................................12, 13

*Substantial Invs., Inc. v. D'Angelo Franchising Corp.*, 2004 U.S. Dist. LEXIS 17300 (D. Mass. Aug. 30, 2004) ...........................................40, 41

*Tom v. Hawaii Dental Serv.*, 606 F. Supp. 584 (D. Haw. 1985) ...........................7

*United Magazine Co. v. Murdoch Magazines Distrib.*, 146 F. Supp. 2d 385 (S.D.N.Y. 2001)...............................................................................42

*United States v. Coyle*, 63 F.3d 1239 (3d Cir. 1995)............................................26

*United States v. LeDonne*, 21 F.3d 1418 (7th Cir. 1994) .....................................26

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) ............................40

*United States v. Urban*, 404 F.3d 754 (3d Cir. 2005)..............................25

*United States ex rel. Joseph Piacentile v. Sanofi Synthelabo*, Inc., 05-2927, 2010 U.S. Dist. LEXIS 137895 (D.N.J. Dec. 30, 2010)..........................14

*Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77 (3d. Cir. 2011) ..............................6

*Watkins & Son Pet Supplies v. Iams Co.*, 107 F. Supp. 2d 883 (S.D. Ohio Mar. 3, 1999) .........................................42

*Williams v. Mohawk Industries,* 465 F.3d 1277 (11th Cir. 2006) ..........................23

*Wilson v. Parisi*, 549 F. Supp. 2d 637 (M.D. Pa. 2008) ..........................................26

*Yeager's Fuel v. Pa. Power & Light Co.*, 953 F. Supp. 617 (E.D. Pa. 1997) .........................................30, 42

### STATE CASES

*Di Cristofaro v. Laurel Grove Memorial Park*, 43 N. J. Super. 244 (App. Div. 1957).................................................49

*Feiler v. New Jersey Dental Ass'n*, 467 A.2d 276 (N.J. Super. Ct. Ch. Div.1983) ...........................................11, 27

*Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739 (1989)...............................................48, 49

### FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

18 U.S.C. §§ 1347, 1349 .............................................................8

18 U.S.C. § 1962(4) ...................................................................21

18 U.S.C. § 1962(c) ...............................................................27, 21

31 U.S.C. § 3729 .......................................................................8

42 U.S.C. § 1320a-7b(b) .............................................................8

42 U.S.C. § 1395w-3a(c)(6)(B) ....................................................4

Fed. R. Civ. P. 8(a)(2)...............................................................45

Medicare Prescription, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003) ..............................4

Racketeer Influenced and Corrupt Organizations Act (RICO), 18
U.S.C. §§ 1962 (c) and (d)..............................................................*passim*

Robinson-Patman Act, 15 U.S.C. § 13(c).................................................1, 39, 40, 42

**OTHER: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL
PROVISIONS**

F.R.C.P. 8 ...........................................................................................45

F.R.C.P. 9(b) ...............................................................................*passim*

F.R.C.P. 12(b)(6)..................................................................................6

**OTHER AUTHORITIES**

47 Antitrust & Trade Reg. Rep. (BNA) 16 (July 5, 1984) .....................................43

# INTRODUCTION

To induce patients and doctors to choose its expensive brand name drugs over more cost-effective, therapeutically-equivalent alternatives, Merck & Co., Inc. pays all or nearly all of a patient's personal copayment obligation (copay), effectively eliminating patient copays.  Merck's copay subsidy or waiver programs are fraudulent in at least two ways.  First, waiver of copays is unlawful.  Second, the routine waiver or reduction of copays results in the reporting of fraudulent, artificially inflated drug prices by failing to report the reduction in price due to the subsidy and leaves third party payors (TPPs) to pay higher prices and to reimburse for more prescriptions of expensive brand name drugs; it is a form of insurance fraud.  Merck's copay subsidy programs violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962 (c) and (d), and the Robinson-Patman Act, 15 U.S.C. § 13(c), and constitute tortious interference with contractual relations.  Plaintiffs Plumbers and Pipefitters Local 572 Health and Welfare Fund (Plumbers) and United Food and Commercial Workers International Union Local 464A Health and Welfare Fund (Workers) seek to recover on behalf of themselves and a class of private TPPs injured as a result of these violations.[1]

---

[1] While the facts recited in the two plaintiffs' complaints are largely the same, they assert different claims.  The Plumbers Complaint alleges Merck violated RICO and the Robinson-Patman Act.  The Workers Complaint alleges Merck engaged in tortious interference.

## STATEMENT OF FACTS

Plumbers and Workers, non-profit employee welfare benefit plans, provide health benefits to thousands of participants and beneficiaries.[2]  Like other TPPs, the plaintiffs offer prescription drug coverage to their beneficiaries through cost sharing mechanisms known as copays.[3]  Copays require a personal payment obligation by the beneficiary for a portion of the cost of a prescription.  Copays and other cost sharing mechanisms provide personal financial incentives to patients to select the most cost-effective treatment and medications.[4]

Merck, with its co-conspirator program administrator, undermines the cost sharing system by providing copay subsidies for its brand name drugs Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia, maintenance drugs for chronic conditions, all of which have multiple therapeutic alternatives.[5]  These

---

[2] Plumbers Complaint ¶ 8; Workers Complaint ¶ 6.

[3] Plumbers Complaint  ¶¶ 41, 43; Workers Complaint ¶¶ 33, 35.

[4] Plumbers Complaint  ¶ 46; Workers Complaint ¶ 38.

[5] Plumbers Complaint  ¶¶ 62-66, 77-79, 92-93, 103-04.  Januvia and Janumet are approved to improve glycemic control in patients with type 2 diabetes and have multiple therapeutic alternatives, including metformin, meglitinides, glipizide, and sulfonylureas.  *Id*. ¶¶ 62-63, 66.  Nasonex is used for the prevention and treatment of seasonal nasal allergies and nasal polyps.  *Id*. ¶ 77.  Therapeutic alternatives to Nasonex include fluticasone proprionate and other prescription allergy medications.  *Id.* ¶ 79.  Vytorin is a cholesterol-lowering medication; therapeutic alternatives include other statins such as pravastatin and simvastatin (generic Zocor).  *Id*. ¶¶ 92-93.  Zetia is a cholesterol-lowering medication with available therapeutic alternatives including statins such as pravastatin and simvastatin.  *Id*. ¶¶ 102-03.  *See also* Workers Complaint ¶¶ 52-56, 67-69, 81-82, 91-92.

copay subsidy programs encourage patients and doctors to choose Merck's brand name drugs rather than less expensive therapeutic alternatives by fraudulently waiving a patient's personal copay obligation.  The copay programs work: based on evidence from copay subsidy program administrators, "25% of [copay subsidy program] use results in a [subsidized] drug being used instead of a preferred brand or generic that might have been used in the absence of the [subsidy]."[6]

Merck provides these copay subsidy programs to increase its profits without regard for the fraud it is committing.  Here's how: Merck collects basic personal and health information about patients and gives them a small card to use at the pharmacy when filling prescriptions for covered drugs.[7]  Patients present their prescription and insurance card to the pharmacist, who enters the insurance information into a computerized data management system.[8]  Insurance information about the patient, including the patient's personal copay obligation, is sent to the pharmacist from the TPP or its pharmacy benefit manager (PBM).[9]  The TPP or its PBM is immediately billed for the cost of the drug minus the patient's personal

---

[6] Plumbers Complaint ¶ 51 (quoting Visante, "How Copay Coupons Could Raise Prescription Drug Costs By $32 Billion Over the Next Decade," Nov. 2011); Workers Complaint ¶ 43.

[7] Plumbers Complaint ¶ 20; Workers Complaint ¶ 12.

[8] Plumbers Complaint ¶¶ 21, 116; Workers Complaint ¶¶ 13, 103.  Only privately-insured consumers can participate.

[9] Plumbers Complaint ¶¶ 21, 116; Workers Complaint ¶¶ 13, 103.

copay obligation.[10]  After learning what the patient owes, the pharmacist enters

information from the copay subsidy card into a secondary insurance field; this

information is transmitted to the program administrator who operates Merck's

copay subsidy programs (and is an unnamed co-conspirator in this action) to

determine the amount Merck will pay to reduce or eliminate the patient's copay

obligation.[11]  The patient's insurer is never told, and has no way of knowing, that

Merck paid all or nearly all of the personal copay.[12]

Waiver of cost sharing or copays misrepresents the true acquisition cost or

the true cost charged by Merck.  Merck distributes its drugs through wholesalers or

pharmacies and sets the Wholesale Acquisition Cost (WAC) for its drugs.[13]  WAC

is the base amount which determines what Merck will receive for a drug from the

wholesaler or pharmacy.  WAC is related to the Average Wholesale Price (AWP),

the published benchmark price used for reimbursements of prescription drugs by

consumers and TPPs.[14]  AWPs are based on standard mark-ups over WAC,

---

[10] Plumbers Complaint ¶¶ 21, 115-16; Workers Complaint ¶¶ 13, 102-03.

[11] Plumbers Complaint ¶¶ 21, 116; Workers Complaint ¶¶ 13, 103.

[12] Plumbers Complaint ¶¶ 22, 118, 126; Workers Complaint ¶¶ 14, 105, 113.

[13] Plumbers Complaint ¶ 56; Workers Complaint ¶ 48.  The Medicare Prescription, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003), includes a definition of WAC, which is codified at 42 U.S.C. § 1395w-3a(c)(6)(B).  This does not change the fact that WAC is the list price a drug manufacturer charges.

[14] Plumbers Complaint ¶ 56; Workers Complaint ¶ 48.

typically 20-25%, in order to allow for some profit to pharmacies and others in the reimbursement chain. When Merck waives a personal copay obligation, the true acquisition cost for the drug, *i.e.*, the true cost charged by the drug manufacturer, is not the stated WAC, upon which reimbursements by TPPs are based, but is instead the price after deduction of the waived copay; Merck is subsidizing and thus reducing the total it will be paid for the drug.[15] Merck causes the charges for prescriptions submitted for payment under its copay subsidy programs to be overstated because the charges are not reduced by Merck's subsidy.

Imagine a drug's WAC – what others will pay the manufacturer for the drug – is purported to be $100 per dose. Assuming a 25% mark-up for AWP, reimbursement to the pharmacy of AWP-14%, and a member copay of $30, the drug costs the TPP $77.50. But if the drug is subject to a copay subsidy program, where the manufacturer regularly reduces the patient's copay by $25, the WAC is actually $75. With the same assumptions in place, the drug should cost a TPP $50.63, a difference of nearly $27 for the prescription.

| No copay subsidy | | Copay subsidy of $25 | |
|---|---|---|---|
| WAC | $100 | WAC | $75 |
| AWP (WAC + 25%) | $125 | AWP (WAC + 25%) | $93.75 |
| Pharmacy reimbursement (AWP – 14%) | $107.50 | Pharmacy reimbursement (AWP – 14%) | $80.63 |
| Member copay | $30 | Member copay | $30 |
| TPP payment | $77.50 | TPP payment | $50.63 |

---

[15] Plumbers Complaint ¶ 31.

## STANDARD OF REVIEW

Under *Bell Atlantic v. Twombly* and *Ashcroft v. Iqbal*, a district court reviewing a motion to dismiss must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, plaintiff may be entitled to relief."[16] Thus, "a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility."[17]

A plaintiff's claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[18]  A plaintiff need only allege facts that "raise a right to relief above the speculative level.'"[19]  A Rule 12(b)(6) motion must fail if a plaintiff is entitled to relief "*under any reasonable reading of the complaint*."[20]

---

[16] *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  *See also Iqbal*, 556 U.S. 662 (2009); *Twombly*, 550 U.S. 544 (2007).

[17] *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 84 (3d. Cir. 2011).

[18] *Iqbal*, 556 U.S. at 678.

[19] *Twombly*, 550 U.S. at 555.  *Twombly* "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element.'"  *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).

[20] *Phillips*, 515 F.3d at 233 (emphasis added).

## ARGUMENT

**A.**  **The RICO claim should not be dismissed.**

**1.**  **Drug makers have a duty under the law to accurately report pharmacy acquisition costs.**

Merck's contention that it has no duty to disclose to TPPs its copay subsidy payments[21] flies in the face of established law providing that "waiver of copayments is a fraudulent and deceptive business practice."[22]  Merck's challenge to the allegations the copay subsidy programs unlawfully inflate the prices for its drugs also falls flat;[23] federal law requires the reporting of accurate prices.

### a.  Routine and hidden waiver of personal copay obligations is fraud.

Copays "sensitize [insureds] to the costs of health care, leading them not only to use less but also to seek out providers," and treatments, including prescription drugs, "with lower fees.  The combination of less use and lower charges . . . makes medical insurance less expensive and enables employers to furnish broader coverage . . . ."[24]  Waiver of copays undermines this system: drug makers like Merck "may seek to increase their business by promising to waive the co-payments.  Patients prefer the lower outlays, but waivers annul the benefits of

---

[21] Merck's Mot. to Dismiss, filed Sept. 17, 2012 (Merck Mem.), at 9-12.

[22] *Tom v. Hawaii Dental Serv.*, 606 F. Supp. 584, 586 (D. Haw. 1985).

[23] Merck Mem. at 12.

[24] *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 699 (7th Cir. 1991).

the co-payment system.  Insurers have trouble policing the rules, because they do not know how much (or even whether) the patient paid the provider directly."[25]

Routine waivers of personal copay obligations are illegal kickbacks and amount to criminal health care fraud.[26]  The federal anti-kickback statute prohibits the payment of remuneration when such remuneration is paid to induce business that will be paid for by a federal health care program.[27]  And the routine waiver of personal copay obligations under Medicare or Medicaid forms the basis of a violation of the False Claims Act and the Civil Monetary Penalties Law.[28]

This practice is no less illegal in the private sector.  In *Kennedy v. Connecticut General Life Insurance Co.*, the Seventh Circuit affirmed that private TPP CIGNA need not pay the healthcare provider anything after learning he had waived the 20% copay required of his patient and "agreed to accept as full compensation whatever the insurer would pay."[29]  Upholding the enforcement of personal payment of a patient's copay obligation, the Seventh Circuit stated "[c]o-payments mean more risk borne by participants.  Whether full indemnity is

---

[25] *Id.*

[26] 18 U.S.C. §§ 1347, 1349.

[27] 42 U.S.C. § 1320a-7b(b).

[28] 42 U.S.C. § 1320a-7a; 31 U.S.C. § 3729.

[29] *Kennedy*, 924 F.2d at 699.

preferable to a co-payment is a question for the marketplace.  The answer in this health plan is co-payments, and its terms will be enforced."[30]

Relying on *Kennedy*, the Ninth Circuit reached the same conclusion in *SmileCare Dental Group v. Delta Dental Plan of California, Inc.* when it approved a primary dental insurer's prohibition on the waiver of patient copays because "'waivers annul the benefits of the co-payment system.'"[31]  The court observed:

> The actuarial basis for Delta Dental's co-payment plan is premised on the theory that insureds will seek cheaper or less frequent treatment if they are forced to consider the pinch to their own wallets.  When SmileCare pays the patient's portion of the fee, the patient has no reason to shop for a less expensive provider or to question the necessity of certain treatment.[32]

*Kennedy* and *SmileCare* make clear that insurers have no obligation to pay for prescriptions when the provider has waived the copays.  Merck's copay subsidy programs effectuate insurance fraud by eliminating personal copay obligations, not disclosing that waiver, and causing insurers to reimburse for filled prescriptions.

### b.    Failing to report accurate prices is fraud.

Federal law holds drug manufacturers responsible for reporting accurate WAC and AWP prices.  Pharmaceutical reimbursement is based on the industry

---

[30] *Id*. at 702.  *See also OSF Healthcare Sys. v. Banno*, Case No. 08-1096, ECF No. 61, 3 (C.D. Ill. Mar. 30, 2009) (denying motion to dismiss RICO claims after finding the complaint "sufficiently alleges that [the defendants] had a legal duty to charge and collect co-insurance payments").

[31] 88 F.3d 780, 783 (9th Cir. 1996) (quoting *Kennedy*, 924 F.2d at 699).

[32] *SmileCare*, 88 F.3d at 784 (internal citations omitted).

expectation of a close relationship between the reimbursement rates represented by the manufacturer (WAC and AWP) and the actual price paid by the pharmacy or provider receiving reimbursement.  Merck's failure to reflect the subsidies in the reimbursement rates it reports is pharmaceutical rate reimbursement fraud.

In 2002, TPPs brought suit against dozens of drug manufacturers, including Merck, challenging the practice of artificially inflating the AWPs of certain drugs. The plaintiffs in *In re Pharmaceutical Industry Average Wholesale Price Litigation* (*In re AWP*) alleged drug manufacturers "send publishers their AWPs (or their WACs), knowing that TPPs . . . consider them indicators of prices to providers.  Defendants know that [TPPs] will make reimbursement payments based on those prices."[33]  The plaintiffs alleged the "AWPs are neither the true average prices charged by wholesalers nor the price measure 'expected by the market'" because defendants "sell a drug to retailers at a net price often significantly below the expected 'AWP minus 16% to 33%' threshold."[34]

AWPs must have a reasonable and fair relationship to the actual price charged by the manufacturer.[35]  Congress intended just that: "the weight of the

---

[33] 230 F.R.D. 61, 69 (D. Mass. 2005).

[34] *Id.*  Drug makers used other "incentives" to "lower[] the providers' overall costs while not reducing the amount they receive in reimbursements," including rebates and providing free samples and encouraging doctors to bill for them.  *In re AWP*, 263 F. Supp. 2d 172, 179 (D. Mass. 2003).

[35] *See In re AWP*, 460 F. Supp. 2d 277, 285-88 (D. Mass. 2006).

legislative history reflects congressional intent to have the AWP moored to actual

wholesale pricing."[36]  And they must reflect discounts and rebates.[37]

In fact, grossly inflating AWPs is an unfair and deceptive business practice:

> Unscrupulously taking advantage of the flawed AWP system for
> Medicare reimbursement by establishing secret mega-spreads far
> beyond the standard industry markup was unethical and oppressive.  It
> caused real injuries to the insurers and the patients who were paying
> grossly inflated prices for critically important, often life-sustaining,
> drugs.  Defendants caused these injuries by not reporting a true
> average wholesale price, that approximated provider actual acquisition
> costs or was within well-established industry expectations . . . .[38]

Merck knows it has a duty under the law to report fair and accurate prices

that take into account discounts, rebates, and other price reductions in the

marketplace.[39]  Each time one of Merck's copay subsidy programs is used, it

---

[36] *Id.* at 285.

[37] *Id.* at 288.  *See also id.* at 286-87 (rejecting argument that "'average wholesale price'" is "a retail sticker price without any connection to prices in the market").

[38] *In re AWP*, 491 F. Supp. 2d 20, 94-95 (D. Mass. 2007), *aff'd*, 582 F.3d 156 (1st Cir. 2009).  *See also Feiler v. New Jersey Dental Ass'n*, 467 A.2d 276, 277, 283-84, 286-87 (N.J. Super. Ct. Ch. Div.1983) (routine and undisclosed copay waivers misrepresent the true cost of a service and harm TPPs: "the payments are higher than they would otherwise be and that is injury enough").

[39] *See*, *e.g.*, *In re: Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 77-79 (D. Mass. 2005) (noting Abbott Laboratories paid a large criminal fine and $150 million to settle civil litigation by TPPs alleging it formed a RICO enterprise with TAP Pharmaceuticals and fraudulently inflated the price of Lupron by failing to reduce the AWP by various price discounts it provided).

reduces the price of the drug for that transaction – but the price of the drug

reported to the TPP remains the same. *In re AWP* and related cases prohibit this.[40]

### 2.   Plumbers "adequately describes the nature and subject" of the RICO fraud and satisfies Rule 9(b).

Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff to state

with particularity "the circumstances constituting fraud or mistake."[41]  The Third

Circuit cautions against focusing too narrowly on Rule 9(b)'s particularity

language.[42]  Rather, "plaintiffs are free to use alternative means of injecting

precision and some measure of substantiation into their allegations of fraud" other

than the date, place or time.  A court should focus simply on whether the complaint

"adequately describes the nature and subject of the alleged misrepresentation."[43]

For example, in *Strayer v. Bare*, the plaintiffs alleged a bank and law firm formed

---

[40] *See*, *e.g.*, *New England Carpenters Health Benefits Fund v. First Databank, Inc. and McKesson Corp.*, 248 F.R.D. 363, 372 (D. Mass. 2009) (*McKesson*) (certifying a class of TPPs in RICO action based on AWP inflation); *McKesson*, No. 1:05-cv-11148, slip op. at 1 (D. Mass. Dec. 1, 2005) (rejecting motion to dismiss RICO claims); *Lupron*, 295 F. Supp. 2d 148, 160, 167-68 (D. Mass. 2003) (reporting inflated AWPs, meaning TPPs paid more for the drug than they should have, is actionable under RICO: "defendants trumpeted a lie by publishing the inflated AWPs, knowing (and intending) them to be used as instruments of fraud. Whether one views the defendants' actions as involving the dissemination of information that was wholly false, or false because of an incomplete depiction of the truth, they are actionable under the mail and wire fraud statutes.").

[41] Fed. R. Civ. P. 9(b).  Fraudulent intent "may be alleged generally." *Id.*

[42] *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

[43] *Id.*; *see also N. Am. Commc'ns, Inc. v. InfoPrint Solutions Co., LLC*, 817 F. Supp. 2d 642 (W.D. Pa. 2011).

an enterprise "to unlawfully transfer client funds from the trust account to the IRS to satisfy the firm's tax obligations."[44]  For Rule 9(b) purposes, the plaintiffs needed only to allege the bank knew the trust account was not subject to taxes and yet "acted in conjunction with" the law firm to disburse the funds to the IRS.[45]

Plumbers provides adequate description of the nature and subject of Merck's deception.  Plumbers alleges a scheme to increase sales of Januvia and other drugs through copay subsidy programs that routinely waive personal copays.[46]  Plumbers further alleges Merck directs pharmacies to falsely label the subsidy transactions as secondary insurance and uses the mail or wire services for every communication in furtherance of the fraud.[47]  Plumbers also alleges Merck reports or causes to be reported fraudulent prices for its drugs; by failing to discount its WACs by the amount of its subsidies, Merck misrepresents its compensation it receives.[48]

Courts relax the particularity rule where, as here, factual information supporting the claim is peculiarly within the defendant's knowledge or control.[49]  The Third Circuit requires allegations to support the claim that the information is

---

[44] 2008 U.S. Dist. LEXIS 34503, *16-17 (M.D. Pa. Apr. 28, 2008).

[45] *Id.*

[46] Plumbers Complaint ¶¶ 1-7, 60-139.

[47] *Id.* ¶¶ 131-39.

[48] *Id.* ¶¶ 56, 57, 59.

[49] *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir. 1992).

uniquely within defendant's control.[50]  Plumbers has done this.  Given the secrecy alleged, neither Plumbers nor any other TPP can know the dates and circumstances of Merck's false transactions.[51]  Although pharmacy claims may indicate the use of secondary insurance, no TPP can know when Merck's unlawful copay subsidies were used and falsely recorded as secondary insurance.[52]  Merck, however, possesses detailed information about each and every subsidized prescription.

Merck's authorities, most of which are "not for publication," do not support a more stringent pleading requirement.  *Lum v. Bank of America* and *Kolar v. Preferred Real Estate Investments, Inc.* both hold that Rule 9(b) *does not require* plaintiff to specify "the date, time, or place of any misrepresentation" when there are alternative means of injecting precision and some measure of substantiation into the allegations of fraud.[53]  The district court's decision in *Grant v. Turner* conflicts with the Third Circuit's admonition: "[W]e are bound by RICO's text and the Supreme Court's instruction that RICO is to be read broadly; therefore, RICO .

---

[50] *See, e.g.*, *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989); *Shapiro*, 964 F.2d at 285; *U.S., ex rel. Joseph Piacentile v. Sanofi Synthelabo*, Inc., 05-2927, 2010 U.S. Dist. LEXIS 137895, *26 (D.N.J. Dec. 30, 2010).

[51] Plumbers Complaint ¶¶ 76, 89,100, 111, 117-18, 122-126.

[52] *Id.*

[53] *Kolar*, 361 F. App'x 354, 363 (3d Cir. 2010); *Lum*, 361 F.3d 217, 224 (3d Cir. 2004).

. . may be applicable to many garden-variety fraud cases, . . . particularly considering the judiciary's broad interpretation of the mail fraud statute."[54]

And Merck's contention that Plumbers should be expected to query all of its beneficiaries and pharmacies in its network to obtain the transaction information is unrealistic and not supported by the case law.[55]

### 3. Direct injury to the plaintiff and conduct by intervening or non-parties in response to the RICO scheme satisfy RICO causation. Plumbers meets both requirements.

Merck argues that Plumbers' RICO claims fail because (1) Plumbers cannot show Merck's copay subsidy programs and its failure to inform TPPs of their use harms Plumbers and the class and (2) TPPs' injury is contingent on several unrelated links in the chain, including the decisions of doctors to prescribe Merck's drugs and patients' decisions to fill the prescriptions.[56]  Merck is wrong.

---

[54] *Compare Grant*,  No. 09-2381, 2011 U.S. Dist. LEXIS 49120, *23-31 (D.N.J. May 9, 2011) (not for publication), *with Annulli v. Panikkar*, 200 F.3d 189, 199 (3d Cir. 1999) (quotations, citations omitted), *abrogated on other grounds by Forbes v. Eagleson*, 228 F.3d 471 (3d Cir.2000).

[55] *See supra* n. 49.

[56] Merck Mem. at 19-24.  Merck also raises an Article III standing challenge on causation grounds, citing *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235 (3d Cir. 2012), but to no avail.  Merck Mem. at 17-19, 31 n.9.  In *Schering*, the plaintiff had not purchased the defendant's drugs and the suggestion that the defendant's false claims about its own drugs *could* have caused doctors to prescribe similar drugs for off-label use and that the plaintiff *could* have paid for them was "inadequate to establish causation."  678 F.3d at 247-48.  *See also In re Actiq Sales & Mktg. Practices Litig*., No. 07-4492, 2012 U.S. Dist. LEXIS 81773, *10-12 (E.D. Pa. June 13, 2012) (refusing to expand the standing

15

### a.   RICO requires direct injury but not direct factual causation.

The Supreme Court has addressed RICO causation multiple times in recent years but the holdings remain consistent: RICO requires direct injury but not direct factual causation.  In *Holmes v. Securities Investment Protection Corp.*, the Supreme Court stated proximate cause requires "some direct relation" between the injury and the alleged conduct and allowed recovery only by those directly injured by RICO conduct because "directly injured victims can generally be counted on to vindicate the law . . . without any of the problems attendant by plaintiffs more remotely injured."[57]  In *Bridge v. Phoenix Bond & Indemity Co.*, the Supreme Court found proximate cause under RICO satisfied where the plaintiff's injury was a foreseeable and natural result of the defendant's conduct, even where other actors served as links in the causal chain.[58]  In *Hemi Group LLC v. City of New York*, the Supreme Court recognized that foreseeability and directness of injury are related – "two of the 'many shapes [proximate cause] took at common law'" – and focused on "the directness of the relationship between the conduct and the harm."[59]

---

analysis in *Schering Plough* beyond its unique facts).  In contrast, Plumbers alleges it has paid for more of Merck's drugs, at falsely inflated prices, as a result of the copay subsidy programs.

[57] 503 U.S. 258, 268, 269-70 (1992).

[58] 553 U.S. 639, 657-58 (2008).

[59] 130 S. Ct. 983, 991 (2010).

Underlying this focus is the question of "whether better situated plaintiffs would have an incentive to sue."[60]

The conduct of third parties does not break the causal chain. *Bridge* reaffirms that RICO injury must be direct but the causal chain leading to it need not be; instead, the conduct giving rise to the fraud must be the conduct directly causing the harm, which exists where non-parties relied on the fraud.[61] *Hemi* explicitly left intact this holding in *Bridge* that conduct by non-parties in response to the RICO scheme satisfies RICO causation.

Merck cites various lower court decisions to support its argument that doctors and other third parties break the causal chain between a manufacturer's conduct and the filling of a prescription for the manufacturer's drug.[62]  But like these cases, Merck misreads *Hemi*.  In *Hemi*, consumers caused the city's injury by deciding not to pay sales taxes – decisions having nothing to do with the RICO scheme of not reporting information to the state.  When the *Hemi* Court wrote that "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud,"[63] it meant just that: the causal chain depended on conduct by non-parties whose actions were wholly unrelated to the RICO scheme.  *Hemi* explicitly

---

[60] *Id*. at 990.

[61] 553 U.S at 656-58.

[62] Merck Mem. at 20-22.

[63] *Hemi,* 130 S. Ct. at 990.

left intact *Bridge*'s holding that conduct by non-parties *in response to the RICO scheme* satisfies RICO causation.

Merck ignores this vital difference and instead simply identifies the presence of additional actors – doctors, patients – in the causal chain, as if the mere existence of third or fourth parties defeats RICO causation.  The Supreme Court disagrees.  *Hemi* holds there is no proximate cause when those non-party actions are "independent" of the RICO scheme.[64]  Here, as in *Bridge*, doctor and patient conduct in selecting and filling prescriptions for Merck's expensive brand name drugs instead of more cost-effective therapeutically-equivalent alternatives is in direct response to the RICO fraud – Merck's fraudulent waiver or subsidy of personal copay obligations – and thus appropriate for use in the causal chain.

### b.    The Seventh Circuit's recent RICO decision is instructive.

Just last year, the Seventh Circuit addressed whether the presence of third parties necessarily breaks the chain of causation or undermines the directness of the RICO injury and, consistent with Supreme Court jurisprudence, found it does not.  *BCS Services, Inc. v. Heartwood 88, LLC* centered on a county's auction process to sell property tax liens.[65]  The auctions occur "in rapid-fire fashion in a room in which the bidders bid by raising a card . . . and shouting out their [bid]";

---

[64] *Hemi*, 130 S. Ct. at 992.

[65] 637 F.3d 750, 752 (7th Cir. 2011).

the vast majority of bids are identical, leading to problems in picking a winner.[66] The county's rules prohibit bidding by more than one agent of a potential buyer or a group of buyers working together.[67]  The defendants conspired to pack the room with multiple bidders working on behalf of the same group of buyers, leading to the awarding of more liens to that group than otherwise would have occurred, harming the plaintiffs and others following the rules.[68]

After the district court granted summary judgment to the defendants on the grounds that the plaintiffs could not prove that the fraud – defendants' flooding of the auction room – was a proximate cause of their injury, the Seventh Circuit reversed, finding the plaintiffs and other rule-abiding bidders were the only and intended victims of the fraud and that the presence of third parties or intervening actors did not break the chain of causation.[69]

Though *BCS Services* involved an "intermediate cause and effect pair" and the independent actions of a third party, causation was met because the fraud led to the intended, foreseeable result that the co-conspirators obtained a larger share of the bids at the expense of law-abiding participants.[70]  Just as the decision to

---

[66] *Id*. at 752-53.

[67] *Id*.

[68] *Id*. at 753.

[69] *Id*. at 752, 756-57, 761.

[70] *BCS Servs.*, 637 F.3d at 757.

purchase Merck's drug is made by doctors and patients, the defendants in *BCS Services* knew that they would have to go through the auctioneers, who exercised independent judgment, in order to win more bids.  But "this [intervening] pair doesn't weaken the inference that by having more hands in the air the defendants stole tax liens from the other bidders."[71]

Where, then, the "plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation."[72]  The presence and independent actions of third parties, particularly third parties that are necessary to the accomplishment of the defendants' fraud, do not break the chain of causation.[73]

Plumbers alleges that it and other private TPPs suffered exactly the "sort of injury that would be the expected consequence" of Merck's fraudulent copay

---

[71] *Id.*

[72] *Id.* at 758.

[73] *See*, *e.g.*, *In re AWP*, 307 F. Supp. 2d 196, 207-08 (D. Mass. 2004) (rejecting argument that plaintiffs' RICO injury was proximately caused by third parties, not defendants, and noting: "In the private, end-payor context, the harm alleged by Defendants' alleged actions is visited directly upon the end-payor Plaintiffs, as they have paid directly for the named drugs based on the AWP's."); *Lupron*, 295 F. Supp. 2d at 175 ("By way of analogy, a company that issues its stock at a fraudulently inflated price is not insulted from liability by the intervening acts of the brokers, transfer agents, and financial analysts who promote the sales of its stock, execute trades on behalf of injured investors, and report the company's falsified financial statements.")

subsidy programs: paying for more of Merck's expensive brand name drugs and at artificially inflated prices.  And they alone suffered injury, as the intended, foreseeable, and direct result of Merck's fraudulent conduct.  Plumbers satisfies controlling RICO jurisprudence on causation.

### 4.   RICO enterprises require only a common purpose, relationships between members, and longevity sufficient to carry out the purpose of the enterprise.

Section 1962(c) prohibits a person employed or associated with an enterprise from conducting or participating in the affairs of the enterprise through a pattern of racketeering.  An "enterprise" includes legal entities, like corporations, but also "groups of individuals associated in fact although not a legal entity."[74]  In *Boyle v. United States*, observing that it has "repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe," the Supreme Court held no more is required to establish an in-fact enterprise than a common purpose, relationships between the members, and sufficient longevity to carry out the purpose of the enterprise.[75]

Plumbers' allegations satisfy *Boyle*: members of the enterprises share a common purpose of disguising the copay subsidies to evade TPPs' drug coverage

---

[74] 18 U.S.C. § 1962(4).

[75] 556 U.S. 938, 948-50 (2009).  The Court elaborated that the RICO statute does not require any particular arrangement of the members: the enterprise need not have a hierarchical structure, regular meetings, or a standardized decision-making process, and members need not have fixed roles.  *Id.*

restrictions and overcharge them; members are parties to a contract to carry out the copay subsidy program; and the enterprises have been in existence for over a year, a sufficient amount of time to carry out the fraud.[76]  Merck sought to enlarge the market for its drugs and specifically targeted TPPs' cost sharing limitations, so that from the insured's perspective, Merck's drugs were no more expensive than therapeutically-equivalent alternatives.  Merck sought McKesson's help to design copay subsidy programs that would allow Merck to hide the fraud by disguising the payments as secondary insurance and prevent TPPs from learning of them.  Merck does not deal with McKesson in the ordinary course of business, but relies on its technical skills to secretly evade TPPs' restrictions on prescription drug coverage.[77]  Merck relies on McKesson to process copay subsidy claims through a "shadow claims system" that hides the subsidies from TPPs.[78]  McKesson's programs are designed to charge primary insurance before addressing the copay and to process Merck's copay subsidy card like a form of secondary insurance.[79]  The member's cost sharing obligation is simply reported to the TPP as having been

---

[76] Plumbers Complaint ¶¶ 60-125.

[77] *See generally id.* ¶¶ 114-19.

[78] *Id.* ¶ 114.

[79] *Id.* ¶¶ 115-16.  For additional information on the design of these programs, *see infra* Statement of Facts and Plumbers Complaint ¶¶ 120-25.

paid.[80]  Plumbers and other TPPs cannot know when illegal subsidies have been used.[81]  These activities differ significantly from those conducted during an ordinary business relationship.

Many courts "have upheld an association-in-fact enterprise in which the RICO defendant or 'person' is a corporation and the enterprise consists of the defendant corporation and other members who are under a contractual obligation with the defendant."[82]  In *Williams v. Mohawk Industries*, for example, the Eleventh Circuit upheld an enterprise consisting of a corporation and its recruiting agents to harbor undocumented workers and destroy documentation,[83] and in *In Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, the Ninth Circuit upheld an enterprise of DuPont and the law firms that represented it in certain litigation.[84] District courts in the Third Circuit have reached similar rulings: an insurance

---

[80] Plumbers Complaint ¶ 117.

[81] *See id.* ¶ 118.

[82] *Coleman v. Commonwealth Land Title Ins. Co.*, 684 F. Supp. 2d 595, 611(E.D. Pa. 2010).

[83] 465 F.3d 1277, 1284 (11th Cir. 2006).

[84] 431 F.3d 353, 361 (9th Cir. 2005).  An early Third Circuit decision also permitted a corporation to be both a defendant "person" and a member of an association-in-fact-enterprise but did not specifically address the distinctiveness requirement.  *See Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1165-66 (3d Cir. 1989) (association-in-fact enterprise consisting of three corporate defendants), *overruled on other grounds*, *Beck v. Prupis*, 529 U.S. 494 (2000).

company can form an enterprise with its insurance agents;[85] a drug manufacturer can form an enterprise with its advertising agency and consultants to engage in illegal off-label advertising;[86] Amway can form an enterprise consisting of itself and a network of Amway distributors;[87] and an enterprise can be formed by the association of helicopter manufacturers and suppliers of helicopter engines for the purpose of providing defective helicopters and concealing their defects.[88]  The fraudulent copay subsidy programs are much like these enterprises.  The schemes are fraudulent, not part of Merck's regular course of business, and Merck could not carry out the schemes without McKesson's expertise.[89]

Merck relies on numerous inapposite decisions, many of which this court deemed not for publication.  *In re Insurance Brokerage Antitrust Litigation* and *Crete v. Resort Condominiums International*, *LLC* make clear that a plaintiff need not allege details about the decision-making roles or management responsibilities

---

[85] *Coleman*, 684 F. Supp. 2d at 611; *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 457 (E.D. Pa. 2010).

[86] *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 526 (D.N.J. 2011).

[87]  *Hanrahan v. Britt*, No. 94-4615, 1995 U.S. Dist. LEXIS 9745, *21-22 (E.D. Pa. July 11, 1995).

[88] *Keystone Helicopter v. Textron, Inc*., 1997 U.S. Dist. LEXIS 19274, *2, 13 (E.D. Pa. Dec. 1, 1997).

[89] *See* Plumbers Complaint ¶ 124.

to establish an enterprise.[90]  *Chassen v. Fidelity National Finance, Inc.* involved

the New Jersey RICO statute and was dismissed not for failure to sue all members

of the enterprise but because Judge Sheridan found "a RICO enterprise involving

the entire title insurance industry" implausible.[91]  And *Association of New Jersey*

*Chiropractors v. Aetna, Inc.* conflicts with the Supreme Court's holding that RICO

does not prescribe any particular arrangement of an enterprise's members.[92]

### 5.     Merck's remaining RICO arguments fare no better.

Merck's other challenges to Plumbers' RICO allegations are without merit.

First, Merck argues Plumbers fails to plead facts that demonstrate "specific

intent to defraud."[93]  But under Rule 9(b), a complaint may allege fraudulent intent

---

[90]  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 366 (3d Cir. 2010); *Crete*, CIV.A. 09-5665, 2011 U.S. Dist. LEXIS 14719, *26-28 (D.N.J. Feb. 14, 2011) (not for publication).  *Crete* addresses whether the defendant participated in the "operation or management" of the enterprise.  *Id.* at *27.  But the question of operation or management concerns the liability of the defendant and is not an additional requirement for an enterprise.  *See U.S. v. Urban*, 404 F.3d 754, 769 (3d Cir. 2005).  Regardless, Merck operates or manages this enterprise: it hired McKesson to help design and administer the copay subsidy programs for Merck's drugs and caused TPPs to be charged inflated reimbursement rates by omitting the subsidies from its reported prices.  Plumbers Complaint ¶¶ 60-61, 64, 166, 170.

[91]  2009 U.S. Dist. LEXIS 107602, *32 (D.N.J. Nov. 16, 2009) (not for publication).  Unlike its federal counterpart, the New Jersey law is limited to "organized-crime-type activities."  *Boyle* cautions against importing preconceived notions of "racketeering" into federal RICO.  556 U.S. at 950.

[92]  2011 U.S. Dist. LEXIS 67718, *15-19 (D.N.J. June 20, 2011) (not for publication).  *See also Boyle*, 556 U.S. at 948-949; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 367.

[93]  Merck Mem. at 13.

generally.[94]  Specific intent to defraud may also be inferred from circumstantial

evidence of the fraud,[95] including material misrepresentations.[96]  Plumbers alleges

it lost money by reason of Merck's "trick, deceit, chicane[ry] or overreaching."[97]

Merck is not offering its drugs at a more competitive price, nor is Merck "helping"

consumers through its copay subsidy programs – uninsured consumers are left out

in the cold.  Merck and its co-conspirator program administrator specifically

targeted *insured* patients and designed a program to disguise Merck's subsidies as

secondary insurance to get around insurance restrictions.  These facts support an

intent to defraud.[98]

Second, Merck raises no grounds to dismiss Plumbers' RICO conspiracy

claims.  If a plaintiff fails to allege a necessary element of a substantive RICO

claim, it may result in the dismissal of a conspiracy claim based on the same set of

---

[94] Fed. R. Civ. P. 9(b); *accord Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.*, 87 Fed. Appx. 227, 231 (3d Cir. 2003) (unpublished) (cited by Merck).

[95] *Wilson v. Parisi*, 549 F. Supp. 2d 637, 659 (M.D. Pa. 2008).

[96] *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995) (citation omitted).  *See also United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994) (citing cases from Second, Fourth, Eighth, and Ninth Circuit Courts of Appeals).

[97] Merck Mem. at 13.

[98] The cases Merck relies on are easily distinguishable.  *Lum* involved a dispute over an ambiguous contract term.  361 F.3d 217.  *Boyle v. D'Onofrio*, 99 F. Supp. 2d 541 (D.N.J. 2000), found that a false statement was not fraudulent because the plaintiff knew at the time it was untrue.  *Id.* at 547 & n.5.  By contrast, Merck commited fraud because it submitted ineligible claims that TPPs could not distinguish from legitimate claims.

facts. But Plumbers satisfied all of the elements of its 18 U.S.C. § 1962(c) claim and Merck has not raised any independent basis to dismiss the conspiracy claim.

Finally, contrary to Merck's claims, the copay subsidy programs directly injured Plumbers by causing it to pay for ineligible claims and by overcharging for drugs sold at an undisclosed discount. Both types of harm satisfy RICO's injury requirement. A TPP is not required to pay for services provided when the provider has contracted with the patient to accept whatever the TPP pays as payment in full and thereby waives the copay and inflates the bill.[99] Merck's copay subsidy programs strip the information that would allow TPPs to determine which claims have satisfied the personal copay obligation. This misconduct directly injures the TPP, who is duped into "paying more than it owed to Defendant[] (which arguably was nothing at all since [the defendant] had impermissibly waived the co-pay) and arguably increased [the TPP's] health care costs by removing the financial incentive for its members to use the lowest cost provider."[100]

Merck's reliance on *Ironworkers Local Union 68 & Participating Employers Health & Welfare Funds v. AstraZeneca Pharm., LP* and related cases is

---

[99] *Kennedy*, 924 F.2d 698. *See also* discussion *supra* at A.1.a.

[100] *OSF Healthcare Sys. v. Banno*, 2008 U.S. Dist. LEXIS 102726, *13 (C.D. Ill. Sept. 24, 2008). *See also Feiler*, 467 A.2d at 283 ("[t]here can be no question but that a payer is injured by making payments based on agreed percentages of [defendant's] false fee statements."); *Lupron*, 295 F. Supp. 2d at 175 (TPPs were directly injured by false representations by making overpayments for the drug).

misplaced.[101]  *Ironworkers* concerned off-label marketing of drugs, where courts have held that an insurer is not injured if a manufacturer's drugs, rather than less expensive alternatives, are prescribed for its insureds, unless the defendant caused prescriptions for unsafe or medically inappropriate drugs to be written.[102] *Ironworkers* does not leave insurers without a right to recover against other types of insurance fraud, such as that perpetrated by Merck and its co-conspirator here.[103]

**B.    The claims under § 2(c) of the Robinson-Patman Act should not be dismissed.**

Merck argues Plumbers' Robinson-Patman § 2(c) claims fail because Plumbers has not alleged any competitive injury, the act does not apply to commercial bribery, and the copay subsidy programs do not constitute commercial bribery.[104]  Merck misreads the law.

**1.    Plumbers has antitrust standing to bring § 2 (c) claims.**

**a.    Purchasing more of an expensive product and paying fraudulently inflated prices for it constitutes antitrust injury under § 2(c).**

To bring an antitrust claim, a plaintiff must establish it has antitrust standing, including antitrust injury; a plaintiff must show its claimed injuries are

---

[101] 634 F.3d 1352 (11th Cir. 2011).

[102] *Id*. at 1362.

[103] *See*, *e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004) (recognizing TPPs are directly injured by paying inflated prices and have standing to assert claims).

[104] Merck Mem. at 34-37.

"of the type the antitrust laws were intended to prevent" and "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."[105]  The injury should "be 'the type of loss that the claimed violations . . . would be likely to cause.'"[106]

Like the Supreme Court, the Third Circuit has yet to define what constitutes antitrust injury under § 2(c) of the Robinson-Patman Act.[107]  Some aspects of the claim are clear, however.  For example, the Supreme Court recognizes that while § 2(a) of the Robinson-Patman Act applies to price discrimination, § 2(c) extends beyond that;[108] like many other circuits, the Third Circuit holds § 2(c) was

---

[105] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  *See also 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 738, 740-41 (3d Cir. 2004) (noting that the "traditional concept of antitrust injury" is part of the Third Circuit's antitrust standing analysis); *Envtl. Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1066 (3d Cir. 1988) ("[A] plaintiff must be able to demonstrate that it is within the class of those injured in their business or property who, based on a variety of factors, are best suited to further the purposes of the statute by remedying the violation alleged."), *aff'd*, 493 U.S. 400 (1990).

[106] *Brunswick*, 429 U.S. at 489.

[107] *See 2660 Woodley*, 369 F.3d at 738; *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 399-400 & n.11 (7th Cir. 1993) ("[C]ourts have relied on the purposes of the Robinson-Patman Act to determine whether the plaintiffs have satisfied the antitrust injury requirement for a Robinson-Patman violation."), cited in *2660 Woodley*, 369 F.3d at 741.

[108] *FTC v. Simplicity Pattern*, 360 U.S. 55, 65 (1959) ("subsection[] (c) . . . unqualifiedly make[s] unlawful certain business practices other than price discriminations . . . . Unlike § 2(a), none of [subsections (c), (d), and (e)] requires, as proof of a prima facie violation, a showing that the illicit practice has had an injurious or destructive effect on competition.").

29

intended to prevent – and thus applies to – commercial bribery.[109]  The prohibition

on commercial bribery guards against losses caused by the corruption of the

relationships detailed in the statute.[110]  A plaintiff need not make allegations or

demonstrations of price discrimination for a § 2(c) claim.[111]

The Third Circuit has also made clear that antitrust injury is distinct from

competitive injury.  A plaintiff must demonstrate that it suffered injuries "of the

type the antitrust laws were intended to prevent."[112]  But "a § 2(c) plaintiff does not

have to prove competitive injury [or the presence of an anti-competitive effect] to

---

[109]*2660 Woodley*, 369 F.3d at 737-38 (commercial bribery actionable under § 2(c)) (citing *FTC v. Henry Broch & Co.*, 363 U.S. 166, 169 n.6 (1960))); *Envtl. Tectonics*, 847 F.2d at 1066.  *See also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972); *Rangen, Inc. v. Sterling Nelson & Sons, Inc.*, 351 F.2d 851, 858 (9th Cir. 1965); *Fitch v. Ky-Tenn. Light & Power Co.*, 136 F.2d 12, 15 (6th Cir. 1943).

[110] *See, e.g.*, *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 993 (4th Cir. 1990) (Congressional Record statements "refer to the corruption of an agency relationship"); *Grace v. E. J. Kozin Co.*, 538 F.2d 170, 173 (7th Cir. 1976) (a purpose of § 2(c) "is to protect the integrity of the principal-agent relationship where a violation has an anticompetitive effect."); *In Town Hotels Ltd. Pshp. v. Marriott Int'l, Inc.*, 246 F. Supp. 2d 469, 480 (S.D. W. Va. 2003) (one purpose of § 2(c) is "to protect against 'the corruption of an agency relationship.'"); *Yeager's Fuel v. Pa. Power & Light Co.*, 953 F. Supp. 617, 665 (E.D. Pa. 1997) (§ 2(c) encompasses commercial bribery "tending to undermine" the relationships enumerated in the statute); *Edison Elec. Inst. v. Henwood*, 832 F. Supp. 413, 418 (D.D.C. 1993) ("In enacting § 2(c), Congress had at least two objectives: to prevent large buyers from extracting hidden price discounts from suppliers in the form of 'dummy brokerage' payments; *and* to prohibit commercial bribery that tended to undermine the fiduciary relationship between a buyer and its agent.").

[111] *Envtl. Tectonics*, 847 F.2d at 1066.

[112] *Brunswick*, 429 U.S. at 489.

establish a § 2(c) violation."[113]   In short, a plaintiff must demonstrate it suffered

injury but need not show competition was injured.

Although the Third Circuit has indicated what is insufficient to establish

antitrust injury in the commercial bribery context[114] and what a plaintiff need not

allege to establish such injury,[115] it has not stated with precision what *is* required to

establish the requisite injury.   Several other courts have offered guidance on this

issue, both for antitrust injury generally and in the context of § 2(c) specifically.

The Supreme Court held in *Reiter v. Sonotone Corporation* that "[w]hen a

commercial enterprise suffers a loss of money it suffers an injury in both its

'business' and its 'property'" and "[a] consumer whose money has been

diminished by reason of an antitrust violation has been injured 'in his . . . property'

within the meaning of § 4" of the Clayton Act, the statute that provides a private

---

[113] *2660 Woodley* at 739.  *See also id*. ("'the presence of an anti-competitive effect is not necessary to prove a violation of section 2(c).'  The anti-competitive effect is the presumed result of the illegal conduct." (citations omitted)); *Blue Tree Hotels Inv., Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 218-19 & n.4 (2d Cir. 2004) (calling "error" the imposition of a competitive injury requirement in the § 2(c) context and noting other courts, including several Merck relies on, "have made similar errors").

[114] *2660 Woodley*, 369 F.3d at 738-39 ("[W]e do not think that paying inflated purchasing prices to vendors, without more, is 'an injury of the type the antitrust laws were intended to prevent . . . that flows from that which makes the defendants' acts unlawful.'"), 739-40 (insufficient to allege merely the "anti-competitive effect that is endemic in the [substantive] violation").

[115] *Envtl. Tectonics*, 847 F.2d at 1066 ("A private plaintiff does not have to prove price discrimination to recover for a violation of 2(c) . . . .").

right of action for Robinson-Patman § 2(c) claims.[116]  Recognizing the antitrust laws "were intended to ensure that businesses start out on a fair footing,"[117] many other courts find the payment of higher prices constitutes antitrust injury.[118]

The same is true in the § 2(c) context.  In *Grace*, the Seventh Circuit concluded that the type of injury recoverable under § 2(c) includes paying a higher price than would have been paid absent the bribe.[119]  Likewise, in *Fitch*, the Sixth Circuit affirmed a lower court's damage award where an employee accepted bribes and caused the employer to pay more than it would have in a competitive market.[120]  The Third Circuit has cited both of these decisions, finding a third party's payment of a bribe corrupted the plaintiff's relationship with its agent and caused the plaintiff to pay higher prices for a product, with approval.[121]

---

[116] 442 U.S. 330, 339 (1979).  The Robinson-Patman Act was enacted as an amendment to the Clayton Act.

[117] *Harris v. Duty Free Shoppers Ltd. P'ship*, 940 F.2d 1272, 1275 (9th Cir. 1991) (discussing a § 2(c) claim).

[118] *See*, *e.g.*, *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 13 (1st Cir. 2008) ("There is no doubt that the types of injuries alleged here – consumers paying artificially inflated prices due to antitrust violations – are antitrust injuries."); *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461, 483 n.12 (E.D. Pa. 2009).

[119] 538 F.2d at 173-74.

[120] *Fitch*, 136 F.2d at 14-15.  *See also*, *e.g.*, *In Town Hotels*, 246 F. Supp. 2d at 481 (antitrust injury established where plaintiffs paid higher prices for supplies because they were "deprived of the rebates and payments to which they were entitled").

[121] *See Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 371-72 (3d Cir. 1985).

### b.      Plumbers alleges an antitrust injury under § 2(c).

Plumbers alleges Merck's copay subsidies intentionally corrupt Plumbers'

relationship with its insureds and directly cause Plumbers and other end payors to

purchase more of Merck's expensive branded drugs instead of less expensive

therapeutic alternatives.[122]  This antitrust violation causes antitrust injury – and has

anticompetitive price effects – in two ways.  First, because of the copay subsidy

programs, Merck fraudulently reports or causes to be reported higher

reimbursement rates than otherwise would be reported; this results in higher

payments by TPPs.[123]  Second, the subsidies cause insureds to choose higher-

priced branded drugs rather than lower-cost therapeutic alternatives; the TPPs pay

for more of the higher-priced drugs than they would have by reason of the

bribes.[124]  The copay subsidies undermine the operative market forces without

providing full information about the costs of the subsidies,[125] intentionally causing

Plumbers' insureds, who act as Plumbers' purchasing agents, to make purchasing

decisions on the incorrect assumption that Merck's brand name drugs cost roughly

the same amount as their therapeutic alternatives.

---

[122] *See, e.g.*, Plumbers Complaint ¶¶ 6, 15.

[123] *See, e.g.*, *id.* ¶¶ 5, 22, 31, 57, 59.

[124] *See, e.g.*, *id.* ¶¶ 3, 6, 15, 24, 58.

[125] *See, e.g.*, *id.* ¶¶ 3, 6, 23, 27, 28, 61.

The antitrust injury caused by Merck's copayment subsidy programs goes beyond these price effects.  Merck's copay subsidy programs reduce TPPs' buying power by reducing or eliminating the impact of tier placement on the insured's drug selection, greatly diminishing TPPs' ability to threaten drug makers with adverse tier placement or negotiate for rebates.[126]  Higher prices end up being paid by all.  Copay subsidy programs also eliminate TPPs' ability to compete on benefit plan design by undermining their capacity to provide plans that strike varying balances between the amount of the premium and the personal copay obligation.[127]

Plumbers' injury results from the anticompetitive nature of Merck's copay subsidy programs, namely the undermining of market structures that encourage Plumbers' insureds to purchase less-expensive therapeutic alternatives to the costly name brand drugs.[128]  This satisfies the antitrust standing requirement that Plumbers suffer an injury that § 2(c) was designed to prevent, caused by Merck's unlawful antitrust violations.[129]

---

[126] *See, e.g.*, *id.* ¶¶ 3, 19, 24, 44, 47 127.

[127] *See, e.g.*, Plumbers Complaint. ¶¶ 43, 45, 46, 127, 129.

[128] *See, e.g.*, *id.* ¶¶ 19, 203.

[129] *See 2660 Woodley*, 369 F.3d at 738-39 (emphasizing that the Supreme Court has not yet defined what constitutes "antitrust injury" for § 2(c) claims and indicating that "in an appropriate case, a breach of contract or a breach of fiduciary duty could result in the kind of injury 'the antitrust laws were intended to prevent'").  *See also Grace*, 538 F.2d at 173-74 (recognizing that paying a higher price than would have been paid absent the bribe is cognizable under the antitrust laws and recoverable under § 2(c)); *Rangen*, 351 F.2d at 853-62 (affirming treble

Merck argues that Plumbers cannot maintain its § 2(c) claim because it cannot show the alleged bribe "impaired competition between the plaintiff and its competitors."[130]  It is wrong.  Section 2(c) claims require neither a showing of price discrimination nor competitive injury.[131]  The Third Circuit's decision in *2660 Woodley* does not change that.

In *2660 Woodley*, the owner of a hotel alleged that its agent, Sheraton, implemented a scheme by which it required vendors to remit payments to Sheraton in exchange for the opportunity to supply the hotels that Sheraton managed.[132]  The case went to trial and the plaintiff recovered on claims for breach of contract, breach of fiduciary duty, and commercial bribery under § 2(c).[133]  Upon review of the full record, the Third Circuit found the owner of the hotel was injured "by a breach of contract and the corruption of the principal-agent relationship," produced no evidence in support of its claim of competitive disadvantage, and did not suffer

---

damage award over objection that § 2(c) does not apply to commercial bribery unassociated with price discrimination); *Fitch*, 136 F.2d at 15 (affirming judgment for § 2(c) buyer-plaintiff who was "suing for damages, not because of receiving the benefit of discriminatory prices, but because, on account of the fraud, it was obliged to pay more for its coal than it would otherwise have paid in a competitive market").

[130] *See* Merck Mem. at 35.

[131] *Supra* Section B.1.a.

[132] *2660 Woodley*, 369 F.3d at 735.

[133] *Id*. at 736.

"'an injury of the type the antitrust laws were intended to prevent'" by "paying inflated purchasing prices to [the] vendors, *without more*."[134]

The facts (and procedural posture) are starkly different here. Plumbers alleges Merck designed and implemented copay subsidy programs that corrupt Plumbers' otherwise sound relationships with its insureds.[135] Plumbers further alleges it over-reimbursed for Merck's drugs, and paid for more of Merck's drugs than it should have, because of the anticompetitive nature of the subsidies. Merck's copay subsidies squelched competition with less expensive alternatives and undermined the operative market forces without providing full information about the cost of the subsidies, causing Plumbers, as an end payor, to pay for more of Merck's prescription drugs than it would have in the absence of the subsidies (and at falsely inflated prices).

These allegations comport with both the historic purpose of § 2(c) (to protect the integrity of principal/agent-type economic relationships)[136] and the antitrust laws generally (to protect competition)[137] and satisfy the requirements of antitrust

---

[134] *Id*. at 738-39 (emphasis added). *See also id*. at 739 n.7.

[135] *See, e.g.*, Plumbers Complaint ¶¶ 3. 6, 18, 161.

[136] *See, e.g.*, *2660 Woodley*, 369 F.3d at 737 (citing Supreme Court dicta indicating that § 2(c) was intended to proscribe "the bribing of a seller's broker by the buyer" (internal quotations omitted); *Grace*, 538 F.2d at 173.

[137] *See Brunswick Corp.*, 429 U.S. at 488. Accordingly, Plumbers can maintain a claim both for monetary and injunctive relief.

injury.[138]  Plumbers has, in short, alleged the "more" that was lacking in *2660 Woodley*.[139]

### c.   Plumbers satisfies the other standing considerations.

Plumbers' allegations also satisfy the remaining considerations relevant to antitrust standing.[140]  Plumbers alleges that the insureds' decisions to choose Merck's more expensive drugs were the intended and actual result of Merck's

---

[138] Accordingly, Plumbers can maintain a claim both for monetary and injunctive relief.

[139] *See 2660 Woodley*, 369 F.3d at 739 (agreeing that "in an appropriate case, a breach of contract or a breach of fiduciary duty could result in the kind of injury 'the antitrust laws were intended to prevent,'" but finding that the plaintiff had failed to establish the requisite injury).  *Cf. Cottman Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d 543, 558-59 (E.D. Pa. 2008) (finding – on "facts and allegations almost identical to those in" *2660 Woodley* – that franchisee-plaintiffs had not suffered an antitrust injury where the franchisor-agent defendants had "engaged in a nefarious scheme to 'churn' franchises and profit at the Franchisee's expense").  Further, courts in this Circuit regularly acknowledge that "the existence of antitrust injury is not typically resolved through motions to dismiss."  *Schuylkill Energy Res. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997).

[140] The Third Circuit considers the following factors in determining whether a party has standing to bring a claim for damages under §4 of the Clayton Act:  (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.  *2660 Woodley*, 369 F.3d at 740-41.  Courts in the Third Circuit evaluate standing on a case-by-case basis.  *Envtl. Tectonics*, 847 F.2d at 1067 (refusing to categorically limit standing under § 2(c)).

payments.[141]  An insured's decision to fill a prescription using the copay subsidy causes Plumbers to bear the cost of that prescription rather than the cost of a cheaper therapeutic alternative.[142]  Plumbers has thus adequately alleged the requisite causal connection and directness of the injury.[143]

No party has been more directly injured by Merck's § 2(c) violation.  It was Plumbers' relationship with its insureds that Merck corrupted with its subsidies and, as a direct result of that corruption and the associated market distortion, Plumbers was forced to purchase more of Merck's more expensive subsidized drugs.  Even if Merck's competitors are also victims of the fraud, their presence does not diminish the directness of Plumbers' injury.[144]  Nor would other hypothetical victims be better plaintiffs "to vindicate the public interest" given the antitrust laws' focus on the benefits that competition provides to end payors like

---

[141] Plumbers Complaint ¶¶ 3, 6, 202, 203.

[142] *See, e.g.*, *id.* ¶¶ 20, 161-62 (detailing the connection between the copay subsidies, the insureds' choices, and Plumbers' injury).

[143] *See SigmaPharm, Inc. v. Mut. Pharm. Co., Inc.*, 772 F. Supp. 2d 660, 676 (E.D. Pa. 2011) (TPPs were directly injured by antitrust violation that caused them to pay inflated prices).

[144] *Glaberson v. Comcast Corp.*, No. 03 Civ. 6604, 2006 U.S. Dist. LEXIS 62672, *25-26 (E.D. Pa. Aug. 31, 2006) (emphasizing that "[p]laintiff's injuries, which consist of overcharges, are distinct from [the other direct victim's injuries], which likely consist of lost profits").  *See also 2660 Woodley*, 369 F.3d at 742 (noting that the "'Robinson-Patman Act *extends* its protection to competitors'" but that the class of potential § 2(c) commercial bribery plaintiffs has not been limited to disfavored competitors (emphasis added)).

Plumbers.[145]  Finally, Plumbers' injury is unique and suffered by it alone; there is

no potential for duplicative recovery or complex apportionment of damages.[146]

Plumbers is a direct victim of Merck's unlawful conduct and a proper party

to remedy Merck's violation of § 2(c).[147]  Plumbers is, in short, "best suited to

further the purposes of the statute by remedying" the violation of § 2(c).[148]

### 2.      Section 2(c) applies to classic agency or intermediary relationships like those Plumbers alleges.

Section 2(c) applies where the recipient of unearned compensation is "the

other party to such transaction or . . . an agent, representative, or other intermediary

therein where such intermediary is acting in fact for or in behalf, or is subject to the

direct or indirect control," of the other party.[149]  Plumbers adequately alleges the

requisite relationship with its insureds.[150]

Section 2(c) does not require that a qualifying "agent, representative, or

---

[145] *See Cottman*, 536 F. Supp. 2d at 559 (recognizing that both consumers and competitors are viable potential commercial bribery plaintiffs).  *See also Glaberson*, 2006 U.S. Dist. LEXIS 62672, at *9, 28 ("[The defendants' competitor] is not the more direct or 'superior' plaintiff to vindicate the public interest.  In general, '[t]he antitrust laws . . . were enacted for the protection of competition, not competitors' and 'basic economic theory teaches us that the chief benefit of competition is lower prices to consumers.).

[146] *See Glaberson*, 2006 U.S. Dist. LEXIS 62672, at *22.

[147] *See 2660 Woodley*, 369 F.3d at 740; *Cottman*, 536 F. Supp. at 559.  *See also* discussion *supra* at Sections B.3, 5.

[148] *2660 Woodley*, 369 F.3d at 742-43.

[149] 15 U.S.C. § 13(c).

[150] *See* Merck Mem. at 31-33.

other intermediary" owe a fiduciary duty to Plumbers,[151] and the Court should not impose a requirement Congress did not intend.[152]   Rather, Section 2(c) requires that unearned compensation pass over what is referred to as the "buyer-seller line," be it through an agent, intermediary, or representative.   Courts in this Circuit and others have clarified this requirement.[153]   In *Substantial Investments, Inc. v. D'Angelo Franchising Corp.*, the court held a franchisee could maintain a Section 2(c) claim against a franchisor, even though a fiduciary relationship may be "lacking in the franchising context," because the "seller-buyer line ha[d] been crossed."[154]   The Third Circuit has similarly, though implicitly, acknowledged a fiduciary relationship is unnecessary to sustain a claim for commercial bribery,[155] instead stressing the payment must cross the buyer-seller line.

---

[151] *See* 15 U.S.C. § 13(c).

[152] *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (where a statute's language is plain, the court's "sole function" is to enforce it according to its terms); *Rea v. Federated Investors*, 627 F.3d 937, 940 (3d Cir. 2010) (same).

[153] *See, e.g., Envtl. Tectonics*, 847 F.2d at 1066; *Seaboard Supply*, 770 F.2d at 372. *See also Bridges v. MacLean Stevens Studios, Inc.*, 201 F.3d 6, 11 (1st Cir. 2000); *Substantial Invs., Inc. v. D'Angelo Franchising Corp.*, No. 03-cv-11202, 2004 U.S. Dist. LEXIS 17300, *8 (D. Mass. Aug. 30, 2004).

[154] *See Substantial Invs.*, 2004 U.S. Dist. LEXIS 17300, at *2-3, 7-8 (existence of a fiduciary relationship was "immaterial").

[155] *See 2660 Woodley*, 369 F.3d at 738 (citing the Model Penal Code's entry for commercial bribery, which prohibits the acceptance of consideration for agreeing to violate a duty of fidelity to which one is subject as, among other things, a "(a) partner, agent, or employee of another" *or* "(b) trustee, guardian, *or other fiduciary*," thereby implicitly acknowledging that the relationships detailed in subsection (a) are not fiduciary relationships (emphasis added)).

Plumbers' allegations that its buying obligations are dictated by its insureds' purchasing decisions, who operate under the constraints imposed by the health plan, establish that Plumbers' insureds are its agents or intermediaries and that the payments crossed the buyer-seller line.[156]  Plumbers' insureds qualify as its intermediaries because they are "instrumental in bringing about" Plumbers' purchasing obligations.[157]  Plumbers' payment obligations do not arise unless and until its insureds choose their medications but the insureds are subject at all times to the terms of their agreements with Plumbers in seeking payment for the selected medication.[158]  The insureds act "in fact or in behalf" of Plumbers and "subject to [Plumbers'] direct or indirect control" under Section 2(c).[159]  Plumbers' insureds *also* qualify as its agents; they have authority to bind Plumbers to remit payment for the drugs they choose.[160]  They are, in effect, Plumbers' purchasing agents.[161]

---

[156] *See, e.g.*, Plumbers Complaint ¶¶ 2, 21-28, 44, 61, 200-03.

[157] *Rangen*, 351 F.2d at 862 (party was an "intermediary" where he "influence[d] the decisions concerning the purchase" of an item).

[158] Plumbers Complaint ¶ 201.

[159] Qualifying intermediaries need not be "agent[s] or representative[s] in the legal sense of the word."  *Fitch*, 136 F.2d at 15.  *See also Rangen*, 351 F.2d at 862.

[160] *See, e.g.*, *Stephen Jay*, 903 F.2d at 993 (rejecting Section 2(c) claim where bribe recipient did "not have the authority to bind" plaintiffs' purchasing decisions); *Fitch*, 136 F.2d at 13-15 (affirming judgment for plaintiff-employer where employee-agent accepted bribes and the employer became "obliged to pay more for its coal than it would otherwise have paid"); *Substantial Invs.*, 2004 U.S. Dist. LEXIS 17300, at *8-9 (denying motion to dismiss where bribe recipient "effectively compelled" the purchasing decisions at issue).

To the extent courts refer to a "fiduciary duty" in connection with Section 2(c), such a duty is inherent in the types of relationships detailed in the statute and alleged here; the cases that Merck cites do not hold differently.[162]

### 3.    Section 2(c) does not require secrecy.

Merck argues Section 2(c) requires secrecy for commercial bribery claims to stand.[163]  But neither Congress nor the Third Circuit requires that compensation be "secret" in order to be actionable under Section 2(c).

Nowhere in the Robinson-Patman statute did Congress state or imply that commercial bribery must be disguised or secretive in nature,[164] and a complete

---

[161] *Cf. Stephen Jay*, 903 F.2d at 993 (school did not assume a position "resembling that of a portrait purchasing agent for the students" because students' "decision[s] to purchase portraits were optional").

[162] *See, e.g.*, *Harris*, 940 F.2d at 1275 ("In addressing whether the payments involved were made to a party to the transaction or to someone connected with that party in an agency, and *thus fiduciary* relationship, we stated that 'reference must be made to the transactions in question to determine whether or not the necessary relationship exists.'" (emphasis added)); *Yeager's Fuel*, 953 F. Supp. at 665 ("Section 2(c) 'encompasses cases of commercial bribery tending to undermine the fiduciary relationship between a buyer and its agent, representative, or other intermediary in a transaction involving the sale or purchase of goods.'").  *See also Stephen Jay*, 903 F.2d at 993 (evaluating whether the relationship in question arose "to one *akin* to that of agency or employment" (emphasis added)); *United Magazine Co. v. Murdoch Magazines Distrib.*, 146 F. Supp.2d 385, (S.D.N.Y. 2001) (actionable commercial bribery "'involv[es] a "breach of a fiduciary duty by the buyer's agent,'" providing as an example a case in which "defendants bribed plaintiff's purchasing manager to buy . . . from defendants"); *Watkins & Son Pet Supplies v. Iams Co.*, 107 F. Supp. 2d 883, 899 (S.D. Ohio Mar. 3, 1999) (citing *Stephen Jay* and implicitly acknowledging "the fiduciary relationship between a buyer and its agent").

[163] Merck Mem. at 33.

reading of the FTC letter that Merck cites indicates that, to the extent it exists, the requirement of secrecy has been imposed by certain courts, not Congress.[165]  But even *Fitch*, the case cited by the FTC to support its secrecy-related conclusion, did not hold the validity of a Section 2(c) claim depended on the presence of secrecy; rather, secrecy was simply an element of the fact pattern presented by the case.[166]

Merck cites not a single case from this Circuit requiring secrecy in the context of commercial bribery.  Because the Third Circuit has imposed no secrecy requirement, the statute should be enforced according to its terms.[167]  But even if this Court were to impose a requirement of secrecy, Plumbers' Section 2(c) claims survive because Plumbers alleges that Merck's copay subsidy programs are "designed [to make ] it impossible for [TPPs] to tell if their members' copays are being subsidized by [Merck's] copay coupons."[168]  Neither Plumbers nor any TPP can know when its insureds use Merck copay subsidies because "[t]he pharmacist and PBM . . . calculate the usual charge (*i.e.*, unreduced by the amount of the subsidy) to the health benefit insurer for the procurement of that prescription drug .

---

[164] *See* 15 U.S.C. § 13(c).

[165] *See* Letter From FTC Bureau of Competition to Maritz, Inc., (June 21, 1984), *reported in* 47 Antitrust & Trade Reg. Rep. (BNA) 16 (July 5, 1984) ("courts have 'apparently made secrecy an essential element of a [§2(c)] bribery violation,' the staff adds" (citing *Fitch*, 136 F.2d 12)).

[166] *See Fitch*, 136 F.2d at 14-16.

[167] *Rea*, 627 F.3d at 940.

[168] Plumbers Complaint ¶ 76; *see also id*. ¶¶ 89, 100, 111, 114, 117.

. . *without advising the insurer* that, at the same time, the plan member's personal cost share obligation is being picked up by the drug's manufacturer."[169]  These "[r]outinized copay subsidy programs constitute commercial bribery because the programs pay *undisclosed* kickbacks to plan enrollees."[170]  These allegations more than satisfy any secrecy requirement this Court may impose and distinguish this case from those on which Merck attempts to rely.[171]

Merck argues these specific allegations "affirmatively disclaim[] any notion of secrecy."[172]  But Plumbers' general awareness of the copay subsidy programs does not foreclose the conclusion that the individual payments were issued in secret.  Commercial bribery occurs each time an insured uses Merck's copay subsidies to purchase a covered drug; it is inherently secretive because Merck makes it impossible for Plumbers to know when this occurs.

**C.   The tortious interference claim should not be dismissed.**

**1.   Workers adequately alleges a tortious interference claim.**

The purpose of a complaint "is to inform the opposing party and the court as

---

[169] *See id*. ¶ 22 (emphasis added); *see also id*. ¶¶ 59, 126-29.

[170] *Id.* ¶ 58 (emphasis added).

[171] *Compare id*. ¶¶ 22, 58-59, 76, 89, 100, 111, 114, 126-29, *with Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 45 (1st Cir. 2001) (plaintiff offered *no* evidence illegal brokerage was concealed), *and Lupia v. Stella D'Oro Biscuit Co. Inc.*, 586 F.2d 1163, 1170 (7th Cir. 1978) (discounts "not disguised in *any* manner" (emphasis added)), *and Stephen Jay*, 713 F. Supp. 937, 941 (E.D. Va. 1989) (no violation if "buyer is not prevented from learning the amount of the commission").

[172] Merck Mem. at 34.

to the nature of the claim and defenses being asserted by the party as well as the relief being requested."[173]  Workers' complaint alleging tortious interference meets the applicable pleading standard in Rule 8,[174] *Twombly*, and *Iqbal*.[175]

> Under New Jersey law, tortious interference requires:
>
> (1) a plaintiff's existing or reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference.[176]

Workers alleges each of these.

First, Workers' health plan constitutes a contract with "its beneficiaries as to the terms and conditions under which the Fund and other class members will pay for health services."[177]  Workers also alleges TPP plans are similar in requiring lower copays for lower cost drugs and higher copays for higher cost drugs like those covered by Merck's copay subsidy programs,[178] and the purpose of this

---

[173] *Call, Inc. v. Advanced Health Media, LLC*, No. 11-3723, 2012 U.S. Dist. LEXIS 44890, *5-6 (D.N.J. Mar. 30, 2012).

[174] Fed. R. Civ. P. 8(a)(2) (requiring "a short, plain statement of the claim").

[175] *See* discussion *supra* at Section Standard of Review.

[176] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (citing *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739 (1989)).

[177] Workers Complaint ¶ 133.

[178] *Id.* ¶ 134.

design is to encourage the purchase of more cost-effective treatments, which lowers the costs to TPPs – an economic benefit.[179]

Second, Merck (a) knows how copays, particularly tiered copays, work[180] and (b) is aware of the contractual relationship between Workers (and other TPPs) and their respective participants because "in order to obtain a coupon for Defendant's co-pay subsidy program, the beneficiary must advise Defendant that the beneficiary is covered by a private health insurance plan."[181]

Third, Merck wrongfully and intentionally interferes with the contract by inducing insureds to breach their obligation to pay the full amount of their copay.[182]  Indeed, "[t]he purpose of Defendant's co-pay subsidy program is to defeat that obligation."[183]

Fourth, Workers formed a contract with its beneficiaries wherein they would contribute copays for prescription drugs[184] and it had a reasonable probability that it would receive the benefit of this agreement.  Merck's subsidies, however, distort the economics inherent in the health plan by removing the incentive to purchase

---

[179] *Id.* ¶ 135.  *See also id.* ¶¶ 14, 17, 51, 66, 79, 88.

[180] *Id.* ¶ 136.

[181] *Id.* ¶ 140.  *See also id.* ¶¶ 3, 14, 17, 47, 51, 54, 57, 66, 79, 88-89, 99, 121, 141.

[182] Workers Complaint ¶¶ 1, 3, 5, 7, 11, 14-15, 17-18, 23, 27-28, 45, 47-49, 51, 54, 57, 66, 71, 79-80, 88-90, 99-100, 101, 114-16, 121, 138.

[183] *Id.* ¶ 137.

[184] *Id.* ¶¶ 133, 134.

generic drugs by making brand name drugs available at the same out-of-pocket cost to plan members as more cost-effective treatments.[185]

Finally, Merck caused damages to TPPs in the form of greater expenses for Merck's drugs by inducing insureds to breach their personal copay obligations.[186]

### 2.    Merck induced insureds to breach their copay obligations.

Merck seeks dismissal because Workers did not allege the "specific provision in Workers' contracts that bars beneficiaries from using a coupon to help them meet their co-pay obligations."[187]  It is not enough that Workers contracted for copays at certain price levels, Merck argues; Workers should also have contracted to prohibit the use of copay subsidies.  As Merck would have it, parties to a contract must not only spell out the parties' affirmative obligations, but also identify and affirmatively prohibit in the contract all of the possible failures to perform those affirmative obligations.  Common sense rejects this proposal, which would lead to chaos in the marketplace.

Merck misapplies *Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.*[188] *Matrix* involved a contract with a specific prohibition – the salons could *not* sell Matrix hair care products to anyone other than retail customers for their personal

---

[185] *See also id.* ¶¶ 1, 3, 5, 6, 17, 49, 103, 116, 126, 138, 139, 142.

[186] *Id.* ¶¶ 139, 142.  For additional allegations regarding damages that resulted from Merck's interference, *see also id.* ¶¶ 1, 3, 5, 6, 17, 49, 120, 126.

[187] Merck Mem. at 39.

[188] 870 F. Supp. 1237 (D.N.J. 1994).

use.[189]  Looking at the specifics of that contract and recognizing the inclusion of the prohibition, the court stated "[a] plaintiff may not maintain a tortious interference action where there is no specific contractual provision barring the behavior at issue," but found that the contract did "contain adequate contractual terms to support a tortious interference claim" – one based on a negative or prohibited duty.[190]  Merck offers no logical basis to extend *Matrix*'s language to a contract that requires affirmative action, like the one at issue here.  Such a ruling would require parties to identify and contract around every contraposition, both positively and negatively, undermining the ability to contract.[191]

### 3.    Merck acted with "malice."

Merck seeks dismissal for failure to plead "malice" but, again, Merck misreads the law.  A claim for tortious interference must allege the defendant acted intentionally and wrongfully: malice here "is the intentional doing of a wrongful act without justification or excuse."[192]  The standard for the claim is "flexible" and "focus[es] on a defendant's actions in the context of the case presented."[193]

---

[189] *See id*. at 1240-42.

[190] *Id*. at 1247.

[191] *In re Schering*, No. 2:06-cv-5774, 2010 U.S. Dist. LEXIS 56621 (D.N.J. June 9, 2010), offers Merck no support.  The court dismissed the claim for failure to allege breach of any existing contract generally.  *Id*. at *42.  Workers sufficiently alleges a breach here.

[192] *Printing Mart*, 116 N.J. at 756.  *See also Lightning Lube, Inc.*, 4 F.3d at 1167.

[193] *Printing Mart*, 116 N.J. at 756-57.

Workers alleges it had an expectation, based on the contract with its

beneficiaries, to pay certain amounts for prescription drugs.  Merck interfered with

that arrangement by inducing Workers' insureds to use the copay subsidy programs

to subvert and undermine the contractual cost sharing requirements for Merck's

benefit.  Workers sufficiently and plausibly alleges Merck's conduct is not

"sanctioned by the rules of the game."[194]

Merck's argument that it did not intentionally and wrongfully interfere with

Workers' contractual expectations, but instead sought merely to "encourage

consumers to purchase Merck drugs instead of therapeutic alternatives," falls

flat.[195]  Marketplace competition cannot come at the expense of interfering with

and undermining existing contractual relations.  Moreover, whether Merck

intentionally interfered or had a valid business justification for its actions raises

factual issues that are not properly adjudicated at this stage of the litigation.[196]

Finally, Merck argues that the tortious interference claim fails because

doctors make independent prescribing decisions which break the chain of

---

[194] *Id.* at 757.

[195] Merck Mem. at 43.

[196] *See, e.g.*, *Printing Mart*, 116 N.J. at 756-57 (concluding, in part, that "malicious acts are determined on a case-by-case basis" and malicious "conduct, *if proven*, could not be justified merely because he was a competitor motivated by profit") (emphasis added); *Di Cristofaro v. Laurel Grove Memorial Park*, 43 N. J. Super. 244, 256 (App. Div. 1957); *Momentive Performance Materials USA, Inc. v. Astrocosmos Metallurgical, Inc.*, 2009 U.S. Dist. LEXIS 45941, *14, 23-24 (N.D.N.Y. 2009).

causation,[197] but cites no support for this argument.  Merck's copay subsidy

programs remove the financial disincentive to pay for Merck's brand name drug

and directly and negatively influence the insured's decision to fill the prescription

or seek a more cost-effective treatment option.  Merck inserts itself into the

decision-making process and undermines Workers' expectation that insureds will

choose lower cost alternatives in lieu of Merck's drug.  Merck's conduct is

unlawful and is not cured by pointing to the learned intermediary doctrine.

## CONCLUSION

Merck readily admits its copay subsidy programs would be criminal

kickbacks if implemented for publicly funded healthcare.  The programs do not

become innocent charities when implemented against private TPPs.  Routine

waiver of copayments without reduction of reported reimbursement rates is a form

of private health insurance fraud, commercial bribery, and tortious interference

with contracts.  Merck's motion to dismiss should be denied.


Dated: October 29, 2012                 Respectfully submitted,

                                        **/s/ Thomas M. Sobol**
                                        Thomas M. Sobol
                                        Lauren Guth Barnes
                                        Kristen Johnson Parker
                                        HAGENS BERMAN SOBOL

---

[197] As discussed above, Workers has adequately and plausibly alleged causation to
meet notice pleading standards.

SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel. (617) 482-3700
Fax. (617) 482-3003
tom@hbsslaw.com
lauren@hbsslaw.com
kristenjp@hbsslaw.com

Steve W. Berman
Barbara A. Mahoney
HAGENS BERMAN SOBOL
SHAPIRO LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
Tel. (206) 623-7292
Fax. (206) 623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

Lisa J. Rodriguez
Nicole M. Acchione
TRUJILLO RODRIGUEZ &
RICHARDS, LLC
258 Kings Highway East
Haddonfield, NJ 08033
Tel. (856) 795-9002
Fax. (856) 795-9887
lisa@trrlaw.com
nacchione@trrlaw.com

Jeffrey L. Kodroff
SPECTOR ROSEMAN KODROFF &
WILLIS PC
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel. (215) 496-0300
Fax. (215) 496-6611
jkodroff@srkw-law.com

Kenneth A. Wexler
Bethany R. Turke
Dawn M. Goulet
Amy E. Keller
WEXLER WALLACE LLP
55 West Monroe St., Suite 3300
Chicago, IL 60603
Tel. (312) 346-2222
Fax (312) 346-0022
kaw@wexlerwallace.com
brt@wexlerwallace.com
dmg@wexlerwallace.com
aek@wexlerwallace.com

*Counsel for Plumbers and Pipefitters
Local 572 Health and Welfare Fund and
the classes*

James E. Cecchi
Donald A. Ecklund
Lindsey H. Taylor
Caroline F. Bartlett
CARELLA BYRNE CECCHI
OLSTEIN BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Tel. (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com
ltaylor@carellabyrne.com
cbartlett@carellabyrne.com

Julie Diane Miller
COMPLEX LITIGATION GROUP
LLC
513 Central Avenue, Suite 300
Highland Park, IL 60035
Tel. (847) 433-4500
Fax. (847) 433-2500

juliem@complexlitgroup.com

*Counsel for United Food and
Commercial Workers International
Union Local 464A Health and Welfare
Fund and the classes*

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2012 a copy of Plaintiff's Memorandum of Law in Opposition to Defendant Merck & Co., Inc.'s Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

**/s/ Thomas M. Sobol**
Thomas M. Sobol