RECEIVED
APR 29 2013
AT 8:30_____M
WILLIAM T. WALSH, CLERK

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL 572 HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>  Defendant. | No. 12-1379 (MAS) (LHG) |
| UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 464A HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>  Defendant. | No. 12-3652 (MAS) (LHG) |
| ALLIED SERVICES DIVISION WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>  Defendant. | No. 12-7027 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

Merck & Co., Inc. ("Merck" or "Defendant"), offers a system of subsidies in the form of coupons and discount cards that cover a portion, or all, of the co-pay or co-insurance that privately insured individuals would normally have to pay for certain Merck brand name prescription drugs. Plaintiffs Plumbers and Pipefitters Local 572 Health and Welfare Fund ("Plumbers") and United Food and Commercial Workers International Union, Local 464A Health and Welfare Fund ("United") (collectively, "Plaintiffs"), allege that Merck's subsidy programs unlawfully disrupt the carefully balanced cost-sharing principles underlying the prescription health care coverage that Plaintiffs offer their members.[1] Plaintiffs filed separate complaints, alleging different theories of liability, but based upon substantially similar factual allegations and related to the same subsidy programs. The cases were consolidated for purposes of briefing of motions to dismiss. (ECF No. 40.)[2]

Merck filed its Motion to Dismiss based upon Federal Rules of Civil Procedure ("Rule") 12(b)(6) and 12(b)(1) on September 17, 2012. (ECF No. 44.) Plaintiffs filed their Opposition on October 29, 2012. (ECF No. 48.) Merck filed its Reply on November 30, 2012. (ECF No. 49.) The Court has carefully considered the Parties' submissions and decided the matter without oral argument pursuant to Rule 78. For the reasons stated below, and good cause shown, Defendant's

---

[1] An additional related action was filed by a different plaintiff, Allied Services Division Welfare Fund, against Merck on July 6, 2012, under docket number 12-7027 (the "*Allied Services Action*"). Pursuant to a Stipulation and Order entered on December 12, 2012, the parties to the *Allied Services Action* agreed to forego any individual motion practice in that matter and rely upon the briefing in the *Plumbers v. Merck* and *United v. Merck* matters. (12-7027 ECF No. 42.) The Parties to the *Allied Services Action* also agreed that the Court's decision regarding Merck's motion to dismiss "will apply to the Complaint in the *Allied Services Action* with equal force and effect as if the decision had been entered in the *Allied Services Action*, and such decision will constitute the law of the case for the *Allied Services Action*." (*Id.*) As such, this Opinion and accompanying Order will be docketed in the *Allied Services Action*.

[2] Unless otherwise noted, all cites to the record are to *Plumbers v. Merck*, docket number 12-1379.

Motion to Dismiss is GRANTED and Plaintiffs' Complaints are DISMISSED without prejudice. Leave to file amended complaints is GRANTED.

I.      **Background**

    A.      **General Factual Allegations**

The factual allegations in both Complaints are substantially the same and revolve around Merck's discount subsidy programs (the "Programs") offered for the following drugs: Janumet, Janumet XR, Januvia, Nasonex, Vytorin and Zetia (the "Drugs"). (Compl. ¶ 1, ECF No. 1.) As described by Plaintiffs, the Programs amount to "undisclosed kickbacks to privately insured individuals" that knowingly cause health insurance providers, such as Plaintiffs, "to pay for more prescriptions of [the Drugs] than they otherwise would have . . . ." (*Id.*) Merck's subsidy programs are allegedly "designed to undermine cost-sharing arrangements" carefully crafted as part of prescription drug benefit plans which "unite the interests of the health insurer with the interests of its beneficiaries." (*Id.* ¶¶ 2-3.) Because of the Programs, Plaintiffs' individual "plan members have no incentive to use less-expensive generic drugs" and Plaintiffs allege that this "will increase health benefit providers' prescription drug costs by $32 billion over the next ten years." (*Id.* ¶ 3.) Plaintiffs maintain that the Programs "functionally reduce[] the price of the [Drugs] without disclosing that price reduction to the insurer." (*Id.* ¶ 4.)[3]

---

[3] The versions of the Programs for Nasonex, Vytorin and Zetia state on the reverse side of the discount card that the pharmacist filling the prescription "must notify the patient's insurance carrier of the coupon redemption, as may be required by the Terms and Conditions of your relationship with the insurance carrier." (*See id.* ¶¶ 89, 100, 111.) Those same Programs also require the patient to report "receipt of [the] coupon benefit to any insurer . . . as may be required. (*See Id.* ¶¶ 90, 101, 112.) The Janumet, Janumet XR and Januvia programs, on the other hand, only require that the *patient* notify his insurance carrier of his use of the coupon. (*Id.* ¶ 76.) The Complaints, however, do not indicate whether Plaintiffs' insurance plans contain requirements for patients/members to report such coupon use to Plaintiffs, or similarly, whether pharmacists are required to inform Plaintiffs of the use of such cards by individual members of Plaintiffs' insurance plans. Although Plaintiffs allege they do not receive notice that a member has

The form of the subsidy programs are similar and function as follows. An individual, either before or after obtaining a prescription for one of the Drugs from a physician, must obtain a subsidy card or coupon. Those coupons or cards can be obtained in person at a doctor's office or via the internet at a website operated by Merck. (*Id.* ¶ 20.) After providing some information to Merck, the individual receives a "card that includes instruction[s] to pharmacists on how to process covered prescriptions [for the Drugs]." (*Id.*)

Typically, the card is then presented to a pharmacist who: 1) enters the individual's prescription drug insurance information, in this case offered through Plaintiffs, into a payment system as the individual's primary form of prescription drug insurance, and 2) subsequently enters the information contained on the discount card as a form of secondary insurance. (*Id.* ¶ 21.) The card, and the amount that Merck decides to pay based upon the version of the Program that card represents, is used to cover, or completely obviate, the co-pay or coinsurance one would normally have to pay for the Drug based upon the terms of their prescription drug insurance offered by Plaintiffs. Neither the pharmacy nor Merck report that the "plan member's personal cost share obligation is being picked by the drug's manufacturer." (*Id.* ¶ 22.)

According to Plaintiffs' characterization, Merck's Programs effectively "bribe[] plan members to choose its branded drugs over less-expensive therapeutic alternatives in order to get the health benefit plan to pay for the bulk of the cost of its more expensive brand name drugs." (*Id.* ¶ 23.) This occurs because, "[f]rom the member's perspective, the branded drug and the therapeutic alternatives cost close to, if not exactly, the same amount." (*Id.*) The price difference between Merck's brand name drugs compared to generics borne by Plaintiffs, however, "may differ by a factor of ten." (*Id.*) The Program's, therefore, allegedly "reduc[es] or eliminate[es] the

---

used one of the Programs, they do admit that Merck's alleged "attack on [the] prescription drug system is open and notorious." (*Id.* ¶ 55.)

personal cost-share feature of the insurance contract" and "increase[s] the overall burden on the plan for providing benefits to its members." (*Id.* ¶ 24.)

Plaintiffs further allege that the Programs effectively function as a secondary form of insurance because Merck "agrees to cover a portion of the privately-insured individual's prescription drug expenses." (*Id.* ¶ 25.) Plaintiffs also note that the Programs do "not comply with the myriad laws covering the provision of health insurance." (*Id.*)

Plaintiffs raise an additional allegation: the Programs violate federal and state law anti-kickback schemes because of the manner in which Merck is routinely waiving co-pays or coinsurance. (*Id.* ¶¶ 29-34.) Plaintiffs note that although Merck states that the Programs are not available to individuals who receive health insurance from the federal government or the Commonwealth of Massachusetts, "on information and belief, the [P]rograms have been, and are being, used by persons who participate in those federal and state programs." (*Id.* ¶ 35.)

A final component of the factual underpinning of the Complaints is Plaintiffs' allegation that Merck's practices manipulate the prices which control industry wide wholesale prescription drug reimbursement prices. Plaintiffs allege that the Programs "constitute insurance fraud because routine waiver of co-payments reduces true acquisition costs, yet drug manufacturers withhold co-payment information, do not decrease the applicable reimbursement benchmark for the [D]rugs, and cause inflated payments to be imposed upon private prescription drug benefit providers." (*Id.* ¶ 59.) This process, whereby Merck does not report that the cost of the co-pay is being borne by Merck, rather than one of Plaintiffs' members, "result[s] in an inflated payment by [Plaintiffs]" and constitutes "commercial bribery." (*Id.* ¶ 57-58.)

Plaintiffs seek to bring this action pursuant to Rule 23 "on behalf of themselves and four national classes (one for each of the four [P]rograms)." (*Id.* ¶ 140.) The classes would "consist of thousands of private health benefit providers." (*Id.* ¶ 147.) Plaintiffs state that they are

appropriately positioned to represent the proposed classes and that "[p]rosecution of separate actions by individual class member would create the risk of inconsistent and varying adjudications with respect to individual class members . . . ." (*Id.* ¶ 151.)

B.   **Plaintiffs' Claims**

The first three claims listed below are contained in Plumbers' Complaint. The final claim, tortious interference, is listed in United's Complaint. Defendant's Motion to Dismiss addresses all four claims in one set of motion papers. Plaintiffs similarly opposed in an omnibus form.

1)   **Plumbers' Complaint**

a.   **RICO Claim — 18 U.S.C. § 1962(c)**

Plumbers' first claim includes four counts alleging a RICO violation arising from each of the Programs. (*Id.* ¶ 154.) Plumbers allege that Merck, along with unnamed defendant McKesson Corporation ("McKesson"),[4] have formed an association-in-fact within the meaning of 18 U.S.C. § 1931(4). (*Id.* ¶ 161.) Each program allegedly constitutes an enterprise through which Merck and McKesson have joined in an association-in-fact. (*Id.* ¶¶ 155-159, 161.) Each Program also allegedly affected interstate commerce. (*Id.* ¶ 164.) Moreover, Merck allegedly "conducted and participated in the affairs of the [Programs] though a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud)." (*Id.* ¶ 167.) In essence, Plaintiffs allege that the Programs are "intentional schemes" that seek to "defraud [P]laintiffs and the classes by interfering with their cost sharing provisions, causing them to pay for prescriptions of the [Drugs] that they would not otherwise have paid for, and causing [Plaintiffs] to pay an inflated rate for each prescription." (*Id.* ¶ 168). These unlawful acts all necessarily required use of the "wires" and the "mails." (*Id.* ¶¶ 168-170.) Plumbers seek treble

---

[4] McKesson is the outside administrator of the Programs.

6

damages, plus cost of the suit and reasonable attorneys' fees arising from the damages inflicted from this conspiracy. (*Id.* ¶ 179.)

b.  RICO Conspiracy Claim — 18 U.S.C. 1962(d)

Plumbers' second claim includes four counts alleging a RICO conspiracy arising from each of the Programs. (*Id.* ¶ 180.) Plaintiffs allege that Merck "adopted the goal of furthering or facilitating the criminal endeavors of the [Programs] minimally by agreeing to facilitate some of the acts leading to the substantive offenses, and directly by engaging in numerous overt and predicate fraudulent racketeering acts in furtherance of each conspiracy [related to the individual Programs]." (*Id.* ¶ 187.) Plumbers seek treble damages, plus cost of the suit and reasonable attorneys' fees arising from the damages inflicted from this conspiracy. (*Id.* ¶ 192.)

c. Commercial Bribery Claim — 15 U.S.C. 13(c)

Plumbers allege that the Programs effectuate a scheme of "commercial bribery in violation of the Robinson-Patman Act . . . ." (*Id.* ¶ 193.) This claim includes an individual count related to each of the individual Programs. Section 2(c) of the Robinson-Patman Act (the "Act"), codified at 15 U.S.C. 13(c), states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

Plumbers allege that this section generally "prohibit[s] a person from paying off fiduciaries, agent[s] or other intermediaries who control purchasing decisions to be paid for by another." (*Id.* ¶ 200.) According to Plumbers, Merck "is a 'person' making payment of something of value: [Merck] pays an individual insured to choose a subsidized drug that is paid for by the

7

individual's health benefit provider," such as Plumbers. (*Id.*) As such, "[p]aying individuals who receive prescription drug benefits pursuant to plans offered by private health benefit providers qualifies as a violation of [the Act] because the subsidies are 'anything of value' which are (i) paid as 'compensation' for purchasing the [Drugs], and (ii) as a 'discount in lieu of brokerage.'" (*Id.*) Plumbers' members are allegedly covered by the Act because they are the agent, representative or intermediary of Plumbers because they "act on behalf of their health benefit providers in having substantial control in the choice of which medications will be paid for by the health benefit providers" and "act subject to their health benefit providers' direct and indirect control in seeking payment for the selected medications through the terms of their plans." (*Id.* ¶ 201.) The Programs provide "illegal inducements to members to choose more expensive drugs, to the detriment of prescription drug plans provided by Plumbers and members of the [proposed] class." (*Id.* ¶ 202.) Plumbers also allege that their "members do not know these co-pay subsidies are bribes." (*Id.* ¶ 201.)

   2) **United's Complaint**

    a. **Tortious Interference with Contractual Relations**

United's Complaint, as noted earlier, contains substantially similar factual averments as Plumbers' Complaint. United's Complaint, however, alleges a single cause of action: common law Tortious Interference with Contractual Relations. United alleges that its "health plan with its participants, and the terms of other class members' health plans, constitute[] a contract between the health plan and its beneficiaries . . . ." (United Compl. ¶ 133; 12-3652 ECF No. 1.) United alleges that Merck "is aware of the obligation of health plan beneficiaries to pay a higher co-pay for its branded prescription drugs than for equivalent generic prescription drugs . . . and the purpose of [the Programs] is to defeat that obligation . . . ." (*Id.* ¶¶ 136-37.) In other words, the Programs "induce[] beneficiaries of the fund . . . to breach their obligation under their respective

health plans to pay the full amount of the required co-pays for prescription drugs." (*Id.* ¶ 138.) As a result of this alleged inducement to breach, United has "been damaged because [it has] incurred the cost of paying for higher-cost branded drugs covered by Defendant's [Programs], rather than lower-cost generic drugs which plan beneficiaries would have purchased but for Defendant's [Programs] making Defendant's [Drugs] have the same out-of-pocket expense to plan beneficiaries as equivalent generic drugs." (*Id.* ¶ 139.) Finally, United alleges that Merck is aware of the contractual relationship between United and its beneficiaries. (*Id.* ¶¶ 140-41.) United, similar to Plumbers, seeks to bring this cause of action as a class action. (*Id.* ¶¶ 117-31.) United seeks the following relief: damages, costs of suit, including reasonable attorneys' fees, a court order enjoining Merck from operating the Programs (or similar subsidy schemes) and other just relief.

## II. Analysis

### A. Plaintiffs' Standing

#### 1) Article III Standing Requirement

Before proceeding to review the merits of a case, even at this early procedural juncture, the Court has a duty to assure itself that Plaintiffs have Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Specifically, Plaintiffs bear the burden of establishing 1) an injury in fact, 2) a causal connection between the injury and the conduct complained of, and 3) that the injury will be redressed by a favorable decision. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 244 (3d Cir. 2012) ("*Schering III*"). These three elements constitute "the irreducible constitutional minimum" of Article III standing. *Lujan*, 504 U.S. 555 at 560-61.

The first element requires that "the party bringing suit must show that the action injures him in a concrete and personal way." *Id.* at 581 (Kennedy, J., concurring in part and concurring in

judgment). This is so because Article III "limit[s] access to the federal courts to those litigants best suited to assert a particular claim." *The Pitt News v. Fisher*, 215 F.3d 354, 362 (3d Cir. 2000) (internal citations omitted). The second element, causation or traceability, requires that "there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal citations omitted). In order to satisfy the final element, redressability, a plaintiff must demonstrate that the purported harm will be redressed if the relief it seeks is granted. *See Massachusetts v. EPA*, 549 U.S. 497, 524 (2007).

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (alteration in original). "In evaluating a Rule 12(b)(1) motion, a court must first determine whether the movant presents a facial or factual attack." *Schering III*, 678 F.3d 235, 243 (3d Cir. 2012) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). A facial attack takes the facts in the pleadings as true, construed in the light most favorable to the plaintiff, and determines therefrom whether jurisdiction exists. *Gould Electronics Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000), *holding modified by Simon v. United States*, 341 F.3d 193 (3d Cir. 2003); *Mortensen*, 549 F.2d at 891; *see Lujan*, 504 U.S. at 561. A factual attack, on the other hand, allows the district court to consider evidence outside the pleadings, to which "no presumptive truthfulness attaches," weigh evidence, and shifts the burden of proving jurisdiction onto the plaintiff. *Mortensen*, 549 F.2d at 891. A factual attack typically arises when recourse to evidence outside the pleadings is required and a key jurisdictional fact is disputed.

Here, the Court is presented with a facial attack. Merck contends that, taking the Complaints on their face, Plaintiffs fail to allege an injury which can be traced to the Programs.

Thus, the Court will take the facts in the Complaint as true and construe them in the light most favorable to Plaintiffs.

### 2) The Parties' Positions

Merck construes Plaintiffs' Complaints as alleging, in the most basic form, that but-for the Programs, "a doctor might have prescribed a lower-priced drug; the patient then might have purchased the lower-priced drug; and [Plaintiffs] thus could have had lower reimbursement costs." (Def.'s Br. 17.) Merck alleges this alleged causation dynamic cannot meet Article III's traceability requirement as to any of Plaintiffs' claims.[5] (Def.'s Br. 17, 31 n.9, 44.) The Court agrees and will DISMISS the Complaints without prejudice and grant leave to amend the Complaints.

According to Merck, Plaintiffs' alleged causal link fails because Plaintiffs have failed to "plead any facts showing that any physician's prescribing decision was affected in any way by a coupon for a drug that was paid for by [Plaintiffs]." (Def.'s Br. 17.) Indeed, Merck implies that the presence of this "learned intermediary" in the causal chain may bar Plaintiffs' claims as a matter of law. Plaintiffs reject Merck's contentions and state that the Complaints allege the requisite injury and causation. Plaintiffs do not, however, directly address Merck's argument that they lack Article III standing and focus more closely on RICO standing, anti-trust injury and causation related to the tortious interference claim. (Pls.' Opp'n 15-18, 28-37, 49-50.)

---

[5] Merck also raises several discrete challenges to Plaintiffs' standing to bring their claims. Merck alleges that Plumbers, in addition to lacking Article III standing, also lacks RICO standing and anti-trust standing sufficient to bring its RICO claims and commercial bribery claim, respectively. The Court, however, need only address the most basic Article III standing, jurisdictional issue to resolve this matter.

3) **Discussion**

a. **Plaintiffs have not Alleged Sufficient Facts to Infer Causation**

Merck's Article III challenge contends that Plaintiffs have simply failed to allege any facts which show that their alleged injury of increased costs is due to the Programs. For example, Merck points out that the Complaints fail to set forth *any* factual allegations that an individual patient purchased a Merck product that was reimbursed by Plaintiffs because of the Programs (Def.'s Br. 18.) Rather, as argued by Defendant and adopted by the Court, Plaintiffs' "alleged standing is based on pure conjecture about the actions and motivations of unidentified doctors and unidentified patients with respect to unidentified prescriptions and unidentified payments by [Plaintiffs]." (Def.'s Br. 19.)

A case involving the alleged malfeasance of one of Merck's competitors is instructive. *See In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 06-5774 (SRC), 2010 WL 2346624 (D.N.J. June 9, 2010) ("*Schering II*"), *aff'd*, 678 F.3d 235 (3d Cir. 2012). In *Schering II*, a pharmaceutical firm was accused of marketing its products to doctors for off-label use in order to increase the amount of product sold into the market place. *Id.* at 1. The plaintiffs in that case, third-party payors similar to Plaintiffs herein, alleged that this led the plaintiffs to pay for drugs that otherwise would not have been used by their members. *Id.* at 12. The *Schering II* court found that the named plaintiffs therein had failed to demonstrate standing because the complaint did "not contain factual allegations that support[ed] Named Plaintiffs' conclusion that they paid for off-label prescriptions written for the Subject Drugs as a result of the unlawful marketing practices described in the pleading." *Schering II*, 2010 WL 2346624, at *7. The *Schering II* court noted that a "plausible showing of having been personally harmed by Defendants' conduct is fundamental to each Named Plaintiff's standing to pursue this action under Article III . . . ." *Id.* Lacking allegations "connecting the Named Plaintiff TPPs' purchases of the Subject Drugs with the alleged

12

fraudulent promotion and/or bribes," the Court concluded that the *Schering II* plaintiffs had failed to meet their pleading burden under Rule 12(b)(1) and Article III. The Court applied this reasoning to the plaintiff's RICO and tortious interference claims. *Id.* at *11-12. The Third Circuit affirmed these conclusions upon appeal. *Schering III*, 678 F.3d at 245-48 ("[B]oth groups of plaintiffs lacked standing because, *inter alia*, they did not allege a plausible nexus between the assailed marketing campaign and the physicians' decisions . . . ."). Moreover, the Third Circuit did not undergo a RICO causation analysis, because:

> [P]rior to considering whether [Plaintiff] has standing to bring a RICO claim, we must determine whether it has Article III standing to invoke the jurisdiction of this Court. Because we find that [Plaintiff] has not established that its alleged injury is fairly traceable to [Defendant's] alleged wrongful conduct, we conclude that the Complaint was properly dismissed for lack of Article III standing.

*Id.* at 246.

The reasoning from the *Schering* cases applies here. Although *Schering* dealt with a slightly different dynamic than the interference alleged in this case, it is a distinction without a material difference. In *Schering*, the drug maker was marketing to and allegedly directly affecting the decisions of doctors. Here, the alleged malfeasance on the part of Merck was aimed directly toward the patients. Nevertheless, a thorough review of the Complaints reveals that there is no allegation that Merck's actions caused any individual doctor to prescribe a Drug covered by one of the Programs when he otherwise would not have. The Complaints also lack any individualized allegation that: 1) any patient insisted on receiving a prescription for a Drug covered by the Program that his doctor would not have otherwise prescribed, 2) that Drug was prescribed, and 3) Plaintiffs were compelled to pay for that prescription in lieu of a cheaper alternative medication. The Complaints are simply devoid of any factual allegation that the Programs led any of Plaintiffs' members to receive prescriptions for the Drugs that they otherwise would not have.

In fact, the holdings from the *Schering* cases are even more appropriately applied in this case. In *Schering*, the defendant pharmaceutical company was accused of directly attempting to manipulate the prescribing decisions of the "learned intermediary." Here, there is no allegation that the Programs had any direct effect on the prescribing activities of Plaintiffs' members' physicians. Additionally, there are simply no facts in the Complaints which identify any individual instance in which Plaintiffs were forced to pay for medication they otherwise would not have. This alone—the failure to allege distinct instances in which Plaintiffs were forced to purchase medications they otherwise would not have, if not for the existence of the Programs—is sufficient to dismiss Plaintiffs' Complaints without prejudice.

This holding applies to Plaintiffs' RICO claims, commercial bribery claims and tortious interference claim because each claim relies, in essence, upon the basic contention that Plaintiffs were forced to pay for Merck's branded drugs over cheaper equivalent medications. Plaintiffs have simply failed to plead the facts necessary to infer that any such event ever took place. Plaintiffs have failed to meet the causation requirement of the Court's Article III standing analysis. The Complaints are DISMISSED without prejudice.

### III.    Conclusion

For the reasons stated above, Plumbers' and United's Complaints are DISMISSED without prejudice. Leave to file amended complaints are granted. Any amended complaints shall be filed within thirty (30) days. An Order consistent with this Opinion will be entered.

Dated: 4/29/13

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE