James E. Cecchi
Lindsey H. Taylor
Caroline F. Bartlett
Donald A. Ecklund
CARELLA BYRNE CECCHI
OLSTEIN BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Thomas M. Sobol
Lauren Guth Barnes
HAGENS BERMAN SOBOL SHAPIRO
LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700

Kenneth A. Wexler
Bethany R. Turke
Dawn M. Goulet
Amy E. Keller
WEXLER WALLACE LLP
55 West Monroe St., Suite 3300
Chicago, IL 60603
(312) 346-2222

*Attorneys for Plaintiffs and the classes*

Lisa J. Rodriguez
Nicole M. Acchione
SCHNADER & LEWIS
220 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002
(856) 482-5222

James G. Stranch, III
J. Gerard Stranch IV
Joe P. Leniski, Jr.
Michael J. Wall
BRANSTETTER STRANCH & JENNINGS
PLLC
227 Second Avenue North, 4th Floor
Nashville, TN 37201
(615) 254-8801

Jeffrey L. Kodroff
SPECTOR ROSEMAN KODROFF &
WILLIS PC
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300

Jeffrey A. Leon
COMPLEX LITIGATION GROUP LLC
513 Central Avenue, Suite 300
Highland Park, IL 60035
(847) 433-4500

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL 572 HEALTH AND WELFARE FUND and UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 464A HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>               Defendant. | Civil Action No.: 12-1379 (MAS)(LHG)<br>Civil Action No.: 12-3652 (MAS)(LHG)<br><br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT and JURY DEMAND** |

## I.      INTRODUCTION

1.      Plaintiffs Plumbers and Pipefitters Local 572 Health and Welfare Fund ("Plumbers") and United Food and Commercial Workers International Union, Local 464A Health and Welfare Fund ("Local 464A") (collectively, "Plaintiffs") bring this proposed class action against Defendant Merck Co., Inc. ("Merck" or "Defendant") to challenge Merck's unlawful prescription co-payment ("co-pay") subsidy programs.  Through those programs, Defendant knowingly causes Plaintiffs and thousands of other third-party payors ("TPPs") to pay for Defendant's branded drugs, Janumet, Janumet XR, Januvia, Nasonex, Vytorin, and Zetia, when those TPPs could and would pay for less-expensive therapeutic alternatives.  Defendant accomplishes this by intentionally and wrongfully interfering with contracts designed to ensure that TPPs pay for cost-effective medications and by misrepresenting to TPPs that its subsidy payments are secondary insurance, when in reality they are coupons secretly paid to TPPs' members for the purpose of frustrating TPPs' cost-sharing requirements.

2.      Cost-sharing provisions in prescription drug benefit plans unite the financial interests of the health insurer with the interests of its beneficiaries.  Requiring health plan members to pay a portion of the high cost of a branded prescription drug - either a co-pay (a fixed dollar amount) or co-insurance (a percentage of the cost of the drug at retail)[1] - provides a reasonable, personal incentive for privately-insured individuals to choose less-costly, usually generic, medications, and drives down the cost of the much larger residual portion paid by the TPPs.  Absent such incentives, patients have no financial motivation to select lower-cost drugs.  Thus, to ensure that TPPs' cost-sharing provisions are effective, TPPs' pharmacy benefit managers ("PBMs") enter into contracts with network pharmacies requiring those pharmacies to

---

[1] As used herein, the term "co-pay" should be understood to include both fixed dollar amount co-payments and percentage co-insurance payments.

comply with the terms and conditions of TPPs' prescription drug benefit plans and collect co-payments *only and directly from patients*.  This is one mechanism by which drug prices are kept in check.

3.     Drug manufacturers do not like cost-sharing provisions because they work, *i.e.*, they are very effective at motivating patients to choose lower cost drugs.  Thus, many manufacturers, including Defendant, began subsidizing members' co-payments for their key brand name prescription drugs.  These subsidies are paid for the sole purpose of undermining cost-sharing arrangements by eliminating plan members' incentives to use less-expensive drugs.  Consequently, despite (and contrary to) the cost-sharing provisions in their prescription drug plans, TPPs end up paying for more costly branded drugs.  A recent study estimated that these subsidies will increase TPPs' prescription drug costs by *$32 billion* over the next ten years.

4.     Moreover, these co-pay subsidy programs offer generous financial incentives to pharmacies, whose prescription drug businesses operate on thin margins, to honor these programs.  Consequently, the programs compromise the gatekeepers of TPPs' cost-sharing provisions and interfere with the contracts between those pharmacies and TPPs' PBMs.

5.     Presenting a co-pay subsidy card or coupon to a pharmacist reduces the price of the drug to the patient.  However, the use of that coupon is not disclosed - and is in fact hidden from - the TPP.  Defendant, through its co-pay subsidy program administrator, instructs the pharmacist to process the coupon as secondary insurance and not as a coupon, concealing the payment of the co-pay subsidy from the TPP.  Thus, the TPP assumes the pharmacy collected the personal cost-share obligation from the member pursuant to its contractual duties, yet the manufacturer's digital paper trail discloses the truth - that the co-pay was subsidized by the manufacturer.

2

6.      Plaintiffs and the proposed classes allege two bases for Defendant's liability. First, federal racketeering law prohibits this form of insurance fraud.  Defendant disguises its co-pay subsidies as secondary insurance to interfere with the cost-sharing provisions of the TPPs' prescription drug benefit programs.  Defendant commits this fraud in conjunction with its program administrator, and the fraud is accomplished through the use of United States mail and wires.  This suit thus seeks damages under 18 U.S.C. § 1964(c) for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).

7.      Second, Defendant's co-pay programs interfere with the contracts between the TPP's PBM and the pharmacies in the PBM's network that are designed to ensure the terms and conditions of the TPP's drug benefit program are honored.  Even though Defendant knows that pharmacies are contractually obligated to collect co-pays directly from patients, Defendant designed and implemented its co-pay subsidy programs to induce pharmacies to breach this duty by instead collecting co-pays from Defendant.  Defendant knew that, as a direct result of its interference with the contracts designed to protect the cost-sharing provisions in Plaintiffs' prescription drug benefit programs, Plaintiffs' members would no longer be incentivized to purchase less-expensive therapeutic alternatives and would instead purchase Defendant's far more expensive brand name drugs.  Consequently, Plaintiffs, like all TPPs that have paid for branded drugs covered by Defendant's co-pay subsidy programs, have paid more for prescriptions of Defendant's subsidized drugs than they would have absent Defendant's co-pay subsidy programs.

## II.      PARTIES

8.      Plaintiff Plumbers and Pipefitters Local 572 is a trust fund administered pursuant to the requirements of the Taft-Hartley Act, 29 U.S.C. § 186, by an equal number of trustees appointed by labor representatives and union representatives.  Plumbers is an "employee welfare

3

benefit plan" and "employee benefit plan" maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §186(c)(5), and is defined by Sections 1002(l) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, *et seq.* As such, Plumbers is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).  Plumbers' office is located in Davidson County, Tennessee.  During the course of Defendant's co-pay subsidy schemes, Plumbers paid for more expensive brand name drugs in circumstances where its members' cost-sharing obligations were not paid by them personally but were subsidized by Defendant.  As a result of Defendant's illegal subsidies, Plumbers purchased more of Defendant's expensive brand name drugs than it otherwise would have.  Plumbers was injured as a result of Defendant's unlawful conduct.

9.     Plaintiff United Food and Commercial Workers International Union, Local 464A Health and Welfare Fund is a trust fund administered pursuant to the requirements of the Taft-Hartley Act, 29 U.S.C. § 186, by an equal number of trustees appointed by labor representatives and union representatives.  Local 464A is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to Section 302(c)(5) of the LMRA, 29 U.S.C. §186(c)(5), and is defined by Sections 1002(1) and (3) of ERISA, 29 U.S.C. §1001, *et seq.*  As such, Local 464A is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).  Local 464A's office is located in Little Falls, New Jersey.  During the course of Defendant's co-pay subsidy schemes, Local 464A paid for more expensive brand name drugs in circumstances where its members' cost-sharing obligations were not paid by them personally but were subsidized by Defendant.  As a result of Defendant's illegal subsidies, Local 464A purchased more of Defendant's expensive brand name drugs than it otherwise would have.  Local 464A was injured as a result of Defendant's unlawful conduct.

10.     Defendant Merck & Co., Inc. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey.  Merck markets the branded drugs Janumet, Janumet XR, Januvia, Nasonex, Vytorin, and Zetia.  In or around 2008 through the present, Merck began to subsidize plan members' co-pays in order to increase the number of prescriptions for its brand named drugs purchased by health benefit providers.

11.     McKesson Corporation, with headquarters at One Post Street in San Francisco, California, administers the co-pay subsidy programs for Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia through its McKesson Patient Relationships Solutions division.  McKesson is also the largest drug wholesaler in North America, delivering pharmaceuticals to retail pharmacies and institutional providers in all fifty states.  It also provides a suite of software, automation, and consulting services to hospitals, physician offices, imaging centers, home health care agencies, and payors.  McKesson is not named as a defendant in this action but is an unnamed co-conspirator.

### III.     ARTICLE III STANDING

12.     Plaintiffs have Article III standing to bring this lawsuit.  As alleged herein, Plaintiffs' injuries are directly traceable to Defendant's conduct.

13.     Because Defendant interferes with the contracts between Plaintiffs' PBM and the pharmacies in Plaintiffs' network, and because Defendant and its third-party program administrator instruct pharmacies to disguise Defendant's co-pay subsidies as secondary insurance, Plaintiffs paid for prescriptions of Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia when they could and would have paid for less-expensive therapeutic alternatives.

14.     Immediately after Defendant implemented its co-pay subsidy programs, Plaintiffs saw an increase in the number of annual prescriptions and the annual amounts they paid for the

drugs.  For example, while Plumbers paid $7,853.47 for 32 prescriptions of Januvia in 2009, the year before Defendant is believed to have launched the Janumet/Januvia co-pay subsidy program,[2] Plumbers paid $10,940.48 for 41 prescriptions in 2011.  Plumbers likewise paid $3,612.33 for 59 prescriptions of Nasonex in 2007, the year before Defendant is believed to have launched the Nasonex co-pay subsidy program, compared to $8,531.13 for 99 prescriptions in 2009.[3]

16. Similarly, Local 464A paid $24,419.20 for 379 prescriptions of Nasonex in 2007, the year before Defendant is believed to have launched the Nasonex co-pay subsidy program, compared to the $34,403.47 that it paid for 439 prescriptions in 2009.[4]

16. Indeed, given the widespread availability of Defendant's co-pay subsidy coupons and the significant number of times Plaintiffs have each reimbursed for prescriptions of Defendant's co-pay subsidy drugs during the class periods, one can reasonably conclude that Plaintiffs have paid for those drugs on a number of occasions where Defendant's co-pay subsidies reduced or eliminated Plaintiffs' members' co-pay obligations.

17. Plumbers, for example, paid for 209 presciptions of Janumet, Janumet XR, or Januvia from early 2010 to the present, 267 prescriptions of Nasonex from early 2008 to the present, 183 prescriptions of Vytorin from late 2010 to the present, and 251 prescriptions of

---

[2] As discussed below, Defendant expanded its Janumet/Januvia co-pay subsidy program to cover Janumet XR after the FDA approved the drug in 2012.

[3] Nationally, annual sales of Zetia and Vytorin began to decline in 2008, after unfavorable results from clinical studies were released demonstrating that Vytorin – a combination of Zetia and Zocor – worked no better to lower patients' cholesterol than Zocor alone, a drug available in generic form.  Upon information and belief, Defendant's co-pay subsidy programs for Zetia and Vytorin injured TPPs by mitigating what would have been even further depressed sales of these drugs.

[4] Local 464A does not assert claims regarding the Janumet/Janumet XR/Januvia co-pay subsidy program.

Zetia from late 2010 to the present.

18.     Local 464A likewise paid for 1,918_prescriptions of Nasonex from early 2009 to the present, 1,534 prescriptions of Vytorin from late 2010 to the present, and 1,360 prescriptions of Zetia from early 2011 to the present.

19.     Plaintiffs are unable to point to specific transactions in which Defendant's co-pay subsidy programs were used precisely because of the conduct alleged herein, whereby Defendant and its co-pay subsidy program administrator disguise the subsidies as secondary insurance at the point of sale.[5] Defendant and its administrator, however, possess detailed records of each transaction in which Defendant's co-pay cards or coupons are used and, upon information and belief and as described in more detail below, routinely analyze this data to measure the efficacy of the programs on a very granular level, down to specific TPPs and even specific members.

20.     Defendant and the third-party administrator of the Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia co-pay subsidy programs are thus in exclusive possession of detailed information demonstrating the effectiveness of these programs in reducing the number of abandoned prescriptions and causing TPPs' members to choose Defendant's expensive brand name drugs over less-expensive therapeutic alternatives.  But for Defendant's interference with the contracts between Plaintiffs' PBM and the network pharmacies, the pharmacies would have enforced the terms and conditions of Plaintiffs' pharmacy benefit plans, which provide economic incentives to Plaintiffs' members to utilize less-expensive therapeutic alternatives.  But for Defendant's mischaracterization of its co-pay subsidies as secondary insurance, Plaintiffs likewise would have paid for less-expensive alternatives to Defendant's branded drugs.

---

[5] Efforts to identify patterns in Plaintiffs' transactional reimbursement data that are indicative of the use of Defendant's co-pay subsidy programs are further complicated by the fact that some of the less-expensive therapeutic alternatives to Nasonex, a seasonal allergy medication, are available over-the-counter and thus would not appear in Plaintiffs' prescription drug data.

21.     Plaintiffs are injured by Defendant's conduct because Plaintiffs pay for Defendant's more expensive branded drugs when they can and would pay for less-expensive alternatives, and they pay more for each prescription in which one of Defendant's co-pay subsidies is processed as secondary insurance rather than the discount that it is.

## IV.     JURISDICTION AND VENUE

22.     This action arises under section 4 of the federal RICO statute (18 U.S.C. § 1964); the Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1964 (RICO).  This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a) because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

23.     In addition, the Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) in that this is a class action in which the amount in controversy exceeds $5 million, exclusive of interest and costs, and at least one member of each putative class is citizen of a State different than that of Defendant.

24.     Merck's activities were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States.  Venue, therefore, lies within this District under 28 U.S.C. § 1391.

25.     Venue is also proper under the special venue provisions of the federal racketeering laws, 18 U.S.C. § 1965, as Merck is headquartered in this District and transacts business within this District.

## V.     FACTS

**A.     Co-pay subsidy programs take direct aim at the cost-sharing provisions of drug benefit plans.**

26.     Branded drug manufacturers have taken direct aim at the cost-sharing provisions

of drug benefit plans.  Whether characterized as coupons, rebates, subsidies, or kickbacks, these payments to plan members interfere with health plans' cost-sharing provisions that are enforced through contracts between the network pharmacies and TPPs' PBMs.  In addition, the programs are designed, quite specifically, to reduce or eliminate privately-insured individuals' personal payment obligations to increase utilization of Defendant's more expensive brand drugs, leaving TPPs like Plaintiffs to foot the bill.

27.     Although co-pay subsidy programs vary as to the drugs covered and the specific amount of the subsidy or rebate, these programs work in very similar ways.  Individuals can enroll in drug-specific programs online by providing basic information (name, address, and whether they have private health insurance coverage).  The drug manufacturer, or its co-pay subsidy program administrator, generates coupon numbers for each individual and, in some instances, mails them wallet-sized cards.  In other cases, insureds can print the cards from online websites, or virtual versions of the cards are transmitted to pharmacists.  These cards include instructions to pharmacists regarding how to process the subsidies.

28.     A member presents his or her coupon or card at the pharmacy with a prescription, and the pharmacist, as instructed by the drug manufacturer, processes the prescription in a way that conceals the use of the co-pay subsidy.  More specifically, and as discussed more fully below, the pharmacist first transmits the insured's insurance information to the primary insurer-TPP (or the TPP's PBM), which adjudicates the claim and transmits back to the pharmacist the amount of the member's co-pay or co-insurance obligation.  Only after the patient's primary insurance is processed (and the reimbursement request submitted) does the pharmacist initiate a separate transaction to process the co-pay subsidy.

29.     As a result, the TPP pays for the medication without being told that the usual cost-

share obligation has not been paid by the insured, but rather by the brand manufacturer.

30.     In effect, Defendant interferes with pharmacies' contracts to induce plan members to choose its branded drugs over less-expensive therapeutic alternatives, knowing that TPPs pay for the bulk of the cost of the drugs.  When an insured purchases a prescription using Defendant's co-pay subsidy, the insured's out-of-pocket cost for the branded drug will be closer to, if not the same or less than, the out-of-pocket cost for a therapeutic alternative.  But the price of the TPP's share of the therapeutic alternative (with the lower co-pay) and the branded drug (with the higher co-pay) may differ by a factor of ten.

> **An Example:** A brand drug company offers a co-pay card giving privately-insured individuals the opportunity to save up to $25 off their co-pay for each prescription filled for a particular, and expensive, medication for chronic illness. The plan member brings the co-pay card to his pharmacy and provides his insurance card and co-pay card to the pharmacist.  The pharmacist processes information from the insurance card and transmits it to the PBM.  The PBM recognizes the drug as a TIER 3 brand drug for the plan member and relays a $70 obligation to the insurer and a $30 co-pay to the plan member.
>
> In a separate, later transaction, the pharmacist processes information from the co-pay savings card or coupon.  The co-pay card program administrator recognizes the $30 co-pay and covers $25 thereof, leaving $5 for the plan member to pay out-of-pocket (while the pharmacy charges the remaining $25 to the manufacturer through the co-pay card program administrator).  The insurer is required to pay for the branded drug as if it were priced at $100, even though the actual cost of the drug in the subsidized transaction is $75, and even though there are equally appropriate, less expensive medications available at prices around 1/3 the cost of the branded drug.

31.     By their terms, Merck's co-pay subsidy programs (i) apply to individuals who are privately insured under a prescription drug plan that requires personal cost sharing by the member for retail prescription drugs such as those covered by the co-pay subsidy programs, (ii) undermine this arrangement between the insurer and the insurer's member (enforced through contracts between the TPP's PBM and network pharmacies) by reducing or eliminating such personal cost-share obligations, (iii) cause the TPP to pay for more units of expensive co-pay

subsidy drugs than it would have if Merck had not interfered with the parties' performance of the contract, (iv) increase the overall burden on the plan for providing benefits to its members, and (v) effectively operate as a form of unregulated secondary health insurance.

**B.    Cost sharing is critical to the effective functioning of health care in the United States and is enforced by contracts at each step of the pharmaceutical reimbursement chain.**

32.    In most economic systems, the person who selects the product or service is also the person who pays for the product or service.  Health care is a notable exception.  Typically, the patient purchases the medication and a public or private TPP pays for it.  Without cost-sharing provisions - such as percentage co-insurance or graduated co-pays - patients have little or no incentive to purchase less-costly drugs.

33.    For this reason, PBMs, on behalf of TPPs, enter into contracts with pharmacies in their pharmacy networks, described more fully below, that provide that pharmacies must collect co-payments *from the patient*.  Similarly, PBMs include policies in pharmacy provider manuals and other similar documents that require those pharmacies to collect co-pays from the patient.  In addition, those agreements and manuals require pharmacies to support the terms of the TPPs' prescription drug benefit plans, including formularies or other cost-containment measures.[6]  PBMs know that, without policies in place requiring pharmacies to honor the terms of TPPs' plans, the cost savings they promise their clients may not be realized.

34.    Public and private health insurance relies on cost sharing to re-align the interests

---

[6] Formularies are pre-approved lists of prescription drugs that a TPP and its PBM use to make reimbursement decisions and determine the amount a consumer must pay out-of-pocket when a prescription for a particular drug is filled.  Although the TPPs rely on the PBMs to help them develop their formularies, the TPPs ultimately decide which formulary to adopt (and, of course, with which PBM to contract for this or any other purpose).  The PBMs' assistance in developing and managing the TPPs' formularies (or non-formulary co-pay structures) is one way in which the PBMs help TPPs control the cost of providing prescription drug benefits.

of patients and TPPs.  Although cost-sharing techniques vary by type and amount, they all have the common purpose of encouraging price sensitivity by imposing a personal financial obligation on the covered individual, in order to achieve an acceptable balance between coverage and cost. Insured individuals often face point-of-service charges for medical services and prescription drugs.  These include deductibles (amounts that must be paid before some or all services are covered), co-payments, and/or co-insurance.  Health benefit providers impose different degrees of cost sharing for different services: annual deductibles for medical services, a separate deductible for prescription drugs, hospital and outpatient co-insurance, co-pays for physician office visits, and/or out-of-pocket maximum amounts.

35.     Cost sharing is therefore fundamental to almost all medical spending in the United States.  Whether it be for hospital, physician, dental, or other health care provider services, for employer-sponsored or individual plans, for medical procedures, or for prescription drugs, numerous forms of cost sharing are imposed as a critical component of public and private health plans in order to carefully incentivize cost-conscious use of medical services and products while at the same time affording appropriate access to medical care.

**C.     Health benefit providers use cost sharing to cope with ever-increasing prescription drug costs.**

36.     Cost sharing has particular importance in the coverage for prescription drug benefits.  In 2000, prescription drug spending in the U.S. exceeded $142 billion.  By 2012, spending ballooned to more than $325 billion.  This increase in drug spending is in large part due to high and rising prices for the most well-known and most often used brand name drugs.  In recent years, the prices of the most widely used brand name drugs increased annually at approximately 6% to 9% - two or three times the general rate of inflation.

**1.     Public and private TPPs use tiered cost sharing to reduce spending on prescription drugs.**

37.     For both public and private TPPs, prescription drug cost sharing is widely and effectively used.

38.     In the public realm, beneficiaries under Medicaid have, for years, been required to pay a portion of the cost of their medications despite the fact that Medicaid eligibility is limited to low-income and disabled individuals.  Even beneficiaries under Medicare Part B - generally the elderly receiving critical physician or in-home services - have been required to share the costs of their medications.  And, more recently, beneficiaries under Medicare Part D are required to make co-payment or co-insurance payments under terms specified by Medicare Part D plan sponsors.

39.     Most health insurance in the United States is provided by private TPPs.  In the private realm, cost sharing for prescription drugs is similarly widespread.  Under private health insurance plans, individuals and employers pay premiums to TPPs and, in turn, the TPPs agree to pay all or a portion of the cost of needed medical services and products.[7]  Well over 95% of covered employees in employer-sponsored private health benefit plans have prescription drug benefits.  More often than not, the form of cost sharing is a co-payment rather than co-insurance, although co-insurance has steadily increased over time.

40.     Drug benefit cost-sharing provisions have evolved over the decades, with the key innovation being the differentiation of co-payments among differing drugs.  When drug insurance was first introduced, the plan member typically paid the same co-insurance (or co-pay) rate for any drug.  Over time, that changed, and the price now depends on the "tier" in which the drug is placed.  The early tiered plans typically had only two tiers, but most plans now have three

---

[7] In the United States, most private health insurance is paid at least in part by employers, although it is also common for employees to contribute to the cost of their premiums.  Truly individual health insurance policies may also be purchased.

or more tiers.  In recent years, an increasing number of plans have created a fourth tier of drug

cost sharing, which may be used for lifestyle drugs or expensive biologics:

> **Generic drugs:** A drug product that is no longer covered by patent protection and thus may be produced and/or distributed by multiple drug companies.
>
> **Preferred drugs:** Drugs included on a formulary or preferred drug list; for example, a brand name drug without a generic substitute.
>
> **Non-preferred drugs:** Drugs not included on a formulary or preferred drug list; for example, a brand name drug with a generic substitute.
>
> **Fourth-tier drugs:** New types of cost-sharing arrangements that typically build additional layers of higher co-payments or co-insurance for specifically identified types of drugs, such as lifestyle drugs or biologics.
>
> **Brand name drugs:** Generally, a drug product that is covered by a patent and is thus manufactured and sold exclusively by one firm.  Cross-licensing occasionally occurs, which allows an additional firm to market the drug.  After the patent expires, multiple firms can produce the drug product, but the brand name or trademark remains with the original manufacturer's product.

41.     The number of plans requiring some form of cost sharing that differentiates

between types of drugs has steadily increased, but has plateaued in recent years.  Almost 90% of

privately-insured individuals are members of plans that have some formula for tiered cost-

sharing; over 75% are enrolled in plans with three, four, or more tiers of cost sharing for

prescription drugs.

42.     A drug's tier placement largely depends on its cost: Tier 1 drugs are less

expensive, usually generic, drugs.  More expensive, usually brand name, drugs are placed on

higher tiers.  Health benefit providers encourage members to choose Tier 1 drugs by imposing a

lesser co-pay than that imposed for Tier 2 drugs.  Tiered co-pays thereby provide reasonable

personal financial incentives to individuals to use similarly effective, but less costly,

medications.  If a drug is placed on Tier 1, the member pays the pharmacy a relatively small co-

pay.  If the drug is placed on Tier 2, the co-pay obligation increases.  The difference in the co-

pay between Tier 2 and Tier 1 incentivizes the plan member to choose the less-costly medication.

If a drug is a Tier 3 drug, a therapeutic alternative or generic equivalent will typically exist for the medication in Tier 2 and/or Tier 1.

43.     As efforts to control healthcare costs mount, another major, long-term trend has been the increasing amount of the co-pay required.  Over the last decade, average retail co-pay levels increased by about 62%.  Average co-pays for Tier 2 drugs increased by about 127%.  Average co-pays for Tier 3 drugs increased the most, from about $17.53 in 1998 to about $42.95 in 2009, an increase of about 149%.  As expected, the 2009 average retail co-pay for Tier 4 is even greater, at $62.11.

44.     Widespread use of cost sharing for prescription drugs, the increasing trend of multi-tier cost sharing, and the increasing amounts for co-pays are, of course, no accident.  Although other forms of prescription drug cost reductions may have more dramatic results - including the market entry of AB-rated generic equivalents - cost sharing has defined, measurable results.  Cost sharing provides personal financial incentives to plan members to select the most cost-appropriate medications.

45.     Patients are sensitive to differences in co-pay requirements, particularly for maintenance drugs they anticipate taking for long or indefinite periods of time.  According to a 2007 literature review published in the Journal of the American Medical Association, every 10% increase in cost sharing reduces drug spending by 2-6%.  And drug companies are well aware that plan members consider co-pay differences when choosing prescription drugs.  In 2008, Bob McMahon, Merck's President of U.S. Pharmaceuticals, cited TPPs' efforts to incentivize the use of generic alternatives and increased co-pays as two of the company's "key drivers":

> BOB MCMAHON: I think the key drivers are as follows. One, generic utilization continues to ramp up. You have some very high-quality generics across several therapeutic areas, where managed care and other payers have gotten very good at

15

driving up generic utilizations. I can talk about specific large customers that see generic utilization rates in the 65% to 75% range. So, that's one.

\* \* \*

And then, more recently, I have to tell you that I think it's about the economy. We have a lot of our patients now who have $50 copays. I will tell you that a large fraction of those patients will walk into a pharmacy and be told that they have to have a $50 copay, and they will walk out and not fill their prescription. I think we finally reached the point where copays have created a real deterrent and a real test for what somebody's willingness [is] to actually fill a prescription.

46.    Similarly, drug companies like Defendant are aware of the effectiveness of tiered formularies and formulary-like co-pay structures in curtailing TPP expenditures on expensive branded drugs.  They know that, as co-pays for branded drugs increase, utilization declines. Consequently, for branded drugs just introduced on the market, drug manufacturers often pay rebates (although the types of rebates vary) to TPPs in exchange for the TPP's placement of that branded drug on formulary, or on a certain tier of that formulary, where the corresponding co-pay is low.  These rebate payments are significant, and drug companies would not pay them absent an understanding that the amount of a co-pay affects utilization.

    **2.    Branded drugs are expensive; differentiated cost sharing for branded and generic drugs helps TPPs curtail prescription drug spending.**

47.    Generic drugs thus play a critical role in TPPs' attempts to curb ever-escalating prescription drug costs.  Generic drugs are almost always significantly less expensive than their branded counterparts.  On average, generic prescriptions cost payers $16, preferred brand prescriptions cost $118, and non-preferred brands cost $124.  Tiered cost-sharing provisions thus incentivize generics by imposing a lower co-pay for generics than for brands.

48.    AB-rated generics are, by definition, substitutable for their branded equivalents. All fifty states have laws that permit, and in some cases require, pharmacies to substitute AB-

rated generics for their branded counterparts when an AB-rated equivalent is available.  Health benefit providers create strong incentives for plan members to demand generic drugs by imposing different co-pays for branded and generic drugs.  Consequently, more than 90% of prescriptions for drugs that are available in both branded and generic forms are filled with generics.  2010 IMS industry data - the industry's gold standard - reflects that, on average, AB-rated generics capture 80% of the brand's sales within the first six months.

49.    In addition to AB-rated generics, a brand name drug may also have less expensive, often generic, therapeutic alternatives.  Therapeutic alternatives are not bioequivalent, but instead are alternative medicines that treat the same medical condition in a similar way.

**D.    Defendant, through its third-party administrator, induces pharmacies to accept co-pay subsidies in violation of the pharmacies' contractual duties.**

50.    Health benefit providers hire PBMs to manage and administer the prescription drug benefit component of their health insurance plans.  As part of the prescription drug management responsibilities they perform on behalf of TPPs, PBMs contract with pharmacies to establish retail networks for dispensing prescription drugs to TPPs' insureds.

51.    Pursuant to the contracts negotiated by the PBMs for the benefit of the TPPs, pharmacies agree to dispense prescription drugs to a TPP's insureds in accordance with the terms and conditions of the TPP's health benefit plan.  As a result, a TPP's insured can purchase drugs at network pharmacies by paying the co-pay required under his/her plan; the TPP then reimburses the pharmacies for such purchases.

52.    Each PBM[8] uses a standard form contract - frequently referred to as a pharmacy

---

[8] As of 2005, there were approximately 40-50 PBMs operating in the United States. http://www.ftc.gov/reports/pharmbenefit05/050906pharmbenefitrpt.pdf.  The PBM market is also highly concentrated.  In the second quarter of 2011, the "Big 3" PBMs - Express Scripts ("ESI"), Medco, and CVS Caremark - combined had nearly 40% of the market:  ESI covered 90

network agreement or a participating provider agreement - to memorialize its agreements with the pharmacies in its network.  Because PBMs enter into contracts with thousands of pharmacies, those form contracts are not heavily negotiated and include the same material terms with respect to the collection of co-pays.  PBMs frequently issue pharmacy manuals as supplements to their pharmacy network agreements; participating pharmacies must also abide by the terms of these manuals.

53.    The PBMs' network agreements and manuals recognize the importance of TPPs' cost-containment initiatives, including TPPs' formularies and/or other co-pay requirements. They include provisions requiring pharmacies in their networks to behave in accordance with these initiatives, provisions defining "co-pays" or "co-payments" as payments made *by the insureds*, provisions requiring that the pharmacies collect *from the insureds* any co-pays required under a TPP's prescription drug plan, and/or provisions prohibiting pharmacies from changing or waiving the required co-pay amounts.  For example, the 2005 Express Scripts Pharmacy Network Manual defines "Copay" as "[t]hat portion of the total charge for each prescription drug *which a Member is required to pay* the Pharmacy in accordance with the Member's Prescription Drug Program."[9]  It further provides that "[t]he total Copay to be collected will be calculated and displayed electronically in the Copay field during online claims transmission," and that "[t]he Copay must be the amount *charged to the Member* and cannot be changed."[10]  Upon information and belief, the current Express Scripts Network Provider Manual contains similar provisions.

_____

million lives, CVS Caremark covered 85.1 million lives, and Medco covered 65 million lives. Since that time, ESI and Medco have merged.

[9] Express Scripts, Inc. Pharmacy Network Manual: Guidelines, Policies and Procedures for Express Scripts, Inc. Network Pharmacies (2005), at 64 (emphasis added).

[10] *Id.* at 6 (emphasis added).

54.     Defendant knows that retail pharmacies are required, under the terms of their agreements with the PBMs, to collect the applicable co-pays from the TPPs' insureds.  The standard pharmacy network agreements establishing this duty are ubiquitous in the industry.  Many such agreements are available online.

55.     Defendant also knows that pharmacies must be coerced into accepting co-pay savings cards and coupons.  Co-pay subsidy programs create extra work for pharmacists, who must adjudicate a second transaction for every prescription that is filled using a co-pay subsidy.  Moreover, pharmacies have no intrinsic economic incentive to encourage plan members to fill prescriptions for expensive, brand name drugs where less-expensive therapeutic alternatives are available in generic form because, although generic drugs are cheaper to consumers and TPPs than branded drugs, pharmacies have higher profit margins on generic drugs.  On the other hand, because pharmacies' prescription drug businesses operate on relatively thin margins, particularly for branded drugs, the inducements offered by Defendant to administer its co-pay programs are significant.

56.     Knowing all of this, Defendant, through its third-party administrator, provides significant economic incentives[11] to pharmacies for the purpose of inducing them to accept Defendant's co-pay savings cards and coupons (and thereby increase the sales of, and profits on, its co-pay subsidy drugs).  In doing so, Defendant knowingly and intentionally interferes with the contractual duty the pharmacies owe, under their pharmacy network contracts, to collect any co-pays directly from plan members.

---

[11] Upon information and belief, the administrative fees that manufacturers and co-pay program administrators pay for pharmacists to process co-pay cards are several times greater than the dispensing fees pharmacists receive from PBMs for simply dispensing the covered drugs in the first place, making co-pay subsidy cards an important new profit center for retail pharmacies.

**E.    Defendant and its third-party administrator hide the co-pay subsidies from PBMs and third-party payors like Plaintiffs by instructing pharmacies to process co-pay subsidies as if they were secondary insurance.**

57.    When an individual has more than one insurance policy (*e.g.*, is covered under a plan with his/her employer and is a dependent under a spouse's plan), each TPP may cover a portion of the cost of the prescription drug benefit.  The order in which the claims are paid by the TPPs is determined by a series of rules developed by the National Association of Insurance Commissioners and adopted by most state insurance departments.  Under these rules, the pharmacy first submits the claim - electronically, through its computerized data management system - to the primary plan.  The primary plan does not receive information regarding the amount a plan member's secondary or tertiary insurers may cover, and it adjudicates the claim and pays just as it would if it were the plan member's only insurance coverage.  In contrast, the payment request that the pharmacy submits to the secondary plan indicates the payment already made by the primary plan, thereby preventing the member from receiving duplicative coverage.

58.    Similarly, when a plan member presents a prescription at the pharmacy along with one of Defendant's co-pay subsidy cards or coupons, the pharmacist first processes the member's primary insurance coverage by entering the patient's health insurance information in the primary insurance fields.  Insurance information regarding the transaction for that particular individual and his/her insurer is transmitted back to the pharmacist from the TPP or its PBM, including the amount of the co-pay that the pharmacy is required to collect from the member.

59.    Because it is instructed to do so by Defendant and Defendant's third-party administrator, the pharmacy then, in a separate, later transaction, processes the co-pay subsidy as if it were secondary insurance by entering information (that is printed on the co-pay cards/coupons or provided in separate instructions by Defendant's program administrator for this purpose) into the secondary insurer fields.  Information regarding the extent of the co-pay

subsidy is then transmitted to the pharmacist from the Defendant's third-party administrator.  If any co-pay amount remains after the subsidy is applied, the pharmacist collects it from the plan member.

60.     Although Defendant is not a registered insurance provider in any state and Defendant's co-pay subsidy programs do not comply with the myriad laws governing the provision of health insurance, Defendant intends for its co-pay subsidies to be adjudicated as a form of secondary insurance and provides pharmacies with the information necessary to process them as secondary coverage.  By causing pharmacies to process its co-pay subsidies as if they were secondary insurance coverage, Defendant fraudulently disguises the payments as something that they are not, concealing the payments from primary-insurer TPPs.

**F.     Co-pay subsidies cause TPPs to pay for subsidized prescriptions for expensive branded drugs.**

61.     These co-pay subsidies work.  According to a 2011 study undertaken for the Pharmaceutical Care Management Association and based on evidence from drug coupon administrators, "25% of [co-pay] coupon use results in a couponed drug being used instead of a preferred brand or generic that might have been used in the absence of the coupon."[12]  More than 100 million prescriptions were associated with co-pay coupons in 2010, accounting for 11% of brand prescriptions.[13]

62.     These numbers will grow exponentially: At current trends, the number of prescriptions associated with co-pay subsidy programs will increase by 15% per year, reaching

---

[12] Visante, "How Copay Coupons Could Raise Prescription Drug Costs By $32 Billion Over the Next Decade", Nov. 2011, *available at* http://www.pcmanet.org/images/stories/uploads/2011/Nov2011/visante%20copay%20coupon%20study.pdf ("Visante Study"), at 11.

[13] *Id.* at 12.

500 million prescriptions and approximately 50% of non-specialty brand prescriptions by 2021.[14] All told, employers and other plan sponsors will likely spend an extra $32 billion on prescription drugs from 2012-2021 as a result of these co-pay subsidy programs.[15] Illinois plans are expected to spend nearly $1.4 billion extra on prescription drug costs as a result of co-pay coupons or programs during that time; plans in Florida, New York, California, and Texas will each spend an extra $2 billion as a result of the same programs.[16]

63.     It is estimated that pharmaceutical companies spend $4 billion on co-pay cards and coupons annually.[17] Drug manufacturer Amgen has stated publicly that spending on its co-pay subsidy programs amounts to about 1% of its total product sales; in the first quarter of 2010, Amgen spent $35 million on co-pay subsidy programs. These amounts are likely to increase as more co-pay subsidy programs are created and more plan members take advantage of existing programs.

64.     Brand-name pharmaceutical manufacturers know co-pay subsidy programs result in increased market share for their more expensive brand drugs: the programs are now a regular part of life cycle planning for branded drugs, typically launching two to three years before AB-rated generic equivalents of the brand name drug are expected to enter the market. The manufacturer tries to maximize the number of prescriptions filled by TPPs' members before pharmacies begin substituting the AB-rated generic equivalents for the brand name drug.

---

[14] *Id.*

[15] *Id.* at 3, 13-15.

[16] *Id.* at 14-15.

[17] Matthew Herper, *How Bargain Lipitor Could Raise Health Costs*, FORBES.COM, http://blogs.forbes.com/matthewherper/2011/03/16/how-bargain-lipitor-could-raise-health-costs/ (last visited Mar. 2, 2012) (citing Mason Tenaglia, managing director of the Amundsen Group, a consulting firm that has studied the cards). *See also* Visante Study at 6.

65.     TPPs have seen significant increases in the number of prescriptions filled for brand name drugs that have co-pay subsidy programs.  Recently, co-pay subsidy administrators have anecdotally reported that their unnamed clients, manufacturers of branded drugs, can earn more than an 8:1 return on their investments in these programs.

66.     Co-pay subsidy administration has become a cottage industry.  Program administrators boast about the effective and efficient methods by which they have wiped out the personal financial incentives of plan enrollees to select less-costly medications.

**G.     Merck subsidized health plan members' co-pays for Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia.**

67.     Defendant designed and implemented the programs described below (collectively, the "co-pay subsidy programs"), relating to the brand name drugs Janumet, Janumet XR, Januvia, Nasonex, Vytorin, and Zetia (collectively, the "co-pay subsidy drugs").

68.     Each of Defendant's co-pay subsidy programs described below alters the carefully calibrated co-payment systems imposed by TPPs on their members and enforced by contracts between TPPs' PBMs and pharmacies in their networks.  Each is intended to steer unsuspecting members toward more expensive brand name drugs when less expensive therapeutic alternatives are available.

**1.     Merck's Multi-Use Savings Card for Januvia, Janumet, and Janumet XR.**

**a.     In the presence of less-expensive therapeutic alternatives, Merck created the Janumet/Janumet XR/Januvia Multi-use Savings Card.**

69.     On October 16, 2006, the FDA approved Januvia (sitagliptin phosphate), a dipeptidyl peptidase-4 inhibitor, to improve glycemic control in patients with type 2 diabetes.

70.     On March 30, 2007, the FDA approved the combination drug Janumet (metformin hydrochloride and sitagliptin phosphate) to treat the same condition in patients who do not respond adequately to metformin or sitgliptin alone.  Thus, Janumet is a combination of Januvia

(sitagliptin) and metformin.

71.     Near the end of 2010, Dick Clark, Merck's President and CEO, told investors that it was offering a coupon to offset patient co-pays for Januvia as a way of helping the company "attract the market that is being held now by . . . generic[ ] sulphonylureas."

> DAVE RISINGER [ANALYST, MORGAN STANLEY]: That is great.  One thing that some brand companies are using . . . to drive consumer demand is buying down co-pays and offering more co-pay assistance.  Is that something that Merck is developing as well?
>
> DICK CLARK [CHAIRMAN, PRESIDENT & CEO, MERCK & CO., INC]:  Well, we are very committed to making sure that our products are in a competitive situation in any plan that they are represented in.  So . . . we actually try to deal with whatever barriers might be there to using our products.  So for example couponing around Januvia is an example of ways of helping people to deal with co-pays and helping us to attack the market that is being held now by . . . generic[ ] sulphonylureas.[18]

72.     In 2012, U.S. sales of Janumet exceeded $880 million and U.S. sales of Januvia were just under $2.5 billion

73.     In the presence of of less-expensive therapeutic alternatives, in or around early 2010, Merck created the Multi-Use Savings Card[19] for Janumet and Januvia.

74.     On February 2, 2012, the FDA approved Janumet XR (metformin hydrochloride and sitagliptin extended-release), an extended release version of Janumet also used to treat type 2 diabetes.  The Multi-Use Savings Card can now also be used with Janumet XR.

75.     Less expensive therapeutic alternatives to Januvia, Janumet, and Janumet XR exist, such as generic sulphonylureas and/or generic sulphonylureas taken in combination with

---

[18] Merck & Co., Inc. at Morgan Stanley Global Healthcare Conference – Final, FD (Fair Disclosure) Wire (Sept. 13, 2010).

[19] Merck also refers to its Multi-Use Savings Card as a Multi-Use Savings Coupon.

generic metformin.

76.     The Multi-Use Savings Card allows eligible patients to pay as little as $5 per prescription on up to twelve qualifying prescriptions of Janumet, Janumet XR, or Januvia, with a maximum savings of $100 per prescription.  The offer, which at one point was set to expire December 31, 2012, was first extended until December 31, 2013 and is now set to expire on December 31, 2014.[20]

77.     Patients can print a Multi-Use Savings Card directly from Merck's website: https://www.activatethecard.com/6551/welcome.html?src=JM06R.

78.     The Multi-Use Savings Card is not a need-based program.  It is open to all patients with commercial prescription insurance coverage for Janumet, Janumet XR, and Januvia.

**b.     Merck deceptively represents the Multi-Use Savings Card as secondary health insurance.**

79.     The fine print accompanying the Multi-Use Savings Card states: "This card is not insurance."  The very same fine print, however, instructs pharmacists to process Merck's co-pay subsidies just like any other form of secondary health insurance coverage:

- Submit transaction to McKesson Corporation using BIN No. 610524.

- If primary coverage exists, input card information as secondary coverage and transmit using the COB segment of the NCPDP transaction.

80.     Despite Merck's disclaimer, the Multi-Use Savings Card functions and is processed as secondary insurance.

---

[20] In addition, patients can receive a free thirty-day trial supply of Janumet, Janumet XR, and Januvia through March 31, 2014.  No personal information is necessary to print the free trial offer online.

           **c.**      **Merck knows that TPPs cannot tell when a co-pay is subsidized.**

81.      Merck knows that the Janumet/Janumet XR/Januvia co-pay subsidy program that Merck and its co-pay subsidy program administrator have designed makes it impossible for TPPs to tell if their members' co-pays are being subsidized.  Merck admits as much in the fine print that accompanies the coupon, where it attempts to push onto insureds the responsibility for making such disclosures: "Patient is responsible for reporting receipt of card benefit to any insurer, health plan, or other third party who pays for or reimburses any part of the prescription filled using the card, as may be required."  By burying this disclosure in the fine print of the card's Terms and Conditions, Merck makes a weak attempt to shield itself from liability with instructions it knows and intends will not be seen or followed.  Merck also knows that pharmacists, not insureds, typically submit reimbursement requests and that insureds lack access to the systems through which such requests are submitted.  Moreover, Merck knows that this instruction is wholly inconsistent with the instructions that it and/or its third-party administrator gives to pharmacies regarding how the coupon should be processed.

        **2.**      **Merck's Nasonex Savings Coupon**

           **a.**      **In the presence of less expensive therapeutic alternatives, Merck created the Nasonex Savings Coupon.**

82.      On October 1, 1997, the FDA approved Nasonex (mometasone furoate monohydrate), a nasal spray corticosteroid, for the treatment of seasonal allergies in adults and children twelve years of age and older.  On December 15, 2004, Nasonex was additionally approved for the treatment of nasal polyps in certain patients.

83.      At the end of 2004, the drug's manufacturer, Schering-Plough (Shering-Plough merged with Merck in 2009), embarked on a new direct-to-customer (DTC) campaign to

increase sales of Nasonex.[21]  By mid-2006, the company bragged to investors that it had

"transformed this 8-year-old product into the fastest-growing brand in the nasal inhaled steroid

category," with sales growing by 25% in the first quarter of that year.[22]  By 2008, Schering-

Plough's Chairman and CEO, Fred Hassan, reassured investors that Nasonex had done well,

despite "all the competition that ha[d] come on the market."[23]  It was clear, however, that sales of

Nasonex in the U.S. were down.[24]

84.     Less expensive therapeutic alternatives to Nasonex exist, including other nasal

corticosteroids available in generic form, such as flunisolide (Nasarel), fluticasone propionate

(Flonase), and triamcinolone (Nasacort AQ), as well as other, over-the-counter allergy

medications.

85.     In 2012, U.S. sales of Nasonex exceeded $1 billion.

86.     In the presence of less-expensive therapeutic alternatives, in or around early 2008,

Schering-Plough created the Nasonex Savings Coupon.  Merck continued to run the program

when it merged with Schering-Plough in 2009 and still does so today.

87.     When it was first launched, the Nasonex Savings Coupon offered up to $10 off a

patient's monthly co-pay.  A patient could use a different coupon every thirty days and there was

apparently no limit to the number of months in which coupons could be used.  Upon information

---

[21] Event Brief of Q4 2004 Schering-Plough Earnings Conference Call – Final, FD (Fair Disclosure) Wire (Jan. 25, 2005).

[22] Schering-Plough at Goldman Sachs Annual Global Healthcare Conference – Final, FD (Fair Disclosure) Wire (June 15, 2006).

[23] Schering-Plough Launches Productivity Transformation Program To Confront New Challenges – Final, FD (Fair Disclosure) Wire (Apr. 2, 2008).

[24] Q1 2008 Schering-Plough Earnings Conference Call – Final, FD (Fair Disclosure) Wire (Apr. 23, 2008).

and belief, the offer was set to expire at the end of 2008, but was subsequently extended.

88.     In or around 2011, Merck's Nasonex Savings Coupon offered up to $15 off a patient's monthly co-pay.  A patient could still use a different coupon every thirty days and there was still apparently no limit to the number of months in which coupons could be used.  The offer was set to expire on June 30, 2012, but was subsequently extended.

89.     In early 2012, Merck limited its $15 Nasonex Savings Coupon to six uses.

90.     In early 2013, Merck changed the terms of its program and now provides up to $20 off of each of up to twelve qualifying prescriptions.  This coupon is set to expire September 30, 2014.

91.     The Nasonex Coupon is not a need-based program.  It is open to all patients with commercial prescription insurance coverage for Nasonex and it subsidizes the co-pays of any commercially-insured patients.  Patients can print the Nasonex Savings Coupon, without providing any identifying information, by answering a few short questions on Merck's website: http://www.nasonex.com/nasx/jsp/special_offers/multi_use_savings_coupon/index.jsp.

**b.     Merck deceptively represents the Nasonex Savings Coupon as secondary health insurance.**

92.     Although the fine print accompanying the Nasonex Savings Coupon states that it "is not insurance," the very same fine print instructs pharmacists to process the coupon as "secondary coverage":

- Submit transaction to McKesson Corporation using BIN No. 610524.

- If primary coverage exists, input coupon information as a secondary coverage and transmit using the COB segment of the NCPDP transaction.

93.     Despite Merck's disclaimer, the Nasonex Savings Coupon functions and is processed just like any other form of secondary insurance.

### c.   Merck knows that TPPs cannot tell when a co-pay is subsidized.

94.     Merck knows that the Nasonex co-pay subsidy program that Merck and its co-pay subsidy program administrator have designed make it impossible for TPPs to tell if their members' co-pays are being subsidized.  Merck admits as much in the fine print that accompanies the coupon, where it attempts to push onto insureds the responsibility for making such disclosures: "Patient or guardian is responsible for reporting receipt of coupon benefit to any insurer, health plan, or other third party who pays for or reimburses any of the prescription filled using this coupon, as may be required."  By burying these disclosures in the fine print of the coupon's Terms and Conditions, Merck makes a weak attempt to shield itself from liability with instructions it knows and intends will not be seen or followed.  Merck also knows that pharmacists, not insureds, typically submit reimbursement requests and that insureds lack access to the systems through which such requests are submitted.  Moreover, Merck knows that this instruction is wholly inconsistent with the instructions that it and/or its third-party administrator give to pharmacies regarding how the coupon should be processed.

### 3.   Merck's Vytorin Savings Coupon

### a.   In the presence of less-expensive therapeutic alternatives, Merck created the Vytorin Savings Coupon.

95.     On July 23, 2004, the FDA approved Vytorin (ezetimibe and simvastatin) as a cholesterol-lowering medicine.  Vytorin combines two of Merck's other cholesterol-lowering drugs: Zetia, a cholesterol absorbtion inhibitor, and Zocor, a statin.  Generic Zocor has been available since 2006.

96.     Less expensive therapeutic alternatives to Vytorin exist, including generic statins such as atorvastatin calcium (Lipitor), fluvastatin (Lescol), pravastatin sodium (Pravachol), and simvastatin (Zocor).

97.     In 2010, U.S. sales of Vytorin were close to $1 billion.

98.     In the presence of less-expensive therapeutic alternatives, in or around late 2010 or early 2011, Merck created the Vytorin Savings Coupon.[25]

99.     With the current version of the Vytorin Savings Coupon, Merck pays up to $20 of a patient's co-pay for up to twelve qualifying prescriptions.  The offer, which was previously set to expire December 31, 2013, is not set to expire December 31, 2014.[26]  A previous version of the card was limited to 6 uses.

100.    The Vytorin Savings Coupon is not a need-based program.  It is open to all patients with commercial prescription insurance coverage for Vytorin.  Patients can print the coupon directly from Merck's website[27] without providing any identifying information.  .

> **b.     Merck deceptively respresents the Vytorin Savings Coupon as secondary health insurance.**

101.    Although the fine print on the Vytorin Savings Coupon states, "[t]his coupon is not insurance," the same fine print instruct pharmacists to process the coupon as "secondary coverage":

- Submit transaction to McKesson Corporation using BIN No. 610524.

- If primary coverage exists, input card information as secondary coverage and transmit using the COB segment of the NCPDP transaction.

102.    Despite Merck's disclaimer, the card functions and is processed just like any other

---

[25]http://www.vytorin.com/ezetimibe_simvastatin/vytorin/consumer/free_trial/index.jsp?WT.svl=2, (last visited Sept. 5, 2013).

[26] In addition, patients can receive a free thirty-day trial supply of Vytorin through June 30, 2014.  No personal information is necessary to print the free trial offer online.

[27] http://www.vytorin.com.

form of secondary insurance coverage.

>    c.   **Merck knows that TPPs cannot tell when a co-pay is subsidized.**

103.   Merck knows that the Vytorin co-pay subsidy program that it and its co-pay subsidy program administrator have designed makes it impossible for TPPs to tell if their members' co-pays are being subsidized.  Merck admits as much in the fine print that accompanies the coupon, where it attempts to push onto insureds the responsibility for making such disclosures: "Patient is responsible for reporting receipt of coupon benefit to any insurer, health plan, or other third party who pays for or reimburses any of the prescription filled using this coupon, as may be required."

104.   By burying this disclosure in the fine print of the card's Terms and Conditions, Merck makes a weak attempt to shield itself from liability with instructions it knows and intends will not be seen or followed.  Merck also knows that pharmacists, not insureds, typically submit reimbursement requests and that insureds lack access to the systems through which such requests are submitted.  Moreover, Merck knows that this instruction is wholly inconsistent with the instructions that it and/or its third-party administrator gives to pharmacies regarding how the coupon should be processed.

>    4.   **Merck's Zetia Savings Coupon**

>    a.   **In the presence of less-expensive therapeutic alternatives, Merck created the Zetia Savings Coupon.**

105.   On October 25, 2002, the FDA approved Zetia (ezetimibe) as a cholesterol lowering medicine.

106.   Less expensive therapeutic alternatives to Zetia exist, including generic statins such as atorvastatin calcium (Lipitor), fluvastatin (Lescol), pravastatin sodium (Pravachol), and simvastatin (Zocor).

107.    In 2012, U.S. sales of Zetia were $1.4 billion.

108.    In the presence of less-expensive therapeutic alternatives, in or around late 2010 or early 2011, Merck created the Zetia Savings Coupon.

109.    In connection with the Zetia Savings Coupon, Merck pays up to $20 off on each of up to twelve qualifying prescriptions for Zetia.  The offer, which was previously set to expire December 31, 2012, was first extended until December 31, 2013 and is now set to expire December 31, 2014.

110.    The Zetia Savings Coupon is not a need-based program.  It is open to all patients with commercial prescription coverage for Zetia.  Patients can print the coupon directly from Merck's website[28] without providing any identifying information.

> **b.    Merck deceptively represents the Zetia Savings Coupon as secondary health insurance.**

111.    Although the fine print on the Zetia Savings Coupon states, "[t]his coupon is not insurance," the same fine print instruct pharmacists to process the coupon as "secondary coverage":

- Submit transaction to McKesson Corporation using BIN No. 610524.

- If primary coverage exists, input card information as secondary coverage and transmit using the COB segment of the NCPDP transaction.

112.    Despite Merck's disclaimer, the Zetia Savings Coupon functions and is processed just like any other form of secondary insurance coverage.

> **c.    Merck knows that TPPs cannot tell when a co-pay is subsidized.**

113.    Merck knows that the Zetia co-pay subsidy program that it and its co-pay subsidy

---

[28] http://www.zetia.com.

program administrator have designed makes it impossible for TPPs to tell if their members' co-pays are being subsidized.  Merck admits as much in the fine print that accompanies the coupon, where it attempts to push onto insureds the responsibility for making such disclosures: "Patient is responsible for reporting receipt of coupon benefit to any insurer, health plan, or other third party who pays for or reimburses any of the prescription filled using this coupon, as may be required."

114.    By burying this disclosure in the fine print of the coupon's Terms and Conditions, Merck makes a weak attempt to shield itself from liability with instructions it knows and intends will not be seen or followed.  Merck also knows that pharmacists, not insureds, typically submit reimbursement requests and that insureds lack access to the systems through which such requests are submitted.  Moreover, Merck knows that this instruction is wholly inconsistent with the instructions that it and/or its third-party administrator gives to pharmacies regarding how the coupon should be processed.

**H.    Merck hired McKesson to administer its co-pay subsidy programs.**

115.    Defendant depends on cooperation from both pharmacies and its program administrator to conduct the co-pay subsidy programs, and it pays them for their efforts.

116.    Defendant and its co-conspirator administrator process co-pay subsidy claims through a "shadow claims system" that hides the subsidies from TPPs.  For prescription drugs, plan members present their co-pay cards or coupons along with their health insurance card (which identifies the prescription drug plan) at the pharmacy.  As instructed by Defendant and its program administrator, the pharmacist first processes an individual's primary insurance, establishing the plan member's co-pay or co-insurance amount and the price of the drug that will be billed to the TPP.

117.    In a separate, later transaction, the pharmacist then processes the co-pay card associated with the co-pay subsidy program.  The pharmacist enters into the pharmacy computer

information on the co-pay card or coupon as though it were a form of secondary insurance.  This information is conveyed to the co-pay subsidy program administrator who calculates the amount of the co-pay that will be subsidized by Defendant.  Although the plan member only pays out-of-pocket the difference between his or her co-pay and the amount subsidized by Defendant, the TPP has already been charged the full amount of its usual payment for the branded drug in question.

118.    In transactions in which the co-pay subsidy cards or coupons are used, the information transmitted to the TPP does not include any disclosure that a subsidy was paid.  To the contrary, a field used to indicate the type of secondary insurer is either left blank or populated with a misleading code indicating that the secondary insurer is a "private" insurer (as opposed to Medicaid or some other government insurer) or an uncategorized or "other" insurer, as there is no code that a pharmacist can use to indicate that a co-pay coupon is being represented as secondary insurance.  Upon information and belief, legitimate secondary insurers must apply to insurance regulators to obtain new codes for this field.  As neither Defendant nor its third-party administrator is a licensed provider of insurance, they have presumably not done so.

119.    As F. Everett Neville, chief trade relations officer at Express Scripts, one of the country's largest PBMs, told the New York Times in January 2011: "[t]he payer doesn't know, and the P.B.M. doesn't know. . . . We have no ability to stop it and no ability to prohibit it."

120.    Here, Defendant hired unnamed co-conspirator McKesson (the "administrator") to administer its co-pay subsidy programs.

**1.    McKesson administers the Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia co-pay subsidy programs for Defendant.**

121.    McKesson administers the Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia co-pay subsidy programs.  McKesson is not named as a defendant in this action but is an

unnamed co-conspirator for purposes of Plaintiffs' RICO claims.

122.    McKesson boasts that its co-pay subsidy administration program, called LoyaltyScript, is "[a]ccepted in virtually every retail pharmacy in the U.S.," and "serves tens of thousands of patients every day."[29]  According to McKesson, the LoyaltyScript program allows manufacturers to "address cost, one of the main reasons cited for non-adherence and prescription abandonment."[30]

123.    Although LoyaltyScript savings are commonly delivered through savings cards, McKesson has also developed "an array of unique and engaging formats[,] including downloadable web coupons, credit card-sized CD-ROMs, web key cards [and co-pay subsidy offers delivered] via mobile devices."[31]  McKesson also operates an online Rebate Portal apparently designed to assist patients in receiving co-pay subsidies if they have trouble redeeming their savings cards at the pharmacy.[32]

> a.    **McKesson helps Defendant disguise its co-pay subsidies as secondary health insurance.**

124.    Through McKesson's LoyaltyScript program, pharmacists are instructed to, and do in fact, process Defendant's co-pay subsidies as separate and distinct transactions at the point of sale, just as secondary insurance coverage is adjudicated.  McKesson boasts that "[n]early every retail pharmacy in the U.S. has processed a McKesson voucher or coupon claim," and that nearly 90% of pharmacies use McKesson's own proprietary adjudication system, called

---

[29] http://mprsannounce.mckesson.com/MPRS/microsite/loyaltyscript_co-pay_discounts.htm (last visited Aug. 29, 2013).

[30] *Id.*

[31] *Id.*

[32] https://www.patientrebateonline.com/patientrebate/welcome.html (last visited Aug. 29, 2013).

RelayHealth Switch, to process claims.[33]  The company assures pharmaceutical companies like Defendant that "[p]harmacies look to McKesson as a trusted resource for all their claims processing questions," and that McKesson "provide[s] dedicated pharmacy support lines staffed with pharmacy technicians who have retail sales experience."[34]  Support line staffers can even view claims data in real time, allowing them to ensure that a pharmacist processes a co-pay subsidy according to Defendant's and McKesson's instructions before ending the call.

125.    McKesson holds a patent, applied for on March 31, 2006, for a means of processing co-pay subsidies at the point of sale[35] that contemplates electronically receiving claims from pharmacies that are separate and distinct from claims that are submitted to members' health benefit plans:

> What is claimed is: 1. An apparatus comprising: one or more processors configured to receive *an electronic claim transaction* submission at an administrator in response to a purchase transaction of a client at a point of sale of a healthcare provider, *a primary payer separate and distinct from the administrator* also receiving the electronic claim transaction submission from the healthcare provider to initiate adjudication of a primary claim for *an offset of at least a portion of a cost associated with the purchase transaction*, wherein the one or more processors are configured *to adjudicate*, in response to receiving the electronic claim transaction submission and *separate and distinct from the primary claim, one or more services of a program of an administrator to which the client is enrolled*, the purchase transaction being applicable to the program, the one or more services including one or more marketing services or interventions, wherein the one or more processors are also configured to trigger provision of the one or more services to the client in response to

---

[33] http://mprsannounce.mckesson.com/MPRS/microsite/the_mckesson_difference.htm (last visited Aug. 29, 2013).

[34] *Id.*

[35] U.S. Patent No. 7,957,983 (issued June 7, 2011).

adjudication of the one or more services.[36]

126.    McKesson's patent asserts that the pharmaceutical industry had not previously

identified a method of providing cost-saving benefits in light of the variability of co-pays:

> [Previously,] monetary incentives for prescription fulfillment have
> been limited to a uniform value for a particular product offer.  *For
> insured patients, pharmaceutical marketers have sought the ability
> to vary the incentives based upon the individual patient's co-pay
> amount*, which can vary considerably across prescription benefit
> plans based upon individual patient coverage, cost sharing tiers,
> drug formulary design, and plan exclusions.  To date, *no solutions
> have been identified to address this variability in patient cost-
> share* amounts on a patient-specific basis in real time using the
> mail-in rebate, debit card or credit card mechanisms.[37]

127.    The patent goes on to say that McKesson's invention solved the industry's

"problem" of not being able to undermine health benefit provider's cost-sharing provisions:

>  [T]he [monetary] secondary benefit may offset at least a portion of
> the out-of-pocket expense for a purchase transaction applicable to
> the respective program. …[T]he secondary benefit may be
> provided in real time at the point of sale … by linking secondary
> benefit with the dispensing and purchase of a medication. The
> secondary benefit may also be tied to a patient's actual primary
> benefit, such as by determining the secondary benefit as a
> percentage of a primary benefit (further offsetting the cost
> associated with a purchase transaction).[38]

128.    McKesson's patent notes that "the adjudications *may* occur sequentially, such that

adjudication at the primary payer occurs prior to adjudication at the administrator,"[39] implying

that the adjudications *could instead* take place simultaneously or in the opposite order.  Yet

Figure 4 (reproduced below) shows two separate feedback loops, one in which the "healthcare

---

[36] *Id.* at Claim 1 (emphasis added).

[37] *Id.* at Background of the Invention (emphasis added).

[38] *Id.* at Summary of the Invention.

[39] *Id.* at Secondary Benefits Provided by Administrator (emphasis added).

provider" (*i.e.* the pharmacy) submits the "primary claim adjudication" to the "primary payer" (*i.e.* bills the health benefit plan) and a second in which the "healthcare provider" separately submits a "service request" to the co-pay subsidy administrator.  The co-pay subsidy administrator then provides "Backstage Support Services:" confirming that the patient is enrolled in the program, paying the "secondary benefit" (the co-pay subsidy) to the pharmacy, and submitting information about the patient's prescription to the "sponsor" (the drug manufacturer):



<u>FIG. 4.</u>

    **b.** **McKesson routinely measures the effectiveness of Defendant's Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia co-pay programs and fine-tunes the offerings in order to increase the efficacy of the programs.**

    129. McKesson advertises that its LoyaltyScript program also "provides a means for tracking and measuring program results" and that, "[b]y utilizing these insights collected through patient and pharmacy activity, [manufacturers'] program[s] can be optimized to drive ongoing

brand loyalty."[40]  Specifically, McKesson offers pharmaceutical companies like Defendant

access to an "award-winning reporting portal" that "is one of the most insightful in the industry,"

providing "24-hour access to more than 15 standard reports," including the following:

- Standard reports that capture aggregated enrollment, claims activity, prescriber acceptance, compliance, persistency, pharmacy activity, geographic/territory alignment, savings per claim and more in an agreed upon HIPAA compliant manner;
- Daily data refreshes for dynamic visibility into daily, weekly or monthly progress;
- Flexibility to modify parameters such as time increments, card channels, and geographic regions;
- Graphical, easy-to-interpret illustrations of program utilization; and
- 24 x 7, password protected access that puts metrics at your fingertips.[41]

130.    In addition, McKesson's Data Analytics team, with a combined forty years of

experience in data analytics (thirty-five in healthcare), is available "to provide consultative

insights and comprehensive data analytics" to the company's pharmaceutical manufacturer

customers, including the following:

- In-Depth Market Analyses: Understand prescriber pull-through and patient behavior with measures such as Medication Possession Ratios and Kaplan-Meier persistency curves;
- Claims Forecasting: Anticipate claim redemption rates of new programs derived from historical averages from our extensive database;
- Budget Forecasting: Estimate costs based upon your program's unique characteristics and projected claims activity;
- Benchmarking: Compare results of your programs to other similar programs from our robust database;
- Program Spend Report: Review and report ongoing monthly spend by program and line item; and
- Program Effectiveness/ROI Studies: Evaluate program success against control group data to understand your true program ROI.[42]

---

[40] http://mprsannounce.mckesson.com/MPRS/microsite/loyaltyscript_co-pay_discounts.htm (last visited Aug. 29, 2013).

[41] http://mprsannounce.mckesson.com/MPRS/microsite/reporting_and_insights.htm (last visited Aug. 29, 2013).

[42] http://mprsannounce.mckesson.com/MPRS/microsite/advanced_analytics.htm (last visited Aug. 29, 2013).

131.     Upon information and belief, Defendant has access to McKesson's 24-hour access reporting portal and Data Analytics team and consequently possesses detailed information about the success of the Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia co-pay subsidy programs, which it has leveraged to refine the number and amount of subsidies paid under the program to more effectively and efficiently undermine the cost-sharing provisions of TPPs' prescription drug benefit plans.

**I.     TPPs do not know, and cannot know, when Merck subsidizes their members' co-pays.**

132.     TPPs are generally aware that drug companies offer co-pay subsidy programs. But TPPs do not know, and cannot know, which of the prescriptions that they have paid for have been subsidized.  Pharmacists process subsidies as instructed by Defendant and its co-conspirator administrator, and they do not tell TPPs or PBMs when a prescription has been subsidized. Defendant and its third-party administrator, however, possess detailed records of each and every subsidized prescription.  They likewise know that the systems they have implemented to process transactions involving co-pay coupons are designed to conceal the use of those coupons from TPPs.  The extent of the injury to Plaintiffs' and the classes can easily be determined through discovery of Defendant's co-pay subsidy program records.

**J.     Merck's co-pay subsidy programs intentionally interfere with the relationship between TPPs and their members.**

**1.     Plaintiffs may assert claims for tortious interference with contract.**

133.     TPPs like Plaintiffs may assert claims for tortious interference with the contractual duties of pharmacies because PBMs are TPPs' agents for purposes of entering into pharmacy network agreements with pharmacies.  The contracts that PBMs enter into with thousands of TPPs are form contracts that are not heavily negotiated, and they include the same

material terms authorizing PBMs to, among other things, establish networks of retail pharmacies at which TPPs' members may fill their prescriptions.  For example, Plumbers and Local 464A both consented to, and contracted with, ESI to act on their behalf for, *inter alia*, the following specific purposes:

a.   entering into pharmacy network agreements on the TPPs' behalf to establish a network of retail pharmacies that agree to fill prescriptions for the TPPs' members in accordance with the terms and conditions of the TPPs' prescription drug benefit program;

b.   making approval determinations regarding requests for reimbursement received from network pharmacies in accordance with the terms and conditions of the TPPs' prescription drug benefit program;

c.   assisting in the design of a formulary and/or co-pay structure for the TPPs' prescription drug benefit program, including cost-sharing provisions meant to incentivize the TPPs' insureds to, where appropriate, select less-expensive therapeutic alternatives to expensive, brand name drugs; and

d.   developing mechanisms to enforce pharmacy compliance with the terms and conditions of Plumbers' prescription drug benefit program.

134.   Although TPPs like Plaintiffs rely on their PBMs' expertise in carrying out these tasks, they also retain a degree of control over their PBMs' actions.  For example, although Plaintiffs delegate limited authority and discretion to ESI to approve or deny reimbursement requests, they retains discretionary authority to establish and construe the provisions of their drug benefit plans and can direct their PBM to adjudicate a claim.  Similarly, although Plaintiffs rely on support from their PBM in developing their formularies or formulary-like co-pay structures, they have the right to either select from the PBM's pre-established formularies or direct the PBM to create customized formularies or co-pay structures.  Plaintiffs are likewise not bound by the pharmacy networks that their PBM establishes, but have the option of having the PBM create a custom pharmacy network for their members.

135.   Like other TPPs, Plaintiffs supervise the work that their PBM does on behalf of

41

Plaintiffs and their members, requiring the PBM to, among other things, submit regular reports, meet certain performance standards, honor specific requests for information, subject itself to periodic audits, and make its representatives available for regular meetings.

136.    Alternatively, TPPs like Plaintiffs can assert claims for tortious interference with the contractual duties of pharmacies because TPPs are intended third-party beneficiaries of the pharmacy network agreements between PBMs and pharmacies.  The pharmacy network agreements and the associated manuals by which the pharmacies agree to abide when they join a PBMs' pharmacy network demonstrate the contracting parties' intent to benefit the PBM's TPP-customers as primary intended beneficiaries.  Indeed, the pharmacy network agreements and manuals would not exist if not for the benefits they confer on TPPs and their members; PBMs are not insurers and have no reason to establish networks of retail pharmacies except to ensure that TPPs' members have access to covered medications.

137.    Thus, ESI's 2005 Pharmacy Network Manual[43] instructs pharmacies to look to ESI's electronic claims processing system for information regarding the plan designs and cost-containment programs required by specific providers like Plaintiffs,[44] and it is replete with instructions designed to ensure that the pharmacies process claims in a manner that comports with those plan requirements.  Indeed, the manual mentions TPPs (referred to therein as "Sponsors" or "Plan Sponsor") over 100 times.

138.    Beyond setting forth the technical requirements for complying with TPPs' drug benefit programs, however, ESI's Pharmacy Network Manual is founded on a broader intent to

---

[43] Upon information and belief, the operative version of ESI's Pharmacy Network Manual contains similar provisions.

[44] ESI Pharmacy Network Manual (2005), at 6 ("The Copay may vary depending on the guidelines of the Member's specific plan.  The total Copay to be collected will be calculated and displayed electronically in the Copay field during online claims transmission.").

benefit TPPs and to refrain from acting in ways that harm them.  By joining ESI's network, pharmacies agree, for example, that any agreements, programs, or formularies established for the benefit of ESI's sponsors and their members must take precedence over any other agreements to which the pharmacy is a party.[45]  The manual further encourages the substitution of lower cost brand or generic therapeutic alternatives.[46]

139.    Importantly, by agreeing to become part of ESI's network, pharmacies not only agree to collect co-payments directly from a TPP's insureds, but also recognize that the requirement is "in accordance with the Member's Prescription Drug Program" established by his or her TPP.[47]  Thus, TPPs like Plaintiffs are specifically contemplated as beneficiaries of the exact duty that, as set forth below, Plaintiffs alleges Defendant induced the pharmacies to breach.

140.    TPPs like Plaintiffs are injured as a proximate result of Defendant's tortious interference with the pharmacies' contractual duties.  Knowing that pharmacies have a duty to collect co-pays directly from insureds, Defendant implemented programs designed to systematically induce pharmacies to breach this duty by instead collecting significant portions of the insureds' co-pay obligations from Defendant.  Defendant knew and intended that, as a direct result of the pharmacies' acceptance of Defendant's co-pay subsidies, insureds would no longer be incentivized to purchase less expensive therapeutic alternatives and would instead purchase Defendant's expensive, brand name drugs.  Plaintiffs and members of the classes have consequently paid for more prescriptions of Defendant's subsidized drugs than they would have absent the use of Defendant's co-pay programs.

---

[45] *Id.* at 22.

[46] *Id.*

[47] *Id.* at 64.

141.    As set forth in more detail above, a recent study conducted by the leading trade group for PBMs concluded that 25% of the time a co-pay subsidy is provided, it results in the expensive, brand name drug being used instead of a less expensive preferred brand or generic drug.[48]  Over the past five years, Plumbers has paid for Janumet, Janumet XR, Januvia, Nasonex, Vytorin, and Zetia on hundreds of separate occasions.

**2.    Defendant tortiously interferes with the contracts between Plaintiffs' PBM and its network pharmacies**

142.    By providing undisclosed payments to reduce or eliminate the cost-sharing mechanism in thousands of health insurance contracts for widely used maintenance prescription drugs, and by inducing pharmacists to violate their contractual obligations to collect such co-pays from the insureds, Defendant unfairly undermines TPPs' best attempts to control prescription drug costs.  PBMs' Pharmacy and Therapeutics ("P&T") committees arrive at formulary placement and co-pay structure decisions after considerable decision-making, in an effort to address overall prescription drug costs as a burden on the delivery of quality health care. Even small co-pay subsidies upset the cost share balance so carefully struck by P&T committees in formulary tier structures and cost-containment provisions in prescription drug benefit plans, which are enforced through contracts between PBMs and participating pharmacies.  Defendant offers subsidies that significantly reduce the co-pays for its branded drugs, often to less than the average co-pay for generic therapeutic alternatives, thereby completely neutralizing TPPs' contractual tiered co-pay structures.

143.    The co-pay subsidies also force other potential short- or long-term changes in available prescription drug coverage.  Without a means of enabling cost sharing (and make no mistake about it, Defendant's co-pay subsidy programs prevent plans and their members from

---

[48] *See supra,* ¶ 61.

agreeing to effective sharing programs), plans are left to consider wholesale cost shifting, under which the benefit provider pays none of the cost of a branded drug, and the member pays all of the cost, when alternatives to a branded drug exist.  At base, Defendant has unfairly, deceptively, and improperly interfered with health insurance providers' ability to effectively contract for appropriate cost-sharing provisions in insurance contracts.

## VI.    CLASS ALLEGATIONS

144.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, on behalf of themelves and two national classes (one for each of the co-pay subsidy programs discussed above) defined as:

> All entities in the United States and its territories that are at risk, pursuant to a contract, policy, or plan, to pay or reimburse all or part of the cost of a co-pay subsidy drug prescribed to natural persons covered by such contract, policy, or plan, and who paid for at least one prescription for Janumet/Janumet XR/Januvia, Nasonex, Vytorin, or Zetia that was subsidized by Defendant's co-pay subsidy program(s).

145.    The class periods run from when Defendant started offering the co-pay subsidy programs until Defendant stops offering these programs.  The precise periods will be identified through discovery.

146.    Excluded from the classes are (i) Defendant, Defendant's legal representatives, officers, directors, assignees, predecessors, and successors, (ii) federal and state governmental entities administering prescription drug programs under Medicare, Medicaid, and or other federally or state-sponsored programs, and (iii) counsel for Plaintiffs and the classes' self-funded health benefit plans (if any).

147.    All class members have suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct.

148.    Class members can be determined precisely from Defendant's records, the records

of the administrator of Defendant's co-pay subsidy programs, and/or pharmacy records.
Members of the classes themselves are unable to identify the subsidized prescriptions.  However,
Defendant and its co-pay subsidy program administrator possess information about the
subsidized prescriptions, including the name and specific identifying information about each
participating member and the pharmacy where the prescription was filled.  The pharmacy has a
record of both the amount of subsidy and the individual's health plan.  The program
administrator also has this information, as well as the accumulated results of each program
across all pharmacies.  No uninjured parties will be included within the classes because each
member can be determined with specificity, based on actual transactional data.

149.    The fact of injury or damages to each class member can also be reasonably
estimated from existing data.  Aggregate damages to the classes as a whole can reasonably be
estimated from existing data, and commonly-used mechanisms by which to allocate that award
among class members exist.

150.    The classes consist of thousands of private TPPs.  These providers are
geographically dispersed throughout the United States.  The disposition of all claims in a single
action will substantially benefit all parties and the Court.

151.    Plaintiffs are the proposed class representatives for each of the classes.

152.    Plaintiffs' claims are typical of the claims of the classes.  Plaintiffs purchased
drugs on behalf of their members whose cost-share obligations were subsidized by Defendant.
Plaintiffs, like all class members, paid for more co-pay subsidy drug prescriptions than they
would have absent Defendant's subsidies.  Plaintiffs will fairly and adequately protect the
interests of the classes.  Plaintiffs have retained counsel with substantial experience prosecuting
nationwide third-party payor class actions.  Plaintiffs and their counsel are committed to

vigorously prosecuting this action on behalf of the classes and have the financial resources necessary to do so.

153.    The factual and legal issues regarding Defendant's alleged misconduct are common to all class members and represent a common thread of misconduct resulting in injury to Plaintiffs and the classes.  Common questions of law and fact include:

a.    Whether Defendant engaged in a course of conduct that improperly increased Plaintiffs' and other class members' drug costs;

b.    Whether Defendant engaged in a pattern of deceptive, fraudulent and/or improper activity intended to defraud Plaintiffs and other members of the classes;

c.    Whether Defendant formed enterprise(s) for the purpose of effectuating its fraudulent schemes;

d.    Whether Defendant used the U.S. mails and interstate wire facilities and commerce to carry out these fraudulent schemes;

e.    Whether Defendant engaged in conduct that violated the federal racketeering laws as alleged herein;

f.    Whether Defendant engaged in conduct that tortiously interfered with the pharmacy network agreements as alleged herein;

g.    Whether Plaintiffs and the other members of the classes were injured by the conduct of Defendant and, if so, the appropriate class-wide measure of damages; and

h.    Whether Plaintiffs and the other members of the classes are entitled to injunctive relief.

154.    Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant.

155.    Defendant has acted on grounds generally applicable to all class members in that Defendant's tortious and fraudulent actions uniformly impacted all class members.  Accordingly, injunctive relief is necessary to protect all class members from further injury.

156.    Plaintiffs know of no difficulty that would prevent this case from being maintained as a class action.  A class action is the superior method for fairly and efficiently adjudicating this controversy.  The cost of litigating a single action would prevent most class members from bringing suit individually.  Class action treatment will, among other things, allow a large number of similarly-situated entities to prosecute their common claims in a single forum, thus avoiding the unnecessary duplication of resources that numerous individual actions would require.  Moreover, class action treatment allows injured payors, including smaller plans with limited means, to seek redress on claims that might be impracticable to pursue individually.  Thus, absent a class action, there would be no remedy at law for thousands of injured entities.  And absent a class action, there would be no mechanism for imposing uniform equitable injunctive relief to the classes as a whole.

## VII.    CAUSES OF ACTION

### COUNTS ONE, TWO, THREE, AND FOUR
### SUBSTANTIVE RICO VIOLATIONS
### (18 U.S.C. § 1962(C))

157.    Plaintiffs incorporate by reference all other paragraphs of the Consolidated Amended Class Action Complaint.

158.    These Counts allege substantive violations of RICO (as provided in 18 U.S.C. § 1962(c)), relating to the co-pay subsidy programs described above, and are asserted against Defendant on behalf of Plaintiffs and the classes.

159.    Plumbers asserts COUNT ONE on behalf of the Class against Merck for the Janumet/Janumet XR/Januvia co-pay subsidy program.  The Janumet/Janumet XR/Januvia co-pay subsidy enterprise is an association-in-fact comprised of Merck, unnamed co-conspirator McKesson, and the pharmacies in PBMs' retail pharmacy networks.

160.    Plaintiffs assert COUNT TWO on behalf of the Class against Merck for the

Nasonex co-pay subsidy program.  The Nasonex co-pay subsidy enterprise is an association-in-fact comprised of Merck, unnamed co-conspirator McKesson, and the pharmacies in PBMs' retail pharmacy networks.

161.    Plaintiffs assert COUNT THREE on behalf of the Class against Merck for the Vytorin co-pay subsidy program.  The Vytorin co-pay subsidy enterprise is an association-in-fact comprised of Merck, unnamed co-conspirator McKesson, and the pharmacies in PBMs' retail pharmacy networks.

162.    Plaintiffs assert COUNT FOUR on behalf of the Class against Merck for the Zetia co-pay subsidy program.  The Zetia co-pay subsidy enterprise is an association-in-fact comprised of Merck, unnamed co-conspirator McKesson, and the pharmacies in PBMs' retail pharmacy networks.

163.    Upon information and belief, prior to retaining McKesson to administer its Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia co-pay subsidy programs, Merck did not independently have such programs, nor could it have engaged in the fraudulent schemes alleged herein on its own, without McKesson's coordination, lacking as it does the extensive contacts with the nation's pharmacies, and the proprietary, in-house claims adjudication system possessed by McKesson. Together, Merck and McKesson commandeered the pharmacy adjudication system to fraudulently cause what are essentially drug discounts to be processed as secondary insurance coverage.  In doing so, Merck assumed the role of a pseudo-insurer and McKesson assumed the role of a pseudo-PBM, paying pharmacies administration fees, not for processing insurance coverage, but for processing co-pay subsidies disguised as insurance.

164.    McKesson engages in businesses other than the administration of Defendant's co-pay subsidy programs.  For example, McKesson is the largest drug wholesaler in North America,

49

delivering pharmaceuticals to retail pharmacies and institutional providers in all fifty states. McKesson also provides a suite of software, automation, and consulting services to hospitals, physician offices, imaging centers, home health care agencies, and payors.  McKesson is not named as a defendant in this action but is an unnamed co-conspirator.

165.    These enterprises are referred to collectively as the "co-pay subsidy enterprises." The drugs Janumet, Janumet XR, Januvia, Nasonex, Vytorin, and Zetia are referred to collectively as the "subsidized drugs."  McKesson is referred to as the "administrator." Pharmacies in PBMs' retail pharmacy networks are referred to collectively as "pharmacies."

166.    Plaintiffs, members of the classes, Defendant, the unnamed co-conspirator, and participants in the enterprises are all "persons" as defined by 18 U.S.C. § 1961(3).

**A.    Plaintiffs have standing to assert their claims for violation of RICO.**

167.    Plaintiffs have been and continue to be injured in their business or property as the proximate result of Defendant's RICO violations, both because material information is concealed from Plaintiffs and their PBM that would cause Plaintiffs to refuse payment for Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia at the point of sale and because Plaintiffs paid for Defendant's more expensive branded drugs, when they could have paid for less expensive therapeutic alternatives.

168.    Defendant instructs and induces pharmacies to disguise its co-pay subsidies - which are really consumer discounts - as secondary insurance and to process them at the point-of-sale through an adjudication system that conceals their use from TPPs and PBMs.  Pharmacies rely on these instructions and process Defendant's co-pay subsidy programs accordingly. Because Plaintiffs do not learn when a co-pay subsidy coupon is used, they cannot effectively mitigate the harm caused by paying for Defendant's more expensive branded drugs.

169.    Alternatively, if Defendant instead instructed pharmacies to process the payments

as the ordinary discounts they are, the pharmacist would deduct the amount of the discount from the price of the drugs before it sends any reimbursement requests to Plaintiffs' PBM.  Plaintiffs would, accordingly, pay less for each prescription in which one of Defendant's co-pay cards is used.

**B.     Merck, its co-conspirator, and network pharmacies formed association-in-fact RICO enterprises.**

170.    For purposes of this claim, the RICO co-pay subsidy enterprises alleged herein are associations-in-fact within the meaning of 18 U.S.C. § 1961(4).  Merck and its co-conspirator administrator, including their directors, employees, and agents, and pharmacies in PBMs' retail pharmacy networks, including their directors, employees, and agents, formed association-in-fact enterprises.  These co-pay subsidy enterprises are each an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purpose of maximizing sales of subsidized drugs by unlawfully interfering with cost-sharing provisions.  Interfering with contractual relationships between a TPP's PBM and network pharmacies in order to make co-pay coupon subsidy payments is not a part of Defendant's normal course of business and would not be a business in which, but for manufacturers' co-pay subsidy programs, Defendant's administrator would engage.

171.    Within each co-pay subsidy enterprise there are contractual relationships, financial ties, and continuing coordination activities between Defendant and its co-conspirator administrator, and between the co-conspirator administrator and the pharmacies in Plaintiffs' network.

172.    On information and belief, members of each co-pay subsidy enterprise have communicated repeatedly over several years to carry out their common purposes, and have entered into, monitored, and enforced contractual and/or agency arrangements regarding

payment and the delivery of services.  Defendant hired its administrator to carry out the programs.  The administrator pays generous administrative fees to pharmacies in PBMs' retail pharmacy networks to coerce them to participate in the enterprises.

**C.      Each co-pay subsidy enterprise engaged in and affected interstate commerce.**

173.    Each co-pay subsidy enterprise engages in and affects interstate commerce because it involves hundreds of thousands of transactions at tens of thousands of pharmacies all over the country and is attendant to Defendant's marketing, distribution, and sale of the subsidized drugs across state boundaries and throughout the United States.

174.    During the class period, the illegal conduct and wrongful practices carried out by members of each co-pay subsidy enterprise (including Defendant, its administrator, and the pharmacies) were effectuated by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products, and funds through the U.S. mails and interstate wire facilities.  In particular, the administrator transmitted pharmacy data to Defendant, and Defendant transmitted funds to the administrator, which transmitted funds to the pharmacies, which transmitted claims information to the administrator.

**D.      Merck associated with its respective co-pay subsidy enterprises.**

175.    The nature of the co-pay subsidy schemes required Merck to form and participate in enterprises.  Merck hired its co-conspirator administrator and monitored and enforced their arrangement regarding payment and the delivery of services.  It interfered with the contracts between Plaintiffs' PBM and its network pharmacies.  Each of these actions was necessary to, or helpful in, each co-pay subsidy enterprise's ability to carry out its goal of interfering with Plaintiffs' and class members' cost-sharing provisions – enforced through the PBMs' contracts with their network pharmacies – and causing Plaintiffs and class members to not only pay more for subsidized drugs than they otherwise would have if the co-pay subsidies had been truthfully

processed as discounts, but to pay for more prescriptions of Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia than they would have if pharmacies had not been induced to collect co-pay subsidies in breach of their contractual duty to honor TPPs' cost-sharing requirements.

**E.      The co-pay subsidy enterprises engaged in a pattern of racketeering activity.**

176.      Defendant conducted and participated in the affairs of the co-pay subsidy enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

**1.      The co-pay subsidy enterprises engaged in schemes to defraud.**

177.      The co-pay subsidy enterprises engaged in intentional schemes to defraud Plaintiffs and the classes by interfering with their cost-sharing provisions, enforced through the PBMs' contracts with network pharmacies, causing them to pay undiscounted rates for subsidized drugs and to pay for more prescriptions of the subsidized drugs than they would have paid absent the co-pay subsidy enterprises' substantive RICO violations.  These transactions necessarily involve the use of the wires.

178.      The co-pay subsidy enterprises engaged in separate but related intentional schemes to defraud Plaintiffs and the classes by causing misrepresentations to be made via the wires in connection with the point-of-sale transactions.  The instructions to pharmacies regarding how co-pay subsidies should be processed, as well as the pseudo-adjudication transactions themselves, necessarily involve the use of the wires.

179.      Defendant knew that entities like Plaintiffs and members of the classes have cost-sharing provisions to reduce their plan members' use of brand drugs.  Defendant knew that Plaintiffs and members of the classes sought to and did enforce these provisions through agreements entered into by PBMs and their network pharmacies.  Defendant knew that it could subvert these provisions by providing significant financial incentives to pharmacies and

instructing them to characterize Defendant's co-pay subsidy payments as secondary insurance. The purpose and intent of Defendant's co-pay subsidy schemes was to overcome such restrictions on brand drug purchases and to cause Plaintiffs and the classes to pay for an increased number of prescriptions for the subsidized drugs, at higher prices than less expensive therapeutic alternatives.

> **2.      The co-pay subsidy enterprises used interstate communication systems to carry out these schemes.**

180.     The nature of these schemes necessarily required members of each co-pay subsidy enterprise to communicate directly and frequently by the U.S. mails and interstate wire facilities.

181.     Many of the precise dates of the co-pay subsidy enterprises' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Defendant's records.  An essential part of the successful operation of the co-pay subsidy enterprises was Defendant's intent and ability to conceal the specific use of subsidies in connection with a particular transaction from Plaintiffs and the classes at the point of sale.

182.     During the class periods, Defendant exerted control over the co-pay subsidy enterprises, and in violation of Section 1962(c) of RICO, it conducted and participated in the conduct of the affairs of the co-pay subsidy enterprises, directly or indirectly, in the following ways:

    a.      Defendant conceived of and implemented the unlawful co-pay subsidy programs;

    b.      Defendant directly controlled the creation and distribution of marketing, sales, and other materials used to inform patients and physicians about the unlawful co-pay subsidy programs;

    c.      Defendant set the terms of the programs, including eligibility criteria, amount of subsidy, and number of subsidies;

d.      Defendant caused the administrator to administer the programs without informing TPPs about the subsidies and in a manner specifically designed to conceal the use of those subsidies from TPPs;

e.      Defendant caused the administrator to pay pharmacies an administrative fee in order to coerce pharmacies to conceal the use of co-pay subsidies from TPPs; and

f.      Defendant instructed and caused pharmacies to charge TPPs for subsidized prescriptions by instructing the pharmacies to process the co-pay subsidies as though they were a form of secondary insurance.

183.    Defendant's pattern of racketeering likely involves hundreds of thousands of separate instances of use of the U.S. mails or interstate wire facilities to carry out the unlawful co-pay subsidy programs.  Each of these fraudulent mailings and interstate wire transmissions and/or each transaction to charge TPPs for subsidized prescriptions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  These violations constitute a "pattern" of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in which Defendant intended to defraud Plaintiffs and members of the classes.

184.    Defendant makes individuals aware of its co-pay subsidy programs through the mail and wires.

185.    Defendant also has individuals sign up for their programs via the wires.  Most patients sign up to participate in the programs online, filling out information that is transmitted to the Defendant via the Internet.

186.    Defendant sends the physical co-pay cards to individuals and pharmacies via U.S. mail or facsimile.

187.    McKesson's patent for methods of administrating these co-pay subsidy programs expressly contemplates pharmacies, co-pay subsidy program administrators, and manufacturers of sponsored drugs communicating through "one or more data networks, such as a local area network (LAN), a metropolitan area network (MAN) and/or a wide area network (WAN) (e.g.

Internet) and . . . one ore more voice networks, such as a public-switched telephone network (PSTN)."

188.    The co-pay subsidy enterprises do, in fact, use the mail and wires to implement Defendant's co-pay subsidy programs.  The shadow adjudication system is used to disguise co-pay subsidies as secondary health insurance and conceal them from PBMs and TPPs.  Defendant and its co-conspirator use the wires to have the pharmacy contact the administrator about the subsidized prescriptions filled and the amount subsidized for each prescription, and the administrator in turn contacts the manufacturer and communicates the subsidy information.

189.    Defendant also uses the mail and wires to send money to the program administrator, and the administrator sends money to the pharmacies to effectuate reconciliation and reimburse the pharmacies for recognizing the co-pay subsidies.

190.    These communications between pharmacies, the administrator, and the Defendant occur tens hundreds of thousands of times per year.  Defendant and its co-conspirator possess information about the specific dates of transactions, which Defendant has withheld from health benefit plans.

**F.     The unlawful activity proximately injured Plaintiffs and the classes.**

191.    Defendant's participation in the affairs of the co-pay subsidy enterprises, through a pattern of racketeering activity, has directly and proximately caused Plaintiffs and members of the classes to be injured in their business or property.  Plaintiffs, members of the classes, and others reasonably relied upon a belief that their members were paying their share of prescription drug costs (as determined by the cost-sharing provisions of their particular health plans and the provisions in network pharmacy contracts requiring pharmacies to collect co-pays from TPPs' members).  In processing Defendant's co-pay subsidies, pharmacies relied on the instructions provided by Defendant and its program administrator.

192.    Defendant profited directly from the co-pay subsidy schemes in the form of increased sales of the subsidized drugs that Plaintiffs and the classes would not otherwise have purchased but for Defendant's interference with the cost-sharing provisions, enforced through the contracts between PBMs and their network pharmacies.  As a direct and proximate result of Defendant's overt acts and/or predicate acts in furtherance of violating 18 U.S.C. § 1962(c), Plaintiffs and the classes have been and are continuing to be injured in their business or property.

193.    Plaintiffs and members of the classes were injured in their property by reason of these violations because Plaintiffs and members of the classes paid undiscounted rates for subsidized drugs and paid for more prescriptions of the subsidized drugs than they would have paid absent the co-pay subsidy enterprises' substantive RICO violations.  By reason of the unlawful acts engaged in by each co-pay subsidy enterprise, Plaintiffs and the classes have suffered ascertainable loss and damages.  These injuries were directly and proximately caused by Defendant's racketeering activity.

194.    Under § 1964(c) of RICO, Defendant is liable to Plaintiffs and members of the classes for three times the damages sustained, plus the cost of bringing suit and reasonable attorneys' fees.

**COUNTS FIVE, SIX, SEVEN, AND EIGHT**
**CONSPIRACY TO VIOLATE RICO**
**(18 U.S.C. § 1962(D))**

195.    Plaintiffs incorporate by reference all other paragraphs of the Consolidated Amended Class Action Complaint.

196.    These Counts allege conspiracies to violate RICO (as provided in 18 U.S.C. § 1962(d)), relating to the co-pay subsidy programs described above, and are asserted against Defendant on behalf of Plaintiffs and the classes.

197.    Plumbers asserts COUNT FIVE on behalf of the Class against Merck for the

Janumet/Janumet XR/Januvia co-pay subsidy program.  The Janumet/Janumet XR/Januvia co-pay subsidy enterprise is an association-in-fact comprised of Merck, unnamed co-conspirator McKesson, and the pharmacies in PBMs' retail pharmacy networks.

198.    Plaintiffs assert COUNT SIX on behalf of the Class against Merck for the Nasonex co-pay subsidy program.  The Nasonex co-pay subsidy enterprise is an association-in-fact comprised of Merck, unnamed co-conspirator McKesson, and the pharmacies in PBMs' retail pharmacy networks.

199.    Plaintiffs assert COUNT SEVEN on behalf of the Class against Merck for the Vytorin co-pay subsidy program.  The Vytorin co-pay subsidy enterprise is an association-in-fact comprised of Merck, unnamed co-conspirator McKesson, and the pharmacies in PBMs' retail pharmacy networks.

200.    Plaintiffs assert COUNT EIGHT on behalf of the Class against Merck for the Zetia co-pay subsidy program.  The Zetia co-pay subsidy enterprise is an association-in-fact comprised of Merck, unnamed co-conspirator McKesson, and the pharmacies in PBMs' retail pharmacy networks.

201.    Upon information and belief, prior to retaining McKesson to administer its Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia co-pay subsidy programs, Merck did not independently have such programs.  McKesson engages in businesses other than the administration of Merck's Janumet/Janumet XR/Januvia, Nasonex, Vytorin, and Zetia co-pay subsidy programs.  *See supra* ¶ 164.

202.    These enterprises are referred to collectively as the "co-pay subsidy enterprises." The drugs Janumet, Janumet XR, Januvia, Nasonex, Vytorin, and Zetia are referred to collectively as the "subsidized drugs."  McKesson is referred to as the "administrator."  The

pharmacies in PBMs' retail pharmacy networks are referred to collectively as "pharmacies."

203.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  Defendant has violated Section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  The object of these ongoing conspiracies was to conduct or participate in, directly or indirectly, the conduct of the affairs of the co-pay subsidy enterprises through a pattern of racketeering activity.

204.    Defendant adopted the goal of furthering or facilitating the criminal endeavor of the co-pay subsidy enterprises minimally by agreeing to facilitate some of the acts leading to the substantive offenses, and directly by, as described above, engaging in numerous overt and predicate fraudulent racketeering acts in furtherance of each conspiracy.

205.    Defendant not only agreed to the objectives of each 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but was also aware that its ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

206.    By hiring the administrator to carry out the co-pay subsidy schemes, including paying pharmacies to conceal the use of its schemes from TPPs, Defendant engaged in overt acts in furtherance of the schemes as well as actual predicate violations of mail or wire fraud.  As a direct and proximate result of Defendant's overt acts and/or predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and members of the classes have been and are continuing to be injured in their business or property.

207.    Plaintiffs and members of the classes were injured in their property by reason of these violations in that Plaintiffs and members of the classes have paid for an increased number of prescriptions for the subsidized drugs as a result of the co-pay subsidy enterprises' conspiracies to violate 18 U.S.C. § 1962(c).

59

208.    By reason of the unlawful acts engaged in by each co-pay subsidy enterprise, Plaintiffs and members of the classes have suffered ascertainable loss and damages.  These injuries were directly and proximately caused by Defendant's racketeering activity.

209.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendant is liable to Plaintiffs and members of the classes for three times the damages sustained, plus the cost of this suit and reasonable attorneys' fees.

<div style="text-align:center">

**COUNTS NINE AND TEN**
**TORTIOUS INTERFERENCE WITH CONTRACT**

</div>

210.    Plaintiffs incorporate by reference all other paragraphs of the Consolidated Amended Class Action Complaint.

211.    The PBMs retained by Plaintiffs and the class members for the management and administration of the prescription drug benefits provided to plan members under their health benefit plans had valid and enforceable contracts with each of the pharmacies at which health plan members filled their prescriptions for Janumet, Janumet XR, Januvia, Nasonex, Vytorin, and Zetia.

212.    The PBMs acted as agents of Plaintiffs and the class members in entering into these contracts with the pharmacies and administering the pharmacy networks to which these contracts relate or, in the alternative, Plaintiffs and the class members were intended third-party beneficiaries of these contracts.  Absent Plaintiffs and other TPPs, PBMs would have no reason to establish such pharmacy networks.

213.    These standardized form contracts between the pharmacies and PBMs, along with the associated pharmacy manuals, require the pharmacies to collect the full co-pay amount for prescriptions drugs, including Janumet, Janumet XR, Januvia, Nasonex, Vytorin, and Zetia, directly from each insured.

214.    The PBMs include this obligation in their contracts with the pharmacies for the benefit of Plaintiffs and the class members.  By requiring health plan members to personally pay a portion of the cost of their prescription drugs, TPPs incentivize their insureds to choose less expensive generic equivalents or therapeutic alternatives (and thereby reduce the cost of the much larger residual portion paid by the TPPs).  Thus, the contractual requirement that pharmacies collect the co-pay amounts *from the insureds* is intended to effectuate the cost-containment measures implemented by the TPPs.

215.    Defendant knew of the contractual relationship between the pharmacies and the PBMs but nevertheless, in order to profit secretly at TPPs' expense, and without justification, intentionally, willfully, wrongfully, improperly, and maliciously interfered and disrupted this contractual relationship by subsidizing the insureds' personal co-pay obligations and issuing financial incentives to pharmacies that were intended to, and did in fact, induce the pharmacies to accept the co-pay subsidies from the Defendant and process the subsidies as secondary insurance.

216.    As a result, Defendant wrongfully and improperly induced the pharmacies to breach the co-pay collection provisions contained in the pharmacy network agreements and associated manuals.

217.    Through its improper acts, Defendant knowingly and proximately caused damages to Plaintiffs and the class members in that they were forced to pay for more prescriptions of the co-pay subsidy drugs than they otherwise would have.  Because Defendant induced the pharmacists to accept the co-pay subsidies in lieu of payment from the insureds and thereby relieved the insureds of their personal co-pay obligations for the co-pay subsidy drugs, the insureds were no longer incentivized to choose the less expensive therapeutic alternatives

and, accordingly, Plaintiffs and the class members paid for more prescriptions of the more expensive subsidized drugs.  If Defendant had not interfered with the contracts with those pharmacies, Plaintiffs would not have been injured.

218.    Defendant has therefore tortiously interfered with the pharmacy network agreements and associated manuals under the laws of all states and jurisdictions within the United States.

## VIII.   DEMAND FOR JUDGMENT

219.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed classes, respectfully request that the Court:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the classes, and declare Plaintiffs the class representative for each of the classes;

B.    Enter judgment against Defendant in favor of Plaintiffs and the classes;

C.    Adjudge and decree the acts alleged herein to be unlawful;

D.    Award the classes damages in an amount to be determined at trial;

E.    Award the classes threefold damages pursuant to 18 U.S.C. § 1964(c);

F.    Award Plaintiffs and the classes their costs of suit, including reasonable attorneys' fees as provided by law; and

G.    Enjoin Defendant from offering these or similar co-pay subsidy programs.

## IX.    JURY DEMAND

Pursuant to Fed. Civ. P. 38, Plaintiffs, on behalf of themselves and the proposed classes,

demand a trial by jury on all issues so triable.

<div style="margin-left:40%">

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Co-Counsel for Plaintiffs and the classes


By:____/s/ James E. Cecchi_____
        JAMES C. CECCHI

SCHNADER & LEWIS
Co-Counsel for Plaintiffs and the classes

By:____/s/ Lisa J. Rodriguez_____
        LISA J. RODRIGUEZ

HAGENS BERMAN SOBOL SHAPIRO LLP
Co-Counsel for Plaintiffs and the classes


By:____/s/ Thomas M. Sobol_____
        THOMAS M. SOBOL

</div>

Dated: September 12, 2013

Jennifer Fountain Connolly
HAGENS BERMAN SOBOL SHAPIRO LLP
1629 K St. NW, Suite 300
Washington, D.C.  20006
(202) 355-6435

Steve W. Berman
Barbara A. Mahoney
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
(206) 623-7292

Kenneth A. Wexler
Bethany R. Turke
Dawn M. Goulet
Amy E. Keller
WEXLER WALLACE LLP
55 West Monroe St., Suite 3300
Chicago, IL 60603
(312) 346-2222

James G. Stranch, III
J. Gerard Stranch IV
Joe P. Leniski, Jr.
Michael J. Wall
BRANSTETTER STRANCH & JENNINGS
PLLC
227 Second Avenue North, 4th Floor
Nashville, TN 37201
(615) 254-8801

Jeffrey A. Leon
COMPLEX LITIGATION GROUP LLC
513 Central Avenue, Suite 300
Highland Park, IL 60035
(847) 433-4500

*Co-Counsel for Plaintffs and the classes*

Jeffrey L. Kodroff
SPECTOR ROSEMAN
KODROFF & WILLIS PC
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300