# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL 572 HEALTH AND WELFARE FUND and UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 464A HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>　　　　Defendant. | Civil Action No.: 12-cv-01379 (MAS)(LHG)<br>Civil Action No.: 12-cv-03652 (MAS)(LHG)<br><br><br>Judge Michael A. Shipp<br>Magistrate Judge Lois H. Goodman |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MERCK'S MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

James E. Cecchi
Lindsey H. Taylor
Caroline F. Bartlett
Donald A. Ecklund
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

James G. Stranch, III
J. Gerard Stranch IV
Joe P. Leniski, Jr.
Michael J. Wall
BRANSTETTER STRANCH
& JENNINGS PLLC
227 Second Svenue North, 4th Floor
Nashville, TN 37201
(615) 254-8801

Thomas M. Sobol
Lauren Guth Barnes
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700

Kenneth A. Wexler
Bethany R. Turke
Dawn M. Goulet
Aaron Chait
Catherine C. Howlett
WEXLER WALLACE LLP
55 West Monroe St., Suite 3300
Chicago, IL 60603
(312) 346-2222

*Attorneys for Plaintiffs*
*(Additional Counsel on Signature Page)*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STANDARD OF REVIEW ........................................................................................3

LEGAL ARGUMENT ..............................................................................................3

    I.     Plaintiffs allege Article III standing.........................................................3

    II.    Plaintiffs adequately allege tortious interference with contract..............................7

          A.    Should the Court identify a true conflict of law, the law of the place of purchase should apply.............................................................7

          B.    Plaintiffs have standing to pursue their tortious interference claims..........8

              1.    PBMs act as third-party payors' agents when entering into pharmacy network agreements with pharmacies. ..........................9

              2.    TPPs like Plaintiffs are third-party beneficiaries of pharmacy network agreements between PBMs and pharmacies. ...................10

          C.    Merck tortiously interfered with the pharmacies' contractual duties to collect co-pays directly from insureds. ........................................11

              1.    Plaintiffs have identified the contractual provision with which Merck intended to and did interfere.............................11

              2.    Plaintiffs allege Merck acted with malice......................................16

              3.    Plaintiffs allege Merck's interference caused them loss and damages..................................................................................19

    III.    Plaintiffs adequately allege claims under RICO. ....................................19

          A.    Plaintiffs allege standing to pursue RICO violations................................19

          B.    Plaintiffs adequately plead mail and wire fraud. ......................................24

               1.    Plaintiffs satisfy Rule 9(b)'s particularity requirement. ...............24

               2.    Plaintiffs allege Merck engaged in fraudulent schemes. ...............28

CONCLUSION...........................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Affiliated Computer Servs. v. Caremark, Inc.*,
  49 F. Supp. 2d 882 (N.D. Tex. 1999) ...................................................................7

*Alboyacian v. BP Prods. N. Am., Inc.*,
  No. 09-5143, 2011 U.S. Dist. LEXIS 134453 (D.N.J. Nov. 22, 2011) ............16, 17

*Allen v. Wright*,
  468 U.S. 737 (1984).............................................................................................4

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)...........................................................................................20

*Archer W. Contrs., Ltd. v. Estate of Pitts*,
  735 S.E.2d 772 (Ga. 2012)................................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................3

*Axa Assurance, Inc. v. Chase Manhattan Bank*,
  770 A.2d 1211 (N.J. Super. App. Div. 2001) ......................................................13

*Baldwin v. Univ. of Pittsburgh Med. Ctr.*,
  636 F.3d 69 (3d Cir. 2011)..................................................................................3

*BCS Services, Inc. v. Heartwood 88, LLC*,
  637 F.3d 750, 752-53 (7th Cir. 2011) ...............................................................22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................3

*Bellator Sport Worldwide, LLC v. Alvarez*,
  No. 13-63, 2013 U.S. Dist. LEXIS 54879 (D.N.J. Apr. 16, 2013) .........................18

*Bellator Sports Worldwide, LLC v. Zuffa*,
  No. 10-4091, 2011 U.S. Dist. LEXIS 143590 (D.N.J. May 16, 2011)..............14, 15

*Benak v. Alliance Capital Mgmt. L.P.*,
  435 F.3d 396 (3d Cir. 2006)..............................................................................14

*Bitzke v. Folger*,
  231 Wis. 513 (Wis. 1939)....................................................................................9

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
    778 F. Supp. 2d 375 (S.D.N.Y. 2011).................................................................................10

*Boyle v. D'Onofrio*,
    99 F. Supp. 2d 541, 546-49 (D.N.J. 2000)........................................................................28

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008)....................................................................................................19, 21

*Cedar Ridge Trailer Sales, Inc. v. Nat'l Cmty. Bank of N.J.*,
    711 A.2d 338 (N.J. Super. App. Div. 1998) ....................................................................16

*Centennial Ins. Co. v. Horizon Contr. Co., L.L.C.*,
    No. 05-3917, 2008 U.S. Dist. LEXIS 88221 (D.N.J. Oct. 31, 2008) .................................13

*Ciecka v. Rosen*,
    908 F. Supp. 2d 545 (D.N.J. 2012) ....................................................................................8

*Civix Sunrise, GC, L.L.C. v. Sunrise Rd. Maint. Assoc.*,
    997 So. 2d 433 (Fla. Dist. Ct. App. 2008) ........................................................................10

*Comcast of Ill. X v. Multi-Vision Elecs., Inc.*,
    491 F.3d 938 (8th Cir. 2007) ...........................................................................................29

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
    430 F. Supp. 2d 346 (D. Del. 2006)...................................................................................7

*Deluxe Bldg. Sys. v. Constructamax, Inc.*,
    No. 2:06-cv-02996, 2013 U.S. Dist. LEXIS 142477 (D.N.J. Sept. 26, 2013).........................8

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
    784 F. Supp. 2d 508 (D.N.J. 2011) .........................................................................5, 10, 23

*Don King Prods., Inc. v. Douglas*,
    742 F. Supp. 786 (S.D.N.Y. 1990) ....................................................................................7

*Eisenstadt v. Tel. Elecs. Corp.*,
    No. 06-CV-1196, 2008 U.S. Dist. LEXIS 74343 (N.D. Tex. Sept. 26, 2008).........................7

*Eli Lilly and Co. v. Roussel Corp.*,
    23 F. Supp. 2d 460 (D.N.J. 1998) ....................................................................................19

*Fineman v. Armstrong World Indus. Sys., Inc.*,
    980 F.2d 171 (3d Cir. 1992)........................................................................................8, 16

*Florian Greenhouse, Inc. v. Cardinal IG Corp.*,
    11 F. Supp. 2d 521 (D.N.J. 1998) ....................................................................................15

*Fox Ins. Co. v. ProCare Pharm. Benefit Manager, Inc.*,
    No. 1:11-CV-4292, 2012 U.S. Dist. LEXIS 64291 (N.D. Ga. May 7, 2012) ........................... 9

*Frank Briscoe Co., Inc. v. Travelers Indemnity Co.*,
    899 F.Supp. 1304 (D.N.J. 1995) ................................................................................. 11, 12

*FTI Consulting, Inc. v. Graves*,
    No. 05-cv-6719, 2007 U.S. Dist. LEXIS 55325 (S.D.N.Y. July 31, 2007) ............................. 7

*Gabel v. Manetto*,
    427 A.2d 71 (N.J. Super. Ct. App. Div. 1981) .......................................................................... 11

*Gibson v. Credit Suisse AG*,
    No. 10-cv-1, 2013 U.S. Dist. LEXIS 139605 (D. Idaho Aug. 16, 2013) ................................. 7

*Graco Inc. v. PMC Global, Inc.*,
    No. 08-1304, 2012 U.S. Dist. LEXIS 188865 (D.N.J. Mar. 6, 2012) ..................................... 17

*Hamilton Cnty. Emergency Commc'ns. Dist. v. Orbacom Commc'ns. Integrator Corp.*,
    No. 1:04-cv-7, 2006 U.S. Dist. LEXIS 94828 (E.D. Tenn. Jan. 30, 2006) ............................. 8

*Hanley v. Cont'l Airlines, Inc.*,
    687 F. Supp. 533 (D. Colo. 1988) ........................................................................................... 9

*Harper-Lawrence, Inc. v. United Merchants & Mfrs., Inc.*,
    619 A.2d 623 (N.J. Super. App. Div. 1993) ............................................................................. 8

*Hemi Group LLC v. City of New York*,
    559 U.S. 1 (2010) ................................................................................................................. 19, 21

*Hodges v. Buzzeo*,
    193 F. Supp. 2d 1279 (M.D. Fla. 2002) ................................................................................... 7

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992) ............................................................................................................. 19, 20

*Howmedica Osteonics Corp. v. Zimmer, Inc.*
    No. 11-1857, 2012 U.S. Dist. LEXIS 162800 (D.N.J. Nov. 14, 2012) ............................. 7, 18

*HT of Highlands Ranch, Inc. v. Hollywood Tanning Sys., Inc.*,
    590 F. Supp. 2d 677 (D.N.J. 2008) ........................................................................................ 19

*Hunt Constr. Group Inc. v. Farina*,
    No. 11-4933, 2012 U.S. Dist. LEXIS 2676 (D.N.J. Jan. 10, 2012) ........................................ 26

*IDT Corp. v. Unlimited Recharge, Inc.*,
    No. 11-4992, 2012 U.S. Dist. LEXIS 130815 (D.N.J. Sept. 13, 2012) ................................... 12

*In re Adams Golf, Inc. Secs. Litig.*,
 381 F.3d 267 (3d Cir. 2004)..................................................................3

*In re Neurontin Mktg. & Sales Practices Litig.*,
 712 F.3d 51 (1st Cir. Apr. 3, 2013)..................................................21, 22

*In re Neurontin Mktg. & Sales Practices Litig.*,
 712 F.3d 60 (1st Cir. Apr. 3, 2013)..................................................22, 23

*In re Publication Paper Antitrust Litig.*,
 690 F.3d 51 (2d Cir. 2012)..................................................................23

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
 No. 06-5774, 2010 U.S. Dist. LEXIS 56621 (D. N.J. June 9, 2010).......................5

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
 No. 2:06-cv-5774, 2009 U.S. Dist. LEXIS 58900 (D. N.J. July 10, 2009) ..................23

*Ironworkers Local Union 68 & Participating Emp'rs Health & Welfare Funds v.*
 *AstraZeneca Pharm., LP*,
 634 F.3d 1352 (11th Cir. 2011) ........................................................9, 24

*James Family Charitable Found. v. State St. Bank & Trust Co.*,
 956 N.E. 2d 243 (Mass. App. Ct. 2011) ...................................................10

*Kaiser Found. Health Plan, Inc. v. Medquist, Inc.*,
 No. 08-cv-4376, 2009 U.S. Dist. LEXIS 29124 (D.N.J. Apr. 8, 2009)....................26

*Kolar v. Preferred Real Estate Invs., Inc.*,
 361 Fed. Appx. 354 (3d Cir. 2010)........................................................25

*Lamorte Burns & Co. v. Walters*,
 770 A.2d 1158 (N.J. 2001)................................................................17

*Lebegern v. Forman*,
 471 F.3d 424 (3d Cir. 2006)...........................................................7, 8

*Lum v. Bank of Am.*,
 361 F.3d 217 (3d Cir. 2004).........................................................25, 27

*Material Techs. v. Carpenter Tech. Corp.*,
 No. 01-2965, 2004 U.S. Dist. LEXIS 28892 (D.N.J. Dec. 15, 2004)....................17

*Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.*,
 870 F. Supp. 1237 (D.N.J. 1994) ........................................................13

*Mehling v. New York Life Insurance Co.*,
 163 F. Supp. 2d 502, 509 (E.D. Pa. 2001) .............................................28

*Mylan Inc. v. SmithKline Beecham Corp.*,
   723 F.3d 413 (3d Cir. 2013)................................................................................15

*Myrus Hack, LLC v. McDonald's Corp.*,
   2009 U.S. Dist. LEXIS 25765, (D.N.J. Mar. 27, 2009)............................................4

*N. Star Mgmt., Inc. v. Ins. Prof'ls, Inc.*,
   No. 12-cv-3839, 2013 U.S. Dist. LEXIS 135286 (D.N.J. Sept. 23, 2013) ..............17

*P.V. v. Camp Jaycee*,
   197 N.J. 132 (2008) ..............................................................................................7

*Pac. Shores Props., LLC v. City of Newport Beach*,
   730 F.3d 1142, 2013 U.S. App. LEXIS 19386 (9th Cir. Sept. 20, 2013) ................22

*Pereira v. United States*,
   347 U.S. 1 (U.S. 1954)..........................................................................................29

*Perez v. Wyeth Labs., Inc.*,
   734 A.2d 1245 (1999) ............................................................................................5

*Phillips USA v. Allflex USA*,
   No. 94-3288, 1993 U.S. Dist. LEXIS 7529 (D. Kan. May 21, 1993).......................9

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008)....................................................................................3

*Piacentile v. Sanofi Synthelabo, Inc.*,
   No. 05-2927, 2010 U.S. Dist. LEXIS 137895 (D.N.J. Dec. 30, 2010)............27, 28

*Plumbers & Pipefitters Local 572 Health & Welfare Fund v. Merck & Co.*
   No. 12-1379 (MAS) (LHG), 2013 U.S. Dist. LEXIS 61051 (D.N.J. Apr. 29, 2013)....5, 13, 29

*Prudential Ins. Co. of Am. V. Nat. Gypsum Co.*,
   711 F. Supp. 1244 (D.N.J. 1989) ..........................................................................26

*Prusky v. ReliaStar Life Ins. Co.*,
   532 F.3d 252 (3d Cir. 2008)..................................................................................24

*Refco Inc. Sec. Litig. v. Aaron*,
   826 F. Supp. 2d 478 (S.D.N.Y. 2010)................................................................7, 19

*Rehabcare Group East, Inc. v. Trenton Convalescent Operating Co.*,
   No. 06-2128, 2006 U.S. Dist. LEXIS 67376 (D.N.J. Sept. 20, 2006) ...............14, 15

*Reynolds v. Owen*,
    34 Conn. Supp. 107 (Conn. Super. Ct. 1977) ...........................................................................9

*Rieder Cmtys. v. N. Brunswick*,
    546 A.2d 563 (N.J. Super. App. Div. 1988) ...........................................................................9

*Rolo v. City Investing Co. Liquidating Trust*,
    155 F.3d 644 (3d Cir. 1998)...........................................................................................24, 25

*Scott's Hollow Joint Venture v. Xanadu of Hermitage, Inc.*,
    No. 01-A-01-9207-CH-00278, 1992 Tenn. App. Lexis 1002 (Tenn. Ct. App. Dec. 23,
    1992) ...........................................................................................................................................8

*Sears Mortgage Corp. v. Rose*,
    634 A.2d 74 (N.J. 1993).............................................................................................................9

*Shapiro v. UJB Financial Corporation*,
    964 F.2d 272, 285 (3d Cir. 1992)...........................................................................................27

*Smith v. Felter*,
    1899 N.J. Sup. Ct. LEXIS 122 (N.J. Feb. 27, 1899)...............................................................8

*Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*,
    171 F.3d 912 (3d Cir. 1999)....................................................................................................19

*Syncsort Inc. v. Innovative Routines Int'l, Inc.*,
    No. 04-3623, 2005 U.S. Dist. LEXIS 15432 (D.N.J. May 3, 2005).......................................13

*Tamposi Assocs. v. Star Mkt. Co.*,
    406 A.2d 132 (N.H. 1979) ........................................................................................................9

*Tel. & Data Sys., Inc. v. Eastex Cellular L.P.*,
    No. 12888, 1993 Del. Ch. LEXIS 182 (Del. Ch. Aug. 27, 1993)............................................7

*Toll Brothers, Inc. v. Twp. of Readington*,
    555 F.3d 131 (3d Cir. 2009).....................................................................................................4

*Trent-Jones, Inc. v. Balinas*,
    No. 95-7462, 1996 U.S. Dist. LEXIS 12267 (E.D. Pa. 1996) ..................................................8

*Trs. of the Univ. of Pa. v. St. Jude Children's Research Hosp.*,
    No. 12-4122, 2013 U.S. Dist. LEXIS 52750 (E.D. Pa. Apr. 12, 2013) ....................................8

*United Nat. Ins. Co. v. Aon Ltd.*,
    No. 04-539, 2008 U.S. Dist. LEXIS 61453 (E.D. Pa. Aug. 8, 2008) .....................................30

*United States v. Basroon*,
    38 Fed. Appx. 772 (3d Cir. 2002)...........................................................................................30

*United States v. Olatunji*,
    872 F.2d 1161 (3d Cir. 1989) ................................................................29

*United States v. Payment Processing Ctr., LLC*,
    2006 U.S. Dist. LEXIS 75715 (E.D. Pa. Oct. 18, 2006) .............................27

*Velop, Inc. v. Kaplan*,
    693 A.2d 917 (N.J. Super. App. Div. 1997) ..........................................11

*Viking Yacht Co. v. Composites One LLC*,
    496 F. Supp. 2d 462 (D.N.J. 2007) .......................................................30

*Waddington N. Am., Inc. v. Sabert Corp.*,
    No. 09-4883, 2010 U.S. Dist. LEXIS 103955 (D.N.J. Sept. 29, 2010) ...................14

*Waddington N. Amer., Inc. v. Sabert Corp.*,
    No. 09-4883, ECF No. 18 ......................................................................14

*Warren Gen. Hosp. v. Amgen, Inc.*,
    643 F.3d 77 (3d Cir. 2011) ....................................................................3

*WYCQ, Inc. v. Nat'l Music Mktg.*,
    No. 05-cv-0979, 2008 U.S. Dist. LEXIS 439 (M.D. Tenn. Jan 3, 2008) ...............11, 16

## OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws § 145 ..........................................7

Restatement (Second) of Torts, § 766, cmt. i. ...........................................16

Restatement (Second) of Torts § 767 cmt. c ...........................................17

Restatement (Second) of Torts § 768 ......................................................18

## PRELIMINARY STATEMENT

Third-party payors ("TPPs") control the mounting cost of prescription drugs by placing less-expensive, usually generic, drugs on lower tiers of their formularies with correspondingly lower co-pays, thereby providing their members with a reasonable, personal incentive to choose less-costly therapeutic alternatives.[1] Drug manufacturers, accordingly, compete for preferred formulary placement by offering rebates to lower the overall cost of their drugs.[2] To ensure that TPPs' cost-saving measures are effective, pharmacy benefit managers ("PBMs") – acting on behalf of their TPP customers and/or with the specific intent to benefit them – enter into standard agreements requiring retail pharmacies to comply with the terms of TPPs' prescription drug benefit plans and – importantly – to collect co-pays *only and directly from patients*.[3]

Merck knows retail pharmacies are required to collect co-pays from TPPs' insureds. Not only are the pharmacy network contracts and corresponding manuals ubiquitous in the industry, but Merck's sophisticated co-pay subsidy program administrator (and North America's largest drug wholesaler), McKesson, boasts of its extensive pharmacy connections.[4] Despite this, and facing less-expensive therapeutic alternatives to several of its expensive, brand-name drugs (the "Merck Drugs"), Merck decided not to lower the prices of its drugs, but to instead systematically pay a portion of insureds' co-pay obligations to increase utilization (the number of prescriptions that patients choose to fill at the pharmacy counter) of its drugs.[5] Pharmacies have no legitimate business interest in accepting co-pay subsidies, so Merck and McKesson bribe them with

---

[1] Consol. Am. Class Action Compl. and Jury Demand ("CAC"), ECF No. 37, ¶¶ 2, 42.

[2] *Id.* ¶ 46.

[3] *Id.* ¶¶ 2, 33, 50-53, 133-39.

[4] *Id.* ¶¶ 54, 124 (McKesson assures its manufacturer customers that "[p]harmacies look to McKesson as a trusted resource for all their claims processing questions"), ¶ 164.

[5] *Id.* ¶¶ 26, 42, 46, 69-78, 82-91, 95-100, 105-110.

significant processing fees each time they accept Merck's co-pay subsidies.[6]

Merck, McKesson, and the pharmacies that participate in Merck's co-pay subsidy programs fraudulently disguise co-pay subsidies as secondary insurance, concealing their use from TPPs.[7]  Merck falsely represents to pharmacies that its co-pay subsidies can and should be processed as secondary insurance through a separate transaction within a "shadow claims system" linked not to any insurance carrier, but to Merck's program administrator.[8]  When an insured has dual coverage, the primary plan receives (through its PBM) a data field used to indicate the *type* of secondary insurer.[9]  To follow Merck's instructions, pharmacies either leave this field blank ("Omission Theory of Fraud") or populate it with a misleading code like "private" ("Misrepresentation Theory of Fraud"), implying that valid secondary insurance was processed.[10]  Thus, although primary insurers and their PBMs are generally aware of co-pay subsidy programs, they have no way of knowing from the point-of-sale information they are provided whether a co-pay subsidy is used with any particular transaction.[11]

Merck's conduct injures TPPs, both by depriving them of material information they would use to deny coverage for Merck's drugs at the point of sale ("Excess Prescriptions Theory of Injury"), and because, deprived of the benefit of what are in fact ordinary manufacturer discounts, TPPs pay more for each prescription where co-pay subsidies are disguised as secondary insurance ("Overcharge Theory of Injury").[12]  Merck asks this Court to grant its

---

[6] CAC ¶¶ 55-56; *see also* ¶¶ 163, 172, 182(e).

[7] *Id.* ¶¶ 5-6, 13, 28, 19, 60, 124-28, 132, 159-63, 168, 181, 182(d)-(e), 188, 206.

[8] *Id.* ¶¶ 5, 13, 27-28, 59, 79, 92, 101, 111, 116-17, 124, 168, 191.

[9] *Id.* ¶¶ 57, 118.

[10] *Id.* ¶ 118 (explaining that no code exists to truthfully indicate a co-pay subsidy was processed).

[11] *Id.* ¶¶ 119, 132.

[12] CAC ¶¶ 21, 140, 167, 193; *see also infra* Argument, Sections I and IIIA.

motion and bless this illegal conduct.  Merck's motion should be denied.

## STANDARD OF REVIEW

A district court reviewing a motion to dismiss under Rule 12(b)(1) or l2(b)(6) must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, plaintiff may be entitled to relief."[13]  Thus, a motion to dismiss may be granted only if a court finds that plaintiff's claims lack facial plausibility."[14]

A plaintiff's "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[15]  A plaintiff need only allege facts that "raise a right to relief above the speculative level."[16]  In fact, "[*Twombly*] does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element."[17]  Therefore, a Rule 12(b)(6) motion must fail if a plaintiff is entitled to relief "*under any reasonable reading of the complaint*."[18]

## LEGAL ARGUMENT

### I.    Plaintiffs allege Article III standing.

Allegations of (1) "injury in fact," (2) traceability, and (3) redressability satisfy Article

---

[13] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008); *see also Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73-74 (3d Cir. 2011).

[14] *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).

[15] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In determining what is plausible, a court may rely upon its experience and common sense.  *Id.* at 663-64.

[16] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Whether a defense is plausible is irrelevant.  *See In re Adams Golf, Inc. Secs. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004).

[17] *Phillips*, 515 F.3d at 234 (internal citation and quotation omitted).

[18] *Id.* at 233 (emphasis added).

III's standing requirement.[19]  Merck argues that Plaintiffs have failed to allege just one of the requirements – traceability.  "If the injury-in-fact prong focuses on *whether* the plaintiff suffered harm, then the traceability prong focuses on who inflicted that harm."[20]  The key question is whether "the defendant's challenged actions, and not the actions of some third party, caused the plaintiff's injury."[21]  For Article III purposes, the "causal connection need not be as close as the proximate causation needed to succeed on the merits of a tort claim."[22]

Plaintiffs allege that, as a direct result of Merck's instructions to pharmacies, Plaintiffs pay more at the point of sale for each prescription in which Merck's co-pay subsidies are processed as secondary insurance rather than the ordinary manufacturer discounts they are.[23]  Plaintiffs also allege that co-pays incentivize insureds to fill prescriptions for cost-effective drugs and that Merck's co-pay subsidies reduce or eliminate this incentive with the intended and actual result of causing Plaintiffs' members to fill (and Plaintiffs to pay for) more prescriptions for the Merck Drugs than they otherwise would.[24]  Under this second theory, Plaintiffs are injured at the point of sale – whether the patient would have simply abandoned the prescription or sought a less-expensive alternative.  These allegations establish Article III standing.[25]

This Court dismissed without prejudice Plaintiffs' initial complaint (asserting different

---

[19] *Allen v. Wright*, 468 U.S. 737, 751 (1984).

[20] *Toll Brothers, Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009).

[21] *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

[22] *Id.*

[23] *See, e.g.*, CAC ¶¶ 21, 168-69.

[24] *See, e.g., id.* ¶¶ 3, 12-21, 167-69.

[25] Notably, Rule 9(b) requires only the circumstances constituting fraud to be pleaded with particularity; it does not require plaintiffs to plead standing or causation with the same level of specificity.  *See Myrus Hack, LLC v. McDonald's Corp.*, 2009 U.S. Dist. LEXIS 25765, at *24 (D.N.J. Mar. 27, 2009).

theories of liability and injury) for failing to allege that "Merck's actions caused any individual doctor to prescribe a Drug covered by one of the Programs when he otherwise would not have."[26]  The Court relied on decisions in *Schering*, an off-label marketing case in which the defendant's conduct was by its very nature directed toward physicians, not patients.[27]  The CAC makes clear, however, that co-pay subsidies target *patients*, not physicians; the programs are designed to (a) reduce the number of prescriptions that *patients* who already have prescriptions for Merck's drugs abandon at the pharmacy counter, and (b) increase *utilization*, *i.e.*, the number of prescriptions for the Merck Drugs that those *patients* actually choose to fill.[28]  Despite this, Merck continues to assert its inapposite intermediary defense.

What Merck fails to grasp is that the schemes as alleged *presume* the existence of written prescriptions; they do not induce them.  Rather, Merck's co-pay subsidy programs focus on decreasing abandoned prescriptions: getting the patient to fill the prescription *after it has been written*.  A doctor's independent medical judgment is not an intervening cause because, no matter what the doctor prescribes, the patient decides whether to fill the prescription.[29]

---

[26] *Plumbers & Pipefitters Local 572 Health & Welfare Fund v. Merck & Co.* No. 12-1379 (MAS) (LHG), 2013 U.S. Dist. LEXIS 61051, at *23 (D.N.J. Apr. 29, 2013) ("*Plumbers*").

[27] *Plumbers*, 2013 U.S. Dist. LEXIS 61051, at *21-24 (citing *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, No. 06-5774, 2010 U.S. Dist. LEXIS 56621 (D. N.J. June 9, 2010) ("*Schering II*"), *aff'd*, 678 F.3d 235 (3d Cir. 2012) ("*Schering III*")).  *Schering* is further distinguishable because the plaintiff there failed to allege it had purchased *any* drug subject to the defendant's marketing scheme.  *See Schering III*, 678 F.3d at 247-48.

[28] *See*, *e.g.*, CAC ¶¶ 20, 26, 46, 122.  Merck suggests several ways in which Plaintiffs could alleviate the harm caused by the co-pay subsidy programs; notably, none of these actions involves physicians.  *See* Merck Mem. at 16-17, 27-29.

[29] For this reason, the *Schering* decisions and *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 515 (D.N.J. 2011), both involving off-label marketing directed at physicians, are inapposite.  The doctor's decision is simply not a relevant – much less an intervening – event.  *See also Perez v. Wyeth Labs., Inc.*, 734 A.2d 1245, 1256 (1999) ("the fact that manufacturers are advertising their drugs and devices to consumers suggests that consumers are active participants in their health care decisions, invalidating the concept that it is the doctor,

The CAC, furthermore, contains much more than "[b]lanket allegations that Plaintiffs would not have purchased the Merck [D]rugs 'but for' the coupon programs."[30]  It now alleges that: (1) Merck and McKesson pay network pharmacies to accept Merck's co-pay subsidies, (2) network pharmacies routinely accept the subsidies, (3) Plaintiffs routinely reimbursed for the Merck Drugs during the pendency of Merck's co-pay subsidy programs, (4) and – where sales of Merck drugs were not decreasing for other reasons – the number of prescriptions and total amount Plaintiffs paid per year for the Merck Drugs increased immediately after Merck implemented each of the programs.[31]

The annual figures Plaintiffs provide and the specific transactions they identify far exceed "rank speculation."[32]  Given the widespread availability of Merck's co-pay subsidy coupons and the significant number of times Plaintiffs have each reimbursed for the Merck Drugs, one can reasonably conclude that Plaintiffs have paid for those drugs where they were subsidized by Merck.[33]  Merck cannot insist that Plaintiffs allege more, where Merck and McKesson

---

not the patient, who decides whether a drug or device should be used").

[30] *See* Merck Mem. at 8.

[31] *See*, *e.g.*, CAC ¶¶ 13-21*, 55-56, 122, 124, 163, 172.  Merck faults Plaintiffs for providing examples of increased purchases for Nasonex and Januvia, but not for Janumet, Janumet XR, Vytorin, or Zetia.  Janumet, Janumet XR, and Januvia, however, are all part of the same co-pay subsidy program and alleged RICO enterprise, and Plaintiffs need not provide examples for each drug to demonstrate that they have standing.  The CAC notes, furthermore, that annual sales of Zetia and Vytorin began to decline in 2008 after unfavorable results from clinical studies were released and that, upon information and belief, Merck's co-pay subsidy programs for these drugs injured Plaintiffs by mitigating what would have been even further depressed sales.  *Id.* ¶ 14 n.3.  Finally, the fact that Local 464A no longer asserts claims regarding the Janumet/Janumet XR/Januvia program, *see id.* ¶ 15 n.4, has no bearing on Plaintiffs' standing as alleged.

[32] It is Merck that engages in rank speculation when it posits, with no support, that Plaintiffs' increased spending on the Merck Drugs just after Merck implemented its co-pay subsidy programs could instead be due to other causes.  *See* Merck Mem. at 10.  To establish causation and standing, however, a plaintiff need not prove a series of negatives by offering evidence precluding every other possible cause for his injury.  *See infra* n.110.

[33] CAC ¶ 16; *see also id.* ¶ 17 (Plumbers: 209 (Janumet, Janumet XR, or Januvia); 267

exclusively possess detailed information demonstrating the programs' ability to (a) reduce (and effectiveness in reducing) the number of abandoned prescriptions, and (b) cause TPPs' members to fill prescriptions for Merck's expensive drugs.[34]

## II.   Plaintiffs adequately allege tortious interference with contract.

### A.   Should the Court identify a true conflict of law, the law of the place of purchase should apply.

Merck assumes that New Jersey law applies to Plaintiffs' tortious interference with contract claims.  Plaintiffs' allegations satisfy the elements of that cause of action under any state's law, rendering a full choice-of-law analysis unnecessary.[35]  However, to the extent a true conflict of law is identified, New Jersey choice-of-law principles call for a court to consider the factors set out in the Restatement (Second) of Conflict of Laws § 145 to determine which state has a superior interest in the application of its tort laws.[36]

---

(Nasonex), 183 (Vytorin), 251 (Zetia)); ¶ 18 (Local 464A: 1,918 (Nasonex), 1,534 (Vytorin), 1,360 (Zetia)).

[34] *Id.* ¶¶ 20, 122, 132; *see also id.* ¶¶ 122, 124 (McKesson's LoyaltyScript co-pay subsidy programs are widely accepted at pharmacies through McKesson's own proprietary adjudication software), ¶¶ 129-31 (Merck and McKesson track and measure program results by collecting patient and pharmacy data to generate detailed reports).

[35] *See P.V. v. Camp Jaycee*, 197 N.J. 132, 144 (2008).  Courts frequently find that the laws of two or more states do not materially differ with respect to this cause of action.  *See, e.g.*, *Howmedica Osteonics Corp. v. Zimmer, Inc.* No. 11-1857, 2012 U.S. Dist. LEXIS 162800, at *37-39 (D.N.J. Nov. 14, 2012); *Gibson v. Credit Suisse AG*, No. 10-cv-1, 2013 U.S. Dist. LEXIS 139605, at *17-18 (D. Idaho Aug. 16, 2013) (Report and Recommendation, *adopted by*, 2013 U.S. Dist. LEXIS 137818 (D. Idaho Sept. 24, 2013)); *Refco Inc. Sec. Litig. v. Aaron*, 826 F. Supp. 2d 478, 519-20 (S.D.N.Y. 2010); *Eisenstadt v. Tel. Elecs. Corp.*, No. 06-CV-1196, 2008 U.S. Dist. LEXIS 74343, at *22 (N.D. Tex. Sept. 26, 2008); *FTI Consulting, Inc. v. Graves*, No. 05-cv-6719, 2007 U.S. Dist. LEXIS 55325, at *38-39 (S.D.N.Y. July 31, 2007); *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 357 n.11 (D. Del. 2006); *Hodges v. Buzzeo*, 193 F. Supp. 2d 1279, 1284 (M.D. Fla. 2002); *Affiliated Computer Servs. v. Caremark, Inc.*, 49 F. Supp. 2d 882, 884 (N.D. Tex. 1999); *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 786, 792 (S.D.N.Y. 1990); *Tel. & Data Sys., Inc. v. Eastex Cellular L.P.*, No. 12888, 1993 Del. Ch. LEXIS 182, at *61 (Del. Ch. Aug. 27, 1993).

[36] *Lebegern v. Forman*, 471 F.3d 424, 428-29 (3d Cir. 2006).  The four contacts most relevant to an

Here, Merck's unlawful conduct injures Plaintiffs at the point of sale, where Merck interferes with pharmacies' duty to collect co-pays directly from insureds and causes Plaintiffs to pay for more of (and more for) Merck's subsidized drugs.  Thus, as to co-pay subsidized prescriptions filled and purchases made in New Jersey,[37] Plaintiffs agree that New Jersey law should apply in the event a true conflict is identified.

### B.    Plaintiffs have standing to pursue their tortious interference claims.

Plaintiffs may assert claims for tortious interference with the contractual duties of pharmacies under two theories: (1) PBMs are TPPs' agents for purposes of entering into pharmacy network agreements with pharmacies, making TPPs parties to those agreements;[38] and (2) TPPs are intended third-party beneficiaries of those contracts.[39]

---

alleged tort are: (1) the place of injury, (2) the place of the injury-causing conduct, (3) where the parties reside or do business, and (4) where the parties' relationship, if any, is centered.  *Id.* at 429.

[37] Plaintiffs reimburse for drugs dispensed in, among other places, their respective home states of New Jersey and Tennessee.  *See* CAC ¶¶ 8, 9.  The laws of these states do not conflict with respect to the substantive elements of a claim for tortious interference with contract.  *See Trs. of the Univ. of Pa. v. St. Jude Children's Research Hosp.*, No. 12-4122, 2013 U.S. Dist. LEXIS 52750, at *11-16 (E.D. Pa. Apr. 12, 2013) (no conflict between the laws of TN and PA); *Ciecka v. Rosen*, 908 F. Supp. 2d 545, 556 (D.N.J. 2012) (no conflict between the laws of PA and NJ); *see also infra* n.50.  *But see Trent-Jones, Inc. v. Balinas*, No. 95-7462, 1996 U.S. Dist. LEXIS 12267, at *5-7 (E.D. Pa. 1996) (noting only procedural statute of limitations distinctions).

[38] *Cf. Harper-Lawrence, Inc. v. United Merchants & Mfrs., Inc.*, 619 A.2d 623, 631 n.6 (N.J. Super. App. Div. 1993) (citing the Restatement of Agency § 302 for the proposition that a "[p]erson who makes [a] contract with [an] agent is liable to the undisclosed principal as if the person has contracted with the principal"); *Smith v. Felter*, 1899 N.J. Sup. Ct. LEXIS 122, at *3 (N.J. Feb. 27, 1899) ("the act of the agent, in signing the agreement in pursuance of his authority, is in law the act of the principal," and therefore "the unnamed principal may sue on the contract"); *Scott's Hollow Joint Venture v. Xanadu of Hermitage, Inc.*, No. 01-A-01-9207-CH-00278, 1992 Tenn. App. Lexis 1002, at *7 (Tenn. Ct. App. Dec. 23, 1992).

[39] *See Fineman v. Armstrong World Indus. Sys., Inc.*, 980 F.2d 171, 195 (3d Cir. 1992) (dismissing claim for tortious interference with contract on other grounds and assuming without deciding that New Jersey would permit a claim for tortious interference with a prospective contractual relationship); *Hamilton Cnty. Emergency Commc'ns. Dist. v. Orbacom Commc'ns. Integrator Corp.*, No. 1:04-cv-7, 2006 U.S. Dist. LEXIS 94828, at *33 (E.D. Tenn. Jan. 30, 2006); *cf. Deluxe Bldg. Sys. v. Constructamax, Inc.*, No. 2:06-cv-02996, 2013 U.S. Dist. LEXIS

### 1.   PBMs act as third-party payors' agents when entering into pharmacy network agreements with pharmacies.

"An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent."[40]  Plaintiffs allege that PBMs act as TPPs' agents when entering into network agreements with pharmacies.  Plaintiffs allege, for example, that their contracts with Express Scripts – like other TPPs' contracts with their PBMs – authorize the PBM to act on Plaintiffs' behalfs in establishing pharmacy networks, designing formularies and/or co-pay structures, making approval determinations, and enforcing pharmacy compliance with Plaintiffs' cost-containment measures.[41]

Plaintiffs further allege that, in performing these functions, PBMs act subject to TPPs' control.  Plaintiffs retain the authority to direct their PBM to adjudicate specific claims on their behalf and to create customized formularies (or formulary-like co-pay structures) and custom pharmacy networks for their members.[42]  Plaintiffs also retain the right to monitor and supervise the work that their PBM does on their behalf.[43]  Other federal courts, faced with similar facts, have found that PBMs act as agents for TPPs.[44]

---

142477, at *4 (D.N.J. Sept. 26, 2013) ("third party beneficiary may sue on [a] contract when it is an intended beneficiary"); *Rieder Cmtys. v. N. Brunswick*, 546 A.2d 563, 566 (N.J. Super. App. Div. 1988).

*See also Phillips USA v. Allflex USA*, No. 94-3288, 1993 U.S. Dist. LEXIS 7529, at *6 (D. Kan. May 21, 1993); *Hanley v. Cont'l Airlines, Inc.*, 687 F. Supp. 533, 538 (D. Colo. 1988); *Tamposi Assocs. v. Star Mkt. Co.*, 406 A.2d 132, 134 (N.H. 1979); *Reynolds v. Owen*, 34 Conn. Supp. 107, 111-12 (Conn. Super. Ct. 1977); *Bitzke v. Folger*, 231 Wis. 513, 521 (Wis. 1939).

[40] *Sears Mortgage Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993).

[41] CAC ¶ 133.

[42] *Id.* ¶ 134.

[43] *Id.* ¶ 135.

[44] *See, e.g., Ironworkers Local Union 68 & Participating Emp'rs Health & Welfare Funds v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1366 (11th Cir. 2011); *Fox Ins. Co. v. ProCare Pharm. Benefit Manager, Inc.*, No. 1:11-CV-4292, 2012 U.S. Dist. LEXIS 64291, at *1 (N.D. Ga. May

### 2.   TPPs like Plaintiffs are third-party beneficiaries of pharmacy network agreements between PBMs and pharmacies.

Under New Jersey law, a party is a third-party beneficiary of a contract if "the contracting parties intended that [the] third party should receive a benefit" from the contract.[45]  Courts look to "the pertinent provisions in the agreement and the surrounding circumstances to ascertain th[e] intent" of the contracting parties.[46]  A party need not be a beneficiary of every promise in a contract; it is enough to be the intended beneficiary of the provision one is seeking to enforce.[47]  Plaintiffs' allegations establish that they are intended beneficiaries of the pharmacy network agreements' requirement that co-pays be collected directly from insureds.

Plaintiffs allege, *inter alia*, that (1) PBMs – which are not insurers – have no reason to enter into pharmacy network agreements or manuals if not to benefit TPPs and their members; (2) ESI's 2005 Pharmacy Services Manual ("ESI Manual") instructs pharmacies to process claims in accordance with TPPs' cost-containment programs; (3) the ESI Manual is based on an intent to benefit TPPs and to avoid harming them; (4) PBMs enter into contracts with pharmacies *on behalf of* TPPs; and (5) "[p]ursuant to the contracts negotiated by the PBMs *for the benefit of the TPPs*, pharmacies agree to dispense prescription drugs to a TPP's insureds in accordance with the terms and conditions of the TPP's health benefit plan."[48]  These allegations establish that ESI and the network pharmacies "intended that [TPPs like Plaintiffs] should receive a

---

7, 2012); *Janssen*, 784 F. Supp. 2d at 515.

[45] *Broadway Maint.*, 447 A.2d at 909 (citation omitted).

[46] *Id.*

[47] *See, e.g.*, *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 414-15 (S.D.N.Y. 2011); *Archer W. Contrs., Ltd. v. Estate of Pitts*, 735 S.E.2d 772, 778 n.13 (Ga. 2012); *James Family Charitable Found. v. State St. Bank & Trust Co.*, 956 N.E. 2d 243, 247-48 (Mass. App. Ct. 2011); *Civix Sunrise, GC, L.L.C. v. Sunrise Rd. Maint. Assoc.*, 997 So. 2d 433 (Fla. Dist. Ct. App. 2008).

[48] CAC ¶ 51 (emphasis added); *see id.* ¶¶ 33, 136-39.

benefit" from the pharmacy network agreements.[49]

### C. Merck tortiously interfered with the pharmacies' contractual duties to collect co-pays directly from insureds.

To succeed on a claim for tortious interference with contract, a plaintiff must establish (1) the existence of a contract; (2) interference that was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages.[50]  Plaintiffs' allegations meet these requirements.

### 1. Plaintiffs have identified the contractual provision with which Merck intended to and did interfere.

Plaintiffs allege that, "to ensure that TPPs' cost-sharing provisions are effective, TPPs' [PBMs] enter into contracts with network pharmacies requiring them to comply with TPPs' prescription drug benefit plans and collect co-payments *only and directly from patients*."[51] Plaintiffs further allege that PBMs use standard form contracts, supplemented by binding pharmacy network manuals, including the same material terms.[52]

Plaintiffs quote, as illustrative examples of these material terms, specific language from the ESI Manual, which defines 'Copay' as '[t]hat portion of the total charge for each prescription drug *which a Member is required to pay* the Pharmacy in accordance with the Member's

---

[49] *See Broadway Maint.*, 447 A.2d at 909.

[50] *Velop, Inc. v. Kaplan*, 693 A.2d 917, 926 (N.J. Super. App. Div. 1997); The elements under Tennessee law are substantially similar.  *See WYCQ, Inc. v. Nat'l Music Mktg.*, No. 05-cv-0979, 2008 U.S. Dist. LEXIS 439, at *28 (M.D. Tenn. Jan 3, 2008).

[51] CAC ¶ 2.  The doctrine *expressio unius est exclusio alterius* provides that the affirmative expression of one thing implies a negation of any other alternative.  *Gabel v. Manetto*, 427 A.2d 71, 73 (N.J. Super. Ct. App. Div. 1981); *Frank Briscoe Co., Inc. v. Travelers Indemnity Co.*, 899 F.Supp. 1304, 1313, n. 8 (D.N.J. 1995).  That the agreements require pharmacies to collect co-pays from insureds necessarily requires that pharmicies *not* collect co-pays from anyone else.

[52] CAC ¶ 52.

Prescription Drug Program.'"[53]  It also provides that "'[t]he total Copay to be collected will be calculated and displayed electronically in the Copay field during online claims transmission,' and that '[t]he Copay must be the amount *charged to the Member* and cannot be changed.'"[54]  Faced with these unambiguous provisions, Merck argues that the ESI Manual somehow has less force than the related network agreement.[55]  But the ESI Manual, like other PBM pharmacy network manuals, establishes binding policies and procedures that are incorporated into the ESI Provider Agreement.[56]

Merck claims that the 2005 ESI Manual cannot be the basis for Plaintiffs' claims because it pre-dates the class periods,[57] but Plaintiffs allege that all of the form agreements in the industry "include the same material terms with respect to the collection of co-pays" and that, upon information and belief, the current ESI manual contains provisions like those quoted above.[58] This more than satisfies Plaintiffs' requirement to plausibly allege the existence of a contract: "New Jersey law permits a claim for tortious interference with contract to survive a motion to dismiss where a plaintiff alleges the existence of a contract but does not plead specific facts identifying it."[59]  Merck's sole authority does not support a contrary conclusion.[60]

---

[53] *Id*. ¶ 53 (quoting ESI Manual at 64 (emphasis added)).

[54] CAC (quoting ESI Manual at 6 (emphasis added)).

[55] *See* Merck Mem. at 27.

[56] *See, e.g.*, CAC ¶ 52 ("[P]articipating pharmacies must also abide by the terms of these manuals."); ESI Manual at 68 ("the Provider Agreement provides that provider must comply with this Provider Manual").

[57] Merck Mem. at 4.

[58] CAC ¶¶ 52, 53.

[59] *IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-4992, 2012 U.S. Dist. LEXIS 130815, at *28 (D.N.J. Sept. 13, 2012) (rejecting argument that plaintiffs' claim for tortious interference failed because they did "not identify a specific contract that [was] interfered with" and concluding that plaintiffs had properly pled the "existence of a contract" by generally alleging "existing contractual relationships with numerous master agents, distributors, and retailers" and identifying

Merck next asserts, nonsensically, that the contractual provisions prohibiting pharmacies from accepting Merck's co-pay subsidies don't mean what they unambiguously say because this would preclude pharmacies from accepting payments from an insured's hypothetical friend or family member.[61]   The contractual provisions exist to influence prescription-filling behavior by sensitizing insureds to the high cost of brand name drugs; Merck thwarts this purpose when it absorbs the cost of the co-pays.  Where a friend or relative pays the pharmacist, however, the insured is still sensitized to the drug's cost, because someone close to him must pay it. Moreover, the friend or family member does not conceal or misrepresent his payment as something it is not or intentionally and maliciously interfere with the pharmacies' duties.[62]

Merck also tries to claim that it was unaware of the contracts between pharmacies and PBMs and therefore could not have intended to interfere with those contracts.[63]   Plaintiffs

---

one specific retailer); *see also Syncsort Inc. v. Innovative Routines Int'l, Inc.*, No. 04-3623, 2005 U.S. Dist. LEXIS 15432, at *35-36 (D.N.J. May 3, 2005).

[60] *See Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.*, 870 F. Supp. 1237, 1238, 1247 (D.N.J. 1994) (ruling, after a bench trial, that two diverters' agreements "contain[ed] adequate contractual terms to support a tortious interference claim" but that there was "simply no proof" that any of the other "diverters had written agreements with [plaintiff] that precluded diversion").

[61] Merck Mem. at 28-29.  Quoting only a portion of the provisions, Merck also argues that pharmacies still "'require[] [the consumer] to pay' the co-pay" when they "accept[ ] a co-payment from a customer that includes a coupon."  Merck Mem. at 28.  To be clear, Plaintiffs allege that *Merck* pays the pharmacy directly to relieve Plaintiffs' members of all or part of their co-pay obligations.  CAC ¶¶ 28-30, 57-60, 116-17.  To permit Merck to pay any portion of a co-pay would violate the "plain meaning" of the contract.  *Centennial Ins. Co. v. Horizon Contr. Co., L.L.C.*, No. 05-3917, 2008 U.S. Dist. LEXIS 88221, at *17 (D.N.J. Oct. 31, 2008).

[62] Likewise, the pharmacies' duty to collect co-pays directly from insureds does not prevent them from accepting *valid* secondary insurance, something that is specifically contemplated in the pharmacy network contracts and manuals.  *See, e.g.*, ESI Manual at 10 ("Express Scripts supports point-of-service Coordination of Benefits (COB) under the National Council for Prescription Drug Programs (NCPDP) version 5.1 COB segment.").  Contractual provisions must be construed harmoniously with other provisions of the contract.  *Axa Assurance, Inc. v. Chase Manhattan Bank*, 770 A.2d 1211, 1214 (N.J. Super. App. Div. 2001).

[63] Merck Mem. at 34-36.

specifically allege that Merck "knows that retail pharmacies are required, under the terms of their agreements with the PBMs, to collect the applicable co-pays from the TPPs' insureds," and that Merck "knowingly and intentionally interferes" with these contractual duties – with the specific intent to injure Plaintiffs and other TPPs – by coercing pharmacies into accepting co-pay coupons through the payment of lucrative administrative fees.[64]  Merck cannot credibly argue that it was unaware of these industry-wide contracts, given that Merck *formerly owned Medco*.[65]

Even if these allegations were not sufficient – and they are[66] – Plaintiffs' allegations state a claim that Merck "knew or should have known" of the pharmacies' contractual obligations.[67] Plaintiffs allege, for example, that the contracts establishing the pharmacies' duty are "standard" "form" agreements that are "ubiquitous in the industry," and that many of these agreements are available online.[68]  These "form contracts . . . include the same material terms with respect to the

---

[64] CAC ¶¶ 54-56.

[65] Merck & Co. Completes Medco Purchase, BALTIMORE SUN, Nov. 19, 1993, *available at* http://articles.baltimoresun.com/1993-11-19/business/1993323090_1_medco-merck-wygod. On a motion to dismiss, a court "may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment."  *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (citation omitted).

[66] *See, e.g.*, *Waddington N. Am., Inc. v. Sabert Corp.*, No. 09-4883, 2010 U.S. Dist. LEXIS 103955, at *25-26 (D.N.J. Sept. 29, 2010) (refusing to dismiss tortious interference counterclaim where defendant alleged plaintiff "'was and is aware of [counterclaimant's] protected interests and advantageous and contractual relationships with its customers'" (quoting from Am. Answer ¶ 300)).  The cited paragraph reads: "[Plaintiff] was and is aware of [counterclaimant's] protected interests and advantageous business and contractual relationships with its customers, including the retail stores of CVS Caremark Corporation, BJ's Wholesale Club, Inc., and Wegmans Food Markets, Inc., etc., and potential; [sic] business relationships."  Am. Answer, *Waddington N. Amer., Inc. v. Sabert Corp.*, No. 09-4883, ECF No. 18, ¶ 300.

[67] *See Bellator Sports Worldwide, LLC v. Zuffa*, No. 10-4091, 2011 U.S. Dist. LEXIS 143590, at *7-9 & n.4 (D.N.J. May 16, 2011) (Report and Recommendation, *adopted by*, 2011 U.S. Dist. LEXIS 142959 (D.N.J. Dec. 12, 2011)).

[68] CAC ¶¶ 52, 54.  Indeed, Merck has obtained a copy of at least one such agreement.  *See* Merck Mem. at 26 n.8.  Plaintiffs were not required to attach the agreements and manuals to their complaint.  *See Rehabcare Group East, Inc. v. Trenton Convalescent Operating Co.*, No. 06-2128, 2006 U.S. Dist. LEXIS 67376, at *4 (D.N.J. Sept. 20, 2006).

collection of co-pays."[69]  Plaintiffs further allege that PBMs impose this duty to ensure that

TPPs' cost-saving provisions are effective, but that drug manufacturers like Merck "do not like

cost-saving provisions because . . . they are very effective at motivating patients to choose lower

cost drugs."[70]  Merck's program administrator, McKesson, is well-versed in the mechanics of

pharmacy-PBM relationships and responsibilities: it boasts that its co-pay administration

program is "[a]ccepted in virtually every retail pharmacy in the U.S.," and that "[p]harmacies

look to [it] as a trusted resource for all their claims processing questions.'"[71]  Accordingly,

Merck – a sophisticated drug manufacturer – and McKesson specifically designed Merck's

programs so that the subsidies are concealed from TPPs, instructing pharmacies to disguise them

as secondary insurance.[72]  Plaintiffs are entitled to the inference that Merck knew of the

pharmacies' contractual duties.[73]  Under the facts alleged, Merck reasonably *should have* known

about the contractual obligations even if it, implausibly, did not.  The cases Merck cites do not

support a contrary conclusion.[74]

Plaintiffs also sufficiently allege that Merck intended to interfere with the contracts

---

[69] CAC ¶ 52.

[70] *Id.* ¶¶ 2-3, 33.

[71] *Id.* ¶¶ 122, 124.

[72] *Id.* ¶¶ 5, 13, 56, 60, 116, 121-24, 132, 134.

[73] *See Bellator*, 2011 U.S. Dist. LEXIS 143590, at *7-9 (denying motion to dismiss tortious interference claim where "Plaintiff assert[ed] that [defendant] knew or should have known of the Contract" and "set[ ] forth additional facts supporting that allegation," including that the "terms of the Contract were common in the industry"); *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 525 (D.N.J. 1998) (denying motion to dismiss tortious interference claim where "it was implicit from the underlying facts that defendant was on notice of these transactions and the potential economic benefit that could result").

[74] In *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413 (3d Cir. 2013), for example, the plaintiff was unable to satisfy the more demanding summary judgment pleading standard.  *Id.* at 422.  Also, unlike here, it was "undisputed that [the defendant] never saw" the contract.  *Id.*

between the pharmacies and Plaintiffs' PBM.[75]  "Interference with a contract is intentional 'if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.'"[76]  Plaintiffs allege Merck directed pharmacies to fraudulently process its co-pay subsidies as secondary insurance with the intent of interfering with the pharmacies' performance of their duty to collect co-pays and the goal of undermining TPPs' formulary structures and cost-sharing provisions.[77]

### 2.    Plaintiffs allege Merck acted with malice.

To state a claim for tortious interference, a plaintiff must allege that defendant acted with "malice."[78]  "'Malice is not used here in its literal sense to mean 'ill will;' rather, it means that harm was inflicted intentionally and without justification or excuse'"; the conduct must be "'injurious and transgressive of generally accepted standards of common morality or of law.'"[79]  Although "the standard is flexible," "[t]he line is clearly drawn at conduct that is fraudulent,

---

[75] Merck cites *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171 (3d Cir. 1992), for the proposition that a defendant must intend to harm a third-party beneficiary specifically, Merck Mem. at 34, but *Fineman* held no such thing.  In *Fineman*, an individual claimed that tortious interference with his company's distribution contract damaged his personal "reputation," and the court found that plaintiff had failed to prove an intent to "injure [him] in his individual capacity." 980 F.2d at 195.  Here, Plaintiffs allege that they stand in the shoes of a party to the exact contract with which Merck intentionally interfered.  *See* discussion *supra* nn.38, 39.  Plaintiffs' allegations that Merck intended to interfere with that contract are, therefore, sufficient.  It is also not necessary for Merck to appreciate the fact that Plaintiffs are third-party beneficiaries of, or principals to, the contract; a defendant need not "appreciate the legal significance of the facts giving rise to the contractual duty," and he may be subject to liability for interfering with the contract even if he "is mistaken as to their legal significance" and "has a different legal effect from what it is judicially held to have."  Restatement (Second) of Torts, § 766, cmt. i.

[76] *Cedar Ridge Trailer Sales, Inc. v. Nat'l Cmty. Bank of N.J.*, 711 A.2d 338, 345 (N.J. Super. App. Div. 1998) (citing Restatement (Second) Torts § 766A, cmt. e).

[77] CAC ¶¶ 3, 6-7, 26, 131, 142-43, 179.

[78] *Alboyacian v. BP Prods. N. Am., Inc.*, No. 09-5143, 2011 U.S. Dist. LEXIS 134453, at *12 (D.N.J. Nov. 22, 2011).

[79] *Id.* (quoting *Lamorte Burns & Co. v. Walters*, 770 A.2d 1158, 1170 (N.J. 2001)).  This is equally true under Tennessee law.  *See WYCQ*, 2008 U.S. Dist. LEXIS 439, at *34.

dishonest, or illegal."[80]  Plaintiffs allege fraudulent conduct that crosses this line.

Specifically, Plaintiffs allege that, rather than competing on price or efficacy, or paying additional rebates to legitimately gain access to more preferential formulary tiers,[81] Merck intentionally conspired with McKesson to subvert TPPs' cost-sharing provisions and bribe pharmacists to improperly and fraudulently process Merck's co-pay subsidies as secondary health insurance.[82]  Plaintiffs further allege that Merck infiltrates the prescription adjudication systems to insert itself directly into hundreds of thousands of point-of-sale pharmacy transactions, all to induce TPPs' members to fill prescriptions for Merck's expensive brand-name drugs (knowing that Plaintiffs will foot the bill).[83]  Plaintiffs' allegations also show that Merck's interest in amassing additional profits on its blockbuster drugs pales in comparison to the far-reaching implications associated with the continued operation of Merck's co-pay subsidy programs, which undermine TPPs' ability to control the ever-rising costs of prescription drugs.[84]  These detailed allegations of fraudulent conduct are more than sufficient.[85]

---

[80] *Lamorte*, 770 A.2d at 1170-71; *see also Alboyacian*, 2011 U.S. Dist. LEXIS 134453, at *12-13; *Material Techs. v. Carpenter Tech. Corp.*, No. 01-2965, 2004 U.S. Dist. LEXIS 28892, at *84 (D.N.J. Dec. 15, 2004) (finding "no evidence of the types of conduct that the Restatement identifies as likely to show malice," such as "physical violence, misrepresentations . . . , abuse of legal process, unlawful conduct, improper motive or desire to harm Plaintiffs"); Restatement (Second) of Torts § 767 cmt. c.

[81] *See, e.g.*, CAC ¶¶ 42, 46; *see generally id.* ¶¶ 39-41 (discussing tiered cost-sharing).

[82] *See, e.g., id.* ¶¶ 1, 56, 59-60, 115-16, 142, 179, 215.

[83] *See, e.g., id.* ¶¶ 3, 7, 19-20, 30, 57-60.

[84] *See, e.g., id.* ¶¶ 3, 30, 62, 142.

[85] *See N. Star Mgmt., Inc. v. Ins. Prof'ls, Inc.*, No. 12-cv-3839, 2013 U.S. Dist. LEXIS 135286, at *6-9 (D.N.J. Sept. 23, 2013) (unpublished) (applying the Rule 12(b)(6) motion to dismiss standard and finding that a proposed amendment was not "legally insufficient" where it alleged "that Defendant acted 'intentionally' and 'wantonly' with 'malice,' and 'tortiously' or 'wrongfully' interfered by using 'improper means' with an 'improper motive'"); *Graco Inc. v. PMC Global, Inc.*, No. 08-1304, 2012 U.S. Dist. LEXIS 188865, at *49 (D.N.J. Mar. 6, 2012) (unpublished) (finding allegations of wrongful conduct sufficient as a matter of law where

Merck would have this Court believe that its fraudulent scheme is nothing more than a "legitimate business activit[y] that enable[s] patients to better afford their Merck medicines."[86] But this "competition" justification applies only where the plaintiff and defendant are in competition with one another and thus does not apply here.[87]   And even if the justification did apply, "a defendant claiming a business-related excuse must justify not only its motive and purpose, but also the means used."[88]   Merck cannot justify either.  Merck's motive – using its co-pay subsidies to undermine the prescription drug rebate system (within which manufacturers legitimately obtain preferred formulary positions through cost reductions) and the cost-sharing provisions of TPPs' prescription drug benefit plans – is impoper.[89]   So are its means: offering briefs and fraudulently inducing pharmacies to breach contracts and process the subsidies as secondary insurance to conceal them from TPPs.[90]   "This Court cannot sanction a privilege to compete if doing so would justify and legitimize what otherwise would be tortious conduct."[91]

---

counterclaimants alleged "'repeated[] false and misleading statements to [counterclaimant's] customers' and 'anti-competitive conduct in violation of the Sherman Act'").

[86] Merck Mem. at 30.

[87] *See* Restatement (Second) of Torts § 768 (justification applies only where, *inter alia*, a defendant (1) does not employ wrongful means, (2) "intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract [that is] terminable at will," and (3) interferes with a contractual relation that "concerns a matter involved in the competition between" the defendant and the plaintiff).

[88] *Howmedica*, 2012 U.S. Dist. LEXIS 162800, at *35 (D.N.J. Nov. 14, 2012) (internal quotation marks and citation omitted).

[89] *See, e.g.*, CAC ¶¶ 3, 26, 39-42, 46, 215.

[90] *Id.* ¶¶ 59-60, 79-80, 92-93, 101-02, 111-12, 168, 191.

[91] *Howmedica*, 2012 U.S. Dist. LEXIS, at *35.  Further, to accept Merck's "legitimate business" argument "would require this Court to make a factual determination that [Merck], in fact, had a legitimate business-related justification" for its conduct, which "would be inappropriate . . . at this stage.  *Bellator Sport Worldwide, LLC v. Alvarez*, No. 13-63, 2013 U.S. Dist. LEXIS 54879, at *9-10 (D.N.J. Apr. 16, 2013) (denying motion to dismiss tortious interference counterclaim).

3.      **Plaintiffs allege Merck's interference caused them loss and damages.**

Merck's argument that Plaintiffs fail to allege proximate causation with respect to their tortious interference with contract claims fails for the same reasons – set out below – establishing that Plaintiffs adequately allege RICO standing.

## III.   Plaintiffs adequately allege claims under RICO.[92]

### A.    Plaintiffs allege standing to pursue RICO violations.

Plaintiffs allege that they are injured in their business and property by reason of Merck's RICO violations.  The standing requirements for RICO – drawn from common law proximate causation principles[93] – require a plaintiff to allege "but for" causation and "some direct relation between the injury asserted and the injurious conduct alleged."[94]  RICO injury must be direct in that it can be neither derivative of harm to another nor unconnected to the RICO scheme,[95] but a plaintiff satisfies this element if the alleged harm was the reasonably foreseeable or anticipated natural consequence of the defendant's actions.[96]  Here, the intended, foreseeable, and direct result of Merck's decision to subsidize co-pays is that TPPs pay the bill and Merck profits from increased utilization of its drugs.[97]  Only TPPs like Plaintiffs are injured by this conduct.[98]

---

[92] Merck briefly argues that Plaintiffs' § 1962(d) claims fail because they do "not plead a valid underlying violation" of § 1962(c).  Merck Mem. at 13 n.5.  As discussed *infra*, Plaintiffs adequately allege violations of § 1962(c); their § 1962(d) claims also survive.  *HT of Highlands Ranch, Inc. v. Hollywood Tanning Sys., Inc.*, 590 F. Supp. 2d 677, 690-91 (D.N.J. 2008).

[93] *Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*, 171 F.3d 912, 921 (3d Cir. 1999).

[94] *Hemi Group LLC v. City of New York*, 559 U.S. 1, 9 (2010).

[95] *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 71-72 (1992).

[96] *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008); *Eli Lilly and Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 483 (D.N.J. 1998); *In re Refco Securities Litig.*, 826 F. Supp. 2d 478, 535 (S.D.N.Y. 2011).

[97] *See supra* nn.5, 12.

[98] *Compare Hemi*, 559 U.S. at 14-15 (*citing Bridge*, 553 U.S. at 658 (proximate causation

Plaintiffs know that Merck's programs exist.  Because of Merck's deception, however, Plaintiffs cannot tell an unlawfully subsidized transaction from an unsubsidized one.  Absent refusing to cover Merck's drugs at all or risking that it is improperly denying coverage for unsubsidized prescriptions, TPPs like Plaintiffs must rely on the assumption that, for a given transaction, the pharmacy collected the co-pay as required and did not omit or misrepresent information concerning the type of secondary insurance.[99]

Merck's conduct injures TPPs, both by depriving them of material information they would use to deny coverage for the Merck Drugs at the point of sale and because, deprived of the benefit of what are in fact ordinary manufacturer discounts, TPPs pay more for each prescription where co-pay subsidies are disguised as secondary insurance.  Neither of these theories involves a causal chain in which the independent judgment of doctors plays a role.  Merck's programs target the decisions patients make at the pharmacy counter, *after a prescription for one of the Merck Drugs has been written*.  A doctor's prescribing decision is not an intervening cause because the patient ultimately decides whether to fill the prescription.[100]

That a patient's decision lies between Merck's conduct and Plaintiffs' injury does not

---

established where misrepresentations are made to an intermediate third party, but that party suffers no injury; rather, the harm flows through to the plaintiffs, as the only parties injured by the misrepresentations), *with Holmes*, 503 U.S. at 268, 271 (where RICO misconduct caused stock prices to collapse, the plaintiffs' obligations to cover the losses of broker-dealers amounted to an injury that was "purely contingent" on, or derivative of, the harm suffered by broker-dealers) *and Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 454, 458 (2006) (where a plaintiff alleged a competitor cheated the State out of sales taxes, thereby enabling it to undercut the plaintiff's prices, the more direct victim was the State).

[99] *See* CAC ¶ 5.  This is one reason Plaintiffs' decision to honor a particular reimbursement request is not, as Merck asserts, an independent, intervening event.  *See* Merck Mem. at 16.  Nor is the pharmacist's decision to dispense a prescribed drug an "independent step" in the chain of causation, *see id.*, as the pharmacist is contractually bound to do this for Plaintiffs' members.

[100] Thus, many of Merck's cases (Merck Mem. at 26-27) – involving marketing directed at physicians – are not applicable to the chain of causation alleged here.

make Plaintiffs' injury less direct.  In *Bridge*, the Supreme Court held that a RICO plaintiff's injury is sufficiently direct, despite other factors in the causal chain, so long as it was "a foreseeable and natural consequence of" the defendant's misconduct.[101]  The Supreme Court drew a distinction between actionable RICO conduct and recoverable RICO injury – issues Merck improperly conflates.  Although the injury must be direct (in that it must be foreseeable), the conduct need not be directed at the plaintiff.[102]  Thus, "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations."[103]

Here, the patient's decision to fill the prescription does not break the chain of causation.  In *Hemi*, the Supreme Court held that plaintiffs failed to allege proximate causation where the causal chain depended on conduct by non-parties *whose actions were wholly unrelated to the RICO scheme*.[104]  But *Hemi* explicitly left intact *Bridge*'s holding that conduct by non-parties *in response to the RICO scheme* satisfies RICO causation.[105]  Merck directs its conduct at patients, who make decisions in response to the co-pay subsidies Merck offers.  As the First Circuit recently recognized in a case concerning off-label promotion to doctors,

> "individualized decisions made by thousands of physicians" . . . do not introduce such attenuation into [plaintiff's] causal theory as to prevent a reasonable jury from finding proximate causation. . . .  A reasonable jury could have concluded, based on the evidence, that defendants' scheme relied upon the expectation that fraudulent off-label marketing to doctors would induce them to act in a foreseeable fashion -- i.e., to write off-label prescriptions for Neurontin that would be paid for by [plaintiff].[106]

---

[101] 553 U.S. at 658.

[102] *Id*. at 656-57.

[103] *Id*. at 642.

[104] *Hemi*, 559 U.S. at 11-12.

[105] *Hemi*, 559 U.S. at 14-15.

[106] *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 51, 59 (1st Cir. Apr. 3, 2013), *petition for cert. filed*, 82 U.S.L.W. 3108 (Aug. 30, 2013).

Likewise, Merck's scheme relies upon an expectation that co-pay subsidies will induce TPPs' *insureds* to fill prescriptions for the Merck Drugs that TPPs will pay for.  Plaintiffs are entitled to an inference that the insureds behaved in accordance with that expectation.

The Seventh Circuit's decision in *BCS Services, Inc. v. Heartwood 88, LLC* expressly approves such an approach.  *BCS Services* involved the rapid-fire auction process used to sell property tax liens, in which many identical bids are often placed simultaneously.[107]  The plaintiffs alleged they were harmed when the defendants conspired to pack the room with multiple bidders working on behalf of the same buyers, causing plaintiffs to win fewer bids.[108]  Defendants posited other reasons why the plaintiffs *might* not have won the bids, arguing that the plaintiffs were required to disprove each possibility to establish proximate causation.[109]  The Seventh Circuit flatly rejected this argument, finding that the district court erred by requiring the plaintiffs to prove the nonexistence of potential superseding causes rather than requiring the defendants to support their conjecturea.[110]  Noting that, once a trier of fact finds causation – "which requires merely a probability of harm attributable to the defendant's wrongful act" – a plaintiff has a more relaxed burden for establishing damages, the court endorsed a theory of "probabilistic injury."[111]  Reasoning that the defendants could have no other reason to pack the auction room with illicit bidders, and crediting the plaintiffs' allegations that they had each bid

---

[107] 637 F.3d 750, 752-53 (7th Cir. 2011).

[108] *Id.* at 753.

[109] *Id.* at 757-58.

[110] *BCS Services*, 637 F.3d at 757-58 (quotations omitted); *see also Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 2013 U.S. App. LEXIS 19386, at *69 (9th Cir. Sept. 20, 2013) (citing *BCS Services* and stating "the plaintiff doesn't have to prove a series of negatives; he doesn't have to offer evidence which positively excludes every other possible cause of the accident"); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 60, 68 (1st Cir. Apr. 3, 2013) (same).

[111] *Id.* at 759.

many thousands of times, the court found it unlikely the plaintiffs had *not* lost bids due to the defendants' conduct.[112]

Here, Plaintiffs' similarly establish just how unlikely it is that they have *not* been injured, alleging that Merck's co-pay subsidy schemes increase utilization of the Merck Drugs, that TPPs like Plaintiffs pay for the increased utilization (and are the only parties injured by this scheme), that Plaintiffs regularly paid for the Merck Drugs while the co-pay subsidy programs were in place, and that they began paying more (and for more prescriptions) immediately after Merck implemented its schemes.[113]  This is more than sufficient to allege causation and injury.

Merck proposes a thinly-veiled mitigation defense, suggesting a number of measures Plaintiffs could take to protect themselves from the harm inflicted on them by Merck's conduct.[114]  The Third Circuit has made clear, however, that mitigation is an affirmative defense,

---

[112] *Id.* at 758 ("Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation.")*; see also In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 66-67 (2d Cir. 2012) ("if an act is deemed wrongful because it is believed significantly to increase the risk of a particular injury, we are entitled—in the tort context at least—to presume that such an injury, if it occurred, was caused by the act'").

[113] *See, e.g.*, CAC ¶¶ 1, 17, 21, 26, 141, 175, 191-93.  Relying on distinguishable off-label marketing cases, Merck argues that "[t]his Court has held that these types of generalized and aggregate allegations cannot support RICO proximate cause in a case alleging that plaintiffs over-reimbursed for prescription drugs."  Merck Mem. at 13-14.  In *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action* ("*Schering I*"), No. 2:06-cv-5774, 2009 U.S. Dist. LEXIS 58900 (D. N.J. July 10, 2009), however, this Court concluded that *the specific plaintiffs* could not prove causation by way of generalized allegations and, relying on *Janssen*, 2008 U.S. Dist. LEXIS 103526, noted that the judge in that case "questioned whether RICO's proximate cause element could ever be satisfied *in a case involving allegations by third party payors of fraudulent off-label marketing directed at prescribing physicians*." *Id.* at *89 (emphasis added). For this same reason, Plaintiffs need not allege that the Merck drugs were ineffective or inferior.

[114] Merck Mem. at 17-18.  Citing *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 179-80 (3d Cir. 2000), and arguing that Plaintiffs' claims are "self-inflicted," Merck appears to equate Plaintiffs, which provide comprehensive prescription drug coverage to their members as a core aspect of their business, to card-counting card players.  This is truly a stretch.

for which the defendant bears the burden of proof,[115] and which typically involves questions of fact not proper for resolution on a motion to dismiss.[116]  Moreover, the actions Merck suggests, including refusing to cover the Merck Drugs outright, imposing onerous reporting, step therapy or prior authorization requirements on their members, and re-writing their contracts with insureds and network pharmacies, are all burdensome, unreasonable, and ineffective steps Plaintiffs should not be forced to take to protect themselves from Merck's unlawful conduct.[117]

### B.   Plaintiffs adequately plead mail and wire fraud.

#### 1.   Plaintiffs satisfy Rule 9(b)'s particularity requirement.

Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff to state with particularity "circumstances constituting fraud or mistake."[118]  Its purpose "is to provide notice of the 'precise misconduct' with which defendants are charged and to prevent false or unsubstantiated charges."[119]  Plaintiffs need not "plead the 'date, place or time' of the fraud, so

---

[115] *See*, *e.g.*, *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 258-59 (3d Cir. 2008).  A defendant must typically demonstrate, *inter alia*, "what *reasonable* actions the plaintiff ought to have taken." *Id.* at 258-59 (emphasis added).

[116] *See*, *e.g.*, *id.* at 257.

[117] The Eleventh Circuit's decision in *Ironworkers*, 634 F.3d 1352, is distinguishable.  There, the manufacturer argued that insurers could avoid paying for off-label prescriptions by instituting preauthorization review (a case-by-case determination of the necessity and appropriateness of a prescription prior to its being filled). *Id.* at 1366.  Noting that this process generally "require[s] either new personnel or the hiring of an agent as well as other new administrative costs," the court nevertheless determined the insurers should have adopted such measures because they made an "important" confession in their complaint that they already had an operative preauthorization system and had simply made a conscious decision not to utilize it.  Here, there is nothing on the face of Plaintiffs' complaint establishing that Plaintiffs already have procedures in place that could effectively block the use of co-pay subsidies.  Nor does a TPP "assume the risk" that it will pay for subsidized prescriptions because pharmacy network contracts specifically require the collection of the co-pay from the insured as a condition of coverage.

[118] FED. R. CIV. P. 9(b).  Fraudulent intent "may be alleged generally." *Id.*

[119] *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (quoting *Seville Indus. Mach. v. Southmost Mach.*, 742 F.2d 786, 791 (3d Cir. 1984)).

long as they use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'"[120]  Plaintiffs have done so.

Specifically, Plaintiffs allege that the co-pay subsidy enterprises disguise co-pay subsidies for the Merck Drugs as secondary insurance to prevent TPPs from discovering that their insureds are relieved from paying the full amount of their co-pays.[121]  The enterprises accomplish this through fraudulent omissions and misrepresentations made by pharmacies to Plaintiffs and other TPPs (through their PBMs) using the electronic claims adjudication process at the point of sale.[122]  These omissions and misrepresentations prevent TPPs from denying claims for subsidized prescriptions and force TPPs to pay undiscounted rates for the co-pay subsidy drugs, allowing Merck to reap profits from increased utilization at TPPs' expense.[123] Plaintiffs have therefore notified Merck of the precise misconduct with which it is charged, identifying the specific programs at issue, the provisions directing pharmacists how to misrepresent the co-pay subsidies as secondary insurance, the specific data fields through which the fraudulent misrepresentations and omissions are transmitted, and the consequences of the fraud.[124]

---

[120] *Id.*  Merck's authorities do not support a more stringent pleading requirement, recognizing that plaintiffs can use such alternative means.  *Kolar v. Preferred Real Estate Invs., Inc.*, 361 Fed. Appx. 354, 363 n.8 (3d Cir. 2010); *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004).

[121] *See* CAC ¶¶ 3, 26, 59-60, 79, 92, 101, 111, 116, 118, 124-28, 178-79.

[122] *Id.*

[123] *See id.* ¶¶ 3, 13-15, 21, 31, 59, 132, 167-69, 192-93.

[124] Merck's "examples" of allegedly missing details, Merck Mem. at 24, are red herrings.  As discussed *supra* at III.A, the names of the prescribing physicians are not relevant to Plaintiffs' claims.  Moreover, Plaintiffs have conducted extensive research to identify the applicable time periods.  CAC ¶¶ 73, 86, 98, 108.  The class periods they allege incorporate these dates.  *Id.* ¶ 145.  Plaintiffs have also alleged that, had the information not been concealed from them, they would have refused payment for the Merck Drugs at the point of sale.  *See, e.g.*, *id.* ¶ 167. Requiring Plaintiffs to allege as much with respect to a particular beneficiary – especially under these circumstances – would far exceed the requirements of Rule 9(b).

Plaintiffs also adequately identify Merck's use of mail and wire services in furtherance of its schemes.  Courts relax the particularity rule, "'in cases of corporate fraud, [where] plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs.'"[125] Plaintiffs allege four co-pay subsidy schemes, each of which necessarily involves tens, if not hundreds, of thousands of separate instances of use of the U.S. mail or wire services.[126]  Merck uses the Internet and mail to market its co-pay subsidy programs, its participants sign up for the programs online, it provides program cards to consumers and pharmacies using the U.S. mail and wire services, its method of administering the co-pay subsidies expressly contemplates communications by and between pharmacies and McKesson through shadow adjudications processed over pharmacy data networks, and it uses the mail and wires to send money to McKesson, who then sends it to pharmacies to reimburse them for accepting the co-pay subsidies.[127]  Merck and McKesson know details regarding each specific use of the mail or wires; this information is peculiarly within their knowledge or control.[128]  These allegations are sufficient to put Merck on notice of the types of transactions without necessitating that Plaintiffs plead the particulars for each transaction.[129]

---

[125] *Hunt Constr. Group Inc. v. Farina*, No. 11-4933, 2012 U.S. Dist. LEXIS 2676, at *14-15 (D.N.J. Jan. 10, 2012); *see also Kaiser Found. Health Plan, Inc. v. Medquist, Inc.*, No. 08-cv-4376, 2009 U.S. Dist. LEXIS 29124, at *16-23 (D.N.J. Apr. 8, 2009).

[126] *See* CAC ¶¶ 159-62, 180-90, 197-200.

[127] *Id*. ¶¶ 27, 56, 59, 77,79, 91-92, 100-01, 110-11, 117-18, 125-28, 184-88.

[128] *See, e.g., id.* ¶¶ 5, 118, 119 (chief trade relations officer at ESI: "'[t]he payer doesn't know, and the P.B.M. doesn't know. . . . We have no ability to stop it and no ability to prohibit it.'"), ¶¶ 129-30 (discussing reports that McKesson and Merck utilize to "'track[ ] and measur[e] program results'" and other "'comprehensive data analytics'" offered by McKesson), ¶¶ 132, 148.

[129] *See, e.g., Kaiser*, 2009 U.S. Dist. LEXIS 29124, at *16-23; *Prudential Ins. Co. of Am. V. Nat. Gypsum Co.*, 711 F. Supp. 1244, 1263 (D.N.J. 1989).  Merck's argument to the contrary notwithstanding, *see* Merck Mem. at 23, Plaintiffs adequately allege the fraud as implemented against Plaintiffs specifically.  Not only do the machinations of the fraudulent conduct apply equally to Plaintiffs as to other TPPs, but Plaintiffs have specifically alleged how they have been

Merck suggests that the Third Circuit's decision in *Shapiro v. UJB Financial Corporation* requires Plaintiffs to survey the 67,000 pharmacies in operation in the United States or each of their beneficiaries to gather individual transactional data.[130] Beyond being administratively and practically impossible, the Third Circuit requires no such thing. Where a complaint contains only a "boilerplate allegation" that defendants are in exclusive control of the information detailing the fraud, plaintiffs must provide information on specific pre-dispute efforts to obtain information to satisfy Rule 9(b)'s heightened pleading requirements.[131] That is not the case here. Here, Plaintiffs (a) allege that Merck and McKesson are "in exclusive possession of" detailed information regarding subsidized transactions,[132] and (b) support this allegation with more than 100 paragraphs detailing how the unlawful co-pay subsidy programs operate and how information on their use is concealed from all but Merck and McKesson, including a statement from nation's largest PBM indicating that TPPs have no way of knowing when the co-pay subsidies are used.[133] This far exceeds "a boilerplate allegation" that Merck and McKesson have exclusive possession of the transaction data, and they need not go further.[134]

---

impacted by that fraud. *See, e.g.*, CAC ¶¶ 13-18 (specific impact allegations), ¶¶ 53 & 133-34 (specific allegations concerning Plaintiffs' PBM). *Lum* does not support a contrary conclusion; there, plaintiffs failed even to allege that the named plaintiffs were impacted by the defendants' false representations. 361 F.3d at 225-26.

[130] Merck Mem. at 25 (citing *Shapiro*, 964 F.2d 272, 285 (3d Cir. 1992)).

[131] *United States v. Payment Processing Ctr., LLC*, 2006 U.S. Dist. LEXIS 75715, at *15, 19-20 (E.D. Pa. Oct. 18, 2006).

[132] CAC ¶ 20.

[133] *Id.* ¶¶ 26-133.

[134] Merck's citation to *Piacentile v. Sanofi Synthelabo, Inc.*, No. 05-2927, 2010 U.S. Dist. LEXIS 137895 (D.N.J. Dec. 30, 2010) for the proposition that a relaxed pleading standard is not appropriate "[w]here a third party possesses information regarding the allegations in the complaint," Merck. Mem. at 24-25, is not persuasive, as not only is it far from clear that the court's reasoning applies outside the False Claims Act context, but the court itself noted authority for the proposition that "where the alleged false claims were submitted not by the

### 2.     Plaintiffs allege Merck engaged in fraudulent schemes.

Through a shadow claims system, Merck and McKesson go to great lengths to conceal the use of Merck's co-pay subsidy programs in any given transaction.  The fact that TPPs generally know the co-pay subsidy programs exist does not change this.

The cases Merck relies on are easily distinguishable.  For example, in *Boyle v. D'Onofrio*, plaintiffs admitted that certain statements were not intended to deceive them and otherwise alleged misrepresentations or omissions that involved no element of deception.[135] Here, Plaintiffs allege Merck and McKesson purposefully structured the co-pay subsidy programs so that pharmacies would process the subsidies as secondary insurance[136] to disguise their use from TPPs, such that TPPs like Plaintiffs incorrectly "assume[ ] the pharmacy collected the personal cost-share obligation from the member pursuant to its contractual duties."[137] Merck's processing instructions require misrepresentations and omissions by pharmacists and are clearly intended to deceive TPPs; otherwise the TPPs would know that the co-pays had not been collected from the insureds and refuse payment for the subsidized drugs.[138]  In *Mehling v. New York Life Insurance Co.*, the plaintiffs did not allege *any* specific misrepresentations.[139]  The

---

defendant, but by a third party instead, . . . the relator *need not* allege the details of particular claims, so long as the complaint as a whole is sufficiently particular to pass muster under the FCA."  *Id.* at *21 (emphasis added) (collecting authorities).

[135] 99 F. Supp. 2d 541, 546-49 (D.N.J. 2000) (noting, as to the scheme discussed by Merck, that "even if the alleged plan had remained secret, it would still not constitute fraud because of the lack of the fraudulent misrepresentations or omission"), *aff'd*, 254 F.3d 1077 (3d Cir. 2011).

[136] That Merck may states its subsidies are "'not insurance'" in the terms and conditions of its coupons is furthermore of no import.  Plaintiffs do not contend that the co-pay subsidies are insurance, but allege that Merck intentionally and deceptively causes them to be disguised as valid secondary insurance at the point of sale.

[137] CAC ¶ 5.

[138] *Id.* ¶ 167.

[139] *See* 163 F. Supp. 2d 502, 509 (E.D. Pa. 2001).  Merck's argument that its instructions to

same cannot be said here.

Merck's argument that neither it nor pharmacies have a "legal duty to notify Plaintiffs" when co-pay subsidies are used and that it cannot be liable for fraud absent such an affirmative duty[140] is also without merit.  For a RICO claim based on mail and wire fraud, fraud "may be effected by deceitful statements of half-truths or the concealment of material facts."[141]  Here, Plaintiffs do not just allege that pharmacies fail to disclose the use of a Merck co-pay subsidy in connection with a particular transaction, but that, at the direction of Merck and McKesson, they process the subsidy as insurance to conceal it from the TPP.[142]

Plaintiffs' allegations are sufficient even if a duty to disclose is required.  A common law duty to disclose may arise where (1) the other party is about to enter into the transaction under a mistake as to facts that are "basic to the transaction" and – "because of the relationship between

---

"patients to disclose the use of a coupon to their insurers" provide some sort of safe harbor, Merck Mem. at 20, is similarly meritless.  This disclosure is buried in the fine print and is illogically directed at insureds when it is pharmacists who typically submit reimbursement requests to TPPs through systems that insureds cannot access.  CAC ¶¶ 57, 79, 92, 101, 111.  Thus, even in the unlikely event insureds read the disclaimer, they are in no position to carry out its directions at the point of sale.  Moreover, courts look with skepticism on such self-serving fine print disclosures.  *See, e.g.*, *Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 944-45 (8th Cir. 2007).

[140] Merck Mem. at 21-22.

[141] *United States v. Olatunji*, 872 F.2d 1161, 1167 (3d Cir. 1989).

[142] *See, e.g.*, *supra* n.7.  Although Merck attempts to shield itself from liability by arguing that Plaintiffs have not alleged *Merck* had a duty to disclose, Plaintiffs clearly allege that pharmacies have such a duty and that Merck directs them to fraudulently process its co-pay subsidies as secondary insurance.  A person commits wire or mail fraud if, in furtherance of a fraudulent scheme, he *causes* an interstate or international wire communication or mailing to be made; the defendant need not personally send the mailing or even intend that it be sent, so long as he acts with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen."  *See Pereira v. United States*, 347 U.S. 1, 8-9 (U.S. 1954).  Neither can Merck seek refuge in Judge Oetken's decision in *American Federation of State, County, and Municipal Employees District Council 37 Health & Security Plan v. Bristol-Myers Squibb Co.*, as that decision addressed theories of liability and injury not advanced here.  No. 1:12-cv-02237, 2013 U.S. Dist. LEXIS 77667 (S.D.N.Y. June 3, 2013), *reconsideration denied by* 2013 U.S. Dist. LEXIS 93026 (S.D.N.Y., July 2, 2013).

them, the customs of the trade or other objective circumstances" – "would reasonably expect a disclosure of those facts,"[143] or (2) where matters are known to a party that are "necessary to prevent a partial or ambiguous statement of the facts from being misleading."[144]

Here, pharmacy network agreements require, as a condition of reimbursement, the collection of co-pays directly from TPPs' insureds.[145]  The pharmacy's role is simple; it collects the prescription and applicable co-pay from the insured and gives the insured the drug.  The failure to perform one of these essential steps is information that is "basic to the transaction," "goes to the basis, or essence, of the transaction," "is an important part of the substance of what is bargained for or dealt with," and its existence "frustrates a key purpose of the transaction."[146]  By submitting payment requests to TPPs, pharmacies implicitly state that the provisions in the pharmacy network agreements are complied with.[147]  The implication is misleading where the pharmacies possess information that would materially impact this impression.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that Merck's motion be denied.

---

[143] *Viking Yacht Co. v. Composites One LLC*, 496 F. Supp. 2d 462, 472 (D.N.J. 2007) (internal quotations omitted) (citing the Restatement (Second) of Torts § 551(2)(e) and noting that New Jersey has adopted the reasoning thereof)).

[144] *United States v. Basroon*, 38 Fed. Appx. 772, 779 (3d Cir. 2002) (citing the Restatement (Second) of Torts § 551(b) (1977) and noting that the disclosure of material information prior to the consummation of a transaction "[is] necessary to prevent someone from being misled by a 'partial or ambiguous' statement").

[145] *See supra* n.3.

[146] *See United Nat. Ins. Co. v. Aon Ltd.*, No. 04-539, 2008 U.S. Dist. LEXIS 61453, at *15-17 (E.D. Pa. Aug. 8, 2008) (citing the Restatement (Second) of Torts § 551(e) and cmt. j).

[147] *See* CAC ¶ 5.

Dated: November 22, 2013     CARELLA BYRNE CECCHI
            OLSTEIN BRODY & AGNELLO, P.C.
            Attorneys for Plaintiffs

            By:  /s/ James E. Cecchi
              JAMES E. CECCHI


            Thomas M. Sobol
            Lauren Guth Barnes
            HAGENS BERMAN SOBOL SHAPIRO LLP
            55 Cambridge Parkway, Suite 301
            Cambridge, MA 02142
            (617) 482-3700

            Jennifer Fountain Connolly
            HAGENS BERMAN SOBOL SHAPIRO LLP
            1629 K St. NW, Suite 300
            Washington, D.C.  20006
            (202) 355-6435

            Steve W. Berman
            Barbara A. Mahoney
            HAGENS BERMAN SOBOL SHAPIRO LLP
            1918 Eighth Ave., Suite 3300
            Seattle, WA 98101
            (206) 623-7292
            Fax. (206) 623-0594

            Kenneth A. Wexler
            Bethany R. Turke
            Dawn M. Goulet
            Aaron Chait
            Catherine C. Howlett
            WEXLER WALLACE LLP
            55 West Monroe St., Suite 3300
            Chicago, IL 60603
            (312) 346-2222

            Jeffrey L. Kodroff
            SPECTOR ROSEMAN KODROFF &
            WILLIS PC
            1818 Market Street, Suite 2500
            Philadelphia, PA 19103
            (215) 496-0300

James G. Stranch, III
J. Gerard Stranch IV
Joe P. Leniski, Jr.
Michael J. Wall
BRANSTETTER STRANCH & JENNINGS
PLLC
227 Second Svenue North, 4th Floor
Nashville, TN 37201
(615) 254-8801

Lisa J. Rodriguez
Nciole M. Acchione
SCHADER & LEWIS
220 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002
(856) 482-5222
*Counsel for Plaintiffs Plumbers and
Pipefitters Local 572 Health and Welfare
Fund*

Jeffrey A. Leon
COMPLEX LITIGATION GROUP LLC
513 Central Avenue, Suite 300
Highland Park, IL 60035
(847) 433-4500

*Counsel for United Food and Commercial
Workers International Union, Local 464A
Health and Welfare Fund and the Classes*