<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL 572 HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated, | : : : : : | Civil Action No. 12-1379 (MAS) (LHG) |
| Plaintiff, | : : | |
| v. | : : | |
| MERCK & CO., INC., | : : | |
| Defendant. | : : | |
| UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 464A HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated, | : : : : : : | Civil Action No. 12-3652 (MAS) (LHG) |
| Plaintiff, | : : | **MEMORANDUM OPINION** |
| v. | : : | |
| MERCK & CO., INC., | : : | |
| Defendant. | : | |

<u>**SHIPP, District Judge**</u>

Defendant Merck & Co., Inc., ("Merck" or "Defendant") moves to dismiss the Consolidated Amended Class Action Complaint ("Amended Complaint" or "CAC") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Def.'s Mot., ECF No. 79.)[1] Plaintiffs Plumbers and Pipefitters Local 572 Health and Welfare Fund and United Food and

---

[1] ECF citations reference entries on the docket for civil action number 12-1379.

Commercial Workers International Union, Local 464A Health and Welfare Fund, (collectively, "Plaintiffs") filed opposition (Pls.' Opp'n, ECF No. 81), and Defendant replied (Def.'s Reply, ECF No. 82). The Court has carefully considered the parties' submissions and decided the matter without oral argument pursuant to Local Civil Rule 78.1.

I.   **Background**

    A.    **Overview**

This putative class action concerns the so-called "co-payment subsidies" that Merck offers for five of its name-brand prescription drugs – Janumet, Januvia, Nasonex, Vytorin and Zetia (collectively, the "Subsidized Drugs"). The Court's April 29, 2013 Memorandum Opinion discussed the subsidy programs in some detail. Essentially, Merck distributes discount cards that consumers present at the pharmacy to receive discounts of $15 to $20 on each Drug prescription they fill. The amount of the discounts roughly corresponds to the co-payments prescription benefits plans charge to their members. As a result, plan members who participate in the subsidy programs pay little or nothing for the Subsidized Drugs. The subsidies do not, however, reduce the cost of the Subsidized Drugs to the members' plans, which end up paying substantially more than they would for a generic alternative.

Plaintiffs operate prescription benefits plans. The gravamen of their various claims against Merck is that the subsidy programs are designed to force "Plaintiffs and thousands of other third-party payors ("TPPs") to pay for Defendant's branded drugs . . . when TPPs could and would pay for less-expensive therapeutic alternatives." (CAC ¶ 1.)

    B.    **Dismissal of Plaintiffs' Original Complaints**

In April 2013, this Court concluded that Plaintiffs' initial Complaints failed to plead sufficient facts to establish Article III standing. In the absence of facts showing the subsidy programs "had [a] direct effect on the prescribing activities of Plaintiffs' members' physicians,"

2

the Court held, Plaintiffs could not establish an injury traceable to Merck's conduct. (Mem. Op., ECF No. 55, 11, 14.) Based on this defect, the Court dismissed both Complaints in their entirety, but permitted Plaintiffs to amend their claims. (Order, ECF No. 56.)

      C.     **The Amended Complaint**

The Amended Complaint describes what amounts to a tug-of-war that pits Plaintiffs and their allies, the pharmacy benefit managers (PBMs), against Merck and its ally, non-party McKesson Corporation, a drug distribution company allegedly in charge of administering the subsidy programs. (CAC ¶ 11, 115-16.) In the center are the retail pharmacies that sell prescription drugs to Plaintiffs' members. A brief explanation of each party's alleged role in this controversy is necessary to discuss the legal theories underlying Plaintiffs' claims.

Plaintiffs and other TPPs that provide prescription drug benefits use copayments to encourage members to choose generic alternatives to expensive name-brand drugs produced by companies like Merck. (CAC ¶¶ 2, 47.) Many TPPs have introduced multi-tiered copayment structures that allow members to pay a nominal sum to fill generic prescriptions, while imposing $10 or $20 co-payments on brand-name equivalents. (CAC ¶¶ 40-46.)

TPPs hire PBMs to administer their prescription benefits plans and enter into contracts with retail pharmacies that sell Defendant's prescription drugs to the TPPs' members. (*Id.* at ¶ 50.) The PBMs' standardized "pharmacy network agreements" and pharmacy network manuals are designed to protect the TPPs' interests. (CAC ¶ 53.) The Amended Complaint cites a passage from a 2005 PBM manual that defines "Copay" as "[t]hat portion of the total charge for each prescription drug which a Member is required to pay the Pharmacy in accordance with the Member's Prescription Drug Program." (*Id.* (emphasis omitted).) Plaintiffs contend that standard provisions like this one forbid retail pharmacies from accepting copayment subsidies.

In 2008, Merck began offering copayment subsidies to counteract the TPPs' promotion of generics. As administrator of Merck's subsidy program, McKesson instructs retail pharmacies to process discount cards as if they were secondary insurance benefits. (CAC ¶¶ 59, 117-20.) Secondary insurance claims are submitted after primary insurance claims have already been processed. As a result, Plaintiffs and other TPPs have no way of knowing when these purported secondary insurance claims are submitted. (*Id.* at ¶¶ 29, 57-58, 118-19.)

This method of processing the subsidies forms the basis for Counts One through Eight of the Amended Complaint, in which Plaintiffs accuse Merck of committing, and conspiring to commit, a pattern of wire and mail fraud violations under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* 18 U.S.C. §§ 1962(c)-(d), 1964(c). Counts Nine and Ten assert common law claims based on Merck's on alleged tortious interference in the contracts between PBMs and retail pharmacies.

## II.   Analysis

Merck contends that Plaintiffs have again failed to establish standing in their Amended Complaint. In the alternative, Merck attacks the sufficiency of Plaintiffs' individual causes of action. The Court considers these challenges in turn.

### A.   The Amended Complaint Adequately Alleges Standing

A motion to dismiss based on "standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.") Because Merck's motion is founded solely on the pleadings, it constitutes a "facial" challenge to this Court's jurisdiction. *See In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) ("*Schering III*").

Accordingly, the Court must construe the Amended Complaint in the light most favorable to Plaintiffs. *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2003).

The three components of standing are (i) injury, (ii) traceability, and (iii) redressability. *Lujan*, 504 U.S. at 560-61. In other words, a "plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014).

The first element, an "injury in fact," requires "the party bringing suit [to] show that the action injures him in a concrete and personal way." *Lujan*, 504 U.S. at 581 (Kennedy, J., concurring in part and concurring in judgment). If the injury "prong focuses on *whether* the plaintiff suffered harm, then the traceability prong focuses on *who* inflicted that harm." *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009). Traceability refers to a "causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal citations omitted); *see also Schering III*, 678 F.3d at 248-49 (plaintiff must allege facts showing injury "*because of*" defendant's misconduct). An "indirect causal relationship will suffice so long as there is a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant." *Toll Bros. Inc.*, 555 F.3d at 142 (internal citations omitted).

Plaintiffs attempt to cure the defect identified in the Court's April 2013 decision by narrowing the scope of their alleged injury. (*Cf.* CAC ¶¶ 20, 26, 28.) Plaintiffs now contend that their injuries occur at the point-of-sale, when copayment subsidies persuade a member "to fill [a]

5

prescription." (Pls.' Br., ECF No. 40, 5.) In their opposition to Defendant's motion, Plaintiffs explain that:

> co-pay subsidies target *patients*, not physicians; the programs are designed to (a) reduce the number of prescriptions that patients who already have prescriptions for [Subsidized Drugs] abandon at the pharmacy counters, and (b) increase *utilization, i.e.*, the number of prescriptions for the Merck Drugs that those *patients* actually choose to fill.

(*Id.*)

The Court agrees that Plaintiffs' claim survives Rule 12(b)(1) scrutiny on the basis of this limited theory. The Amended Complaint alleges that the number of claims Plaintiffs' members submitted for the Subsidized Drugs increased considerably in 2008 and 2009.[2] (CAC ¶ 14-18.) The increase in claims roughly corresponds with Merck's introduction of the subsidy programs. (*Id.* at ¶ 10.) While this correlation may be coincidence, it is sufficient to establish traceability at this stage of the litigation. *See Pub. Interest Research Grp. v. Powell Duffryn Terminals*, 913 F.2d 64, 72 (3d Cir. 1990) ("A plaintiff need not prove causation with absolute scientific rigor to defeat a motion for summary judgment.").

Accordingly, Defendant's motion to dismiss the Amended Complaint under Rule 12(b)(1) is denied.

### B. The Amended Complaint's Individual Claims

A district court conducts a three-part analysis when considering a Rule 12(b)(6) motion. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual

---

[2] The CAC provides transactional data for several Subsidized Drugs. (*See* CAC ¶¶ 14-19.) For example, Plumbers allegedly paid $3,612.33 for 59 prescriptions of Nasonex in 2007, before Merck began offering copayment subsidies, and, after the program's launch, paid $8,531.13 for 99 prescriptions in 2009. (*Id.* at ¶ 14.)

allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). Defendant bears the burden of showing that no claim has been presented. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

### i. RICO Claims

To plead a substantive RICO violation, a plaintiff must allege "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013). To satisfy the RICO pattern element, plaintiff must allege that Defendant either committed, or agreed to commit, at least two of the predicate acts set forth in 18 U.S.C. § 1961(5). *District 1199P Health and Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 527 (D.N.J. 2011). "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). Moreover, where mail or wire fraud is a RICO predicate, the complaint is judged under Rule 9(b) of the Federal Rules of Civil Procedure. *Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594, 598 (D.N.J. 2000).

The Amended Complaint alleges that Merck conducted the affairs of the "co-pay subsidy enterprises" – association-in-fact enterprises comprised of Merck, the retail pharmacies, and McKesson – through a pattern of "acts that are indictable under 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud)." (CAC ¶ 176.) Plaintiffs' RICO claims fail because the

Amended Complaint (i) does not identify specifically which "acts" are alleged to constitute fraud, and (ii) fails to plead the requisite causal relationship between the predicate acts and Plaintiffs' injury.

Under Rule 9(b), fraud pleadings must provide the defendant precise notice of the misconduct alleged. The plaintiff may furnish the requisite detail through averments pinpointing the "'date, place or time' of the fraud, or through [some] 'alternative means of injecting precision and some measure of substantiation'" into the claim. *Crozier v. Johnson & Johnson Consumer Cos.*, 901 F. Supp. 2d 494, 506 (D.N.J. 2012) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)).

Here, the Amended Complaint accuses Merck of conducting the affairs of the copayment subsidy enterprises through two "intentional schemes to defraud." (CAC ¶¶ 177-78.) Plaintiffs allege:

> 177.   The co-pay subsidy enterprises engaged in intentional schemes to defraud Plaintiffs and the classes by interfering with their cost-sharing provisions[] enforced through the PBMs' contracts with network pharmacies. . . .
>
> 178.   The co-pay subsidy enterprises engaged in separate but related intentional schemes to defraud Plaintiffs and the classes by causing misrepresentations to be made via the wires in connection with the point-of-sale transactions.

(*Id.*) Thus, Plaintiffs not only omit the date, place, or time of a predicate misrepresentation, they barely hint at the subject of the misrepresentations in question. *Cf. Livingston*, 98 F. Supp. 2d at 597 (observing that mail or wire fraud "scheme must involve some sort of fraudulent misrepresentation or omission") (internal quotation marks omitted).

Plaintiffs are more explicit in their opposition to Defendant's motion. There they assert that the Amended Complaint "[s]pecifically . . . allege[s] that the co-pay subsidy enterprises disguise co-pay subsidies for the Merck Subsidized Drugs as secondary insurance to prevent

TPPs from discovering that their insureds are relieved from paying the full amount of their co-pays." (Pls.' Opp'n, 25.) In providing this information, however, Plaintiffs essentially concede that Defendant's "fraud" is too remote from Plaintiffs' injury to satisfy RICO's causation requirement. As Plaintiffs explain in their Amended Complaint, the subsidies are not processed as secondary insurance until after the pharmacist has transmitted the insured's prescription to the TPP or PBM, and the TPP or PBM has wired back the amount of the insured's co-payment. (CAC ¶¶ 57-58.) The fact that the insured has secondary insurance, or a subsidy disguised as a secondary insurance, is never transmitted to the TPP or BPM. (*Id.*) As such, the method pharmacies use to process the co-pay subsidies – dishonest or not – is too "attenuated" from Plaintiffs' injury to support a RICO claim. *Hemi*, 559 U.S. at 10-11.

Nor may Plaintiffs allege an injury directly tied to the pharmacies' failure to disclose the subsidies in their initial transmission inasmuch as the Amended Complaint contains no indication that Plaintiffs could refuse to pay for the prescriptions of members who used the subsidy. *Cf. Am. Fed'n of State, Cnty. & Mun. Emps. Dist. Council 37 Health & Sec. Plan v. Bristol-Myers Squibb,* 948 F. Supp. 2d 338, 347 (S.D.N.Y. 2013) (finding "no active deception" in pharmacies' statements "—at least no more so than would be the case if an insured[s'] . . . rich uncle or a stranger on the street" paid the copayment).

Accordingly, the Plaintiffs' RICO claims must be dismissed.

        ii.    **Tortious Interference With Contract**

In order to state a claim for tortious interference with contract under New Jersey law, a plaintiff must establish: (1) the existence of the contract; (2) interference which was intentional and with malice; (3) the loss of the contract or prospective economic gain as a result of the

9

interference; and (4) damages.[3] *Amgro, Inc. v. Lincoln Gen. Ins. Co.*, 361 F. App'x 338, 345 n.9 (3d Cir. 2010) (quoting *Velop, Inc. v. Kaplan*, 693 A.2d 917, 926 (N.J. Super. Ct. App. Div. 1997)). Courts in this district have held that a "claim for tortious interference with contract [may] survive a motion to dismiss where a plaintiff alleges the existence of a contract but does not plead specific facts identifying it." *IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-4992, 2012 WL 4050298, at *9 (D.N.J. Sept. 13, 2012) (citing *Syncsort Inc. v. Innovative Routines Int'l*, No. 04-3623, 2005 WL 1076043, at *12 (D.N.J. May 6, 2005)). Accepting the well-pled facts alleged in Plaintiffs' Complaint as true, the Court finds that Counts Nine and Ten of the Amended Complaint state facially sufficient tortious interference claims.

Plaintiffs allege that "PBMs retained by Plaintiffs" had "valid and enforceable contracts" with the retail pharmacies that required the pharmacies to collect co-payments directly from patients. (CAC ¶¶ 2, 211, 213.) Furthermore, Plaintiffs allege that Defendant induced the pharmacies to participate in the subsidy programs, despite its knowledge of these contracts, and to Plaintiffs' financial detriment. (CAC ¶¶ 52-56.) Although the Court does not accept Plaintiffs' claim that Defendant's conduct was "fraudulent" (Pls.' Opp'n 17), the Court is equally unprepared to accept Merck's characterization of the subsidy programs "as legitimate business activities that enabled patients to better afford their Merck medicines." (Def.'s Br. 29).

Accordingly, Merck's motion to dismiss Counts Nine and Ten of the Amended Complaint is denied.

---

[3] Neither party opposes the application of New Jersey law to Plaintiffs' common law claims of tortious interference of contract. (Pls.' Opp'n 7.)

### III.     Conclusion

For the reasons set forth above, and for other good cause shown, Defendant's motion to dismiss is granted with respect to Counts One through Eight, which are dismissed without prejudice. Defendant's motion is denied with respect to Counts Nine and Ten. An appropriate Order follows.

/s Michael A. Shipp
**Michael A. Shipp**
**United States District Judge**

**Dated:** June 30, 2014